## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CHANDRA CATES and KELLY STUART, individually and as representatives of a class of participants and beneficiaries of the Retirement Plan for Officers of Columbia University, and the Columbia University Voluntary Retirement Savings Plan,

*Plaintiffs*,

v.

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK (better known as COLUMBIA UNIVERSITY), JEFFREY SCOTT, LUCINDA DURNING, LOUIS BELLARDINE, WILLIAM L. INNES, BARBARA HOUGH, AND DIANE L. KENNEY,

*Defendants*.

Civil Action No. 16-cv-6524

COMPLAINT—CLASS ACTION

JURY TRIAL DEMANDED

## COMPLAINT

1.     Plaintiffs Chandra Cates and Kelly Stuart, individually and as representatives of a class of participants and beneficiaries of the Retirement Plan for Officers of Columbia University and the Columbia University Voluntary Retirement Savings Plan (collectively "Plans"), brings this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plans against Defendants the Trustees of Columbia University in the City of New York (better known as Columbia

University), Jeffrey Scott, Lucinda Durning, Louis Bellardine, William L. Innes, Barbara Hough, and Dianne L. Kenney for breach of fiduciary duties under ERISA.[1]

2.     The duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to act with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As fiduciaries to the Plans, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plans' investments are prudent.

3.     The marketplace for retirement plan services is established and competitive. Billion-dollar-defined contribution plans, like the Plans, have tremendous bargaining power to demand low-cost administrative and investment management services. Instead of using the Plans' bargaining power to benefit participants and beneficiaries, Defendants allowed unreasonable expenses to be charged to participants for administration of the Plans, and retained investments with excessive costs and poor performance compared to available alternatives.

4.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty and to restore to the Plans any profits made through Defendants' use of the Plans' assets. In addition,

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

Plaintiffs seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## JURISDICTION AND VENUE

5.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

6.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plans are administered, where at least one of the alleged breaches took place, and where at least one of the Defendants resides.

## PARTIES

### The Plans

7.     Columbia University maintains the "Columbia University Retirement Savings Program" to provide retirement income benefits for its faculty and other officers. The Program consists of two plans: the Retirement Plan for Officers of Columbia University ("Officers Plan"), and the Columbia University Voluntary Retirement Savings Plan ("VRSP").

8.     The Plans are defined contribution, individual account, employee pension benefit plans under 29 U.S.C. §1002(2)(A) and §1002(34). In a defined-contribution plan, the retirement benefit that an employee receives is limited to the value of the employee's individual account, which depends upon contributions to the plan, the performance of the funds in which the employee invests, and the fees and expenses charged to the account. The Plans are of the type commonly referred to as

3

"403(b) plans," which refers to the section of the Internal Revenue Code governing the taxation of such plans, 26 U.S.C. §403(b).

9.     The Officers Plan is funded by contributions made on employees' behalf by Columbia University, while the VRSP is funded by the employees' own elective contributions. As of December 31, 2014, the Officers Plan had over $2.8 billion in net assets, while the VRSP had over $1.8 billion in net assets. Each Plan is in the top 1% of all defined contribution plans in the United States based on asset size. Plans of such great size are commonly referred to as "jumbo plans."

10.     Upon information and belief, there is significant overlap between the individuals who participate in the Plans. As of December 31, 2014, the Officers' Plan had 27,309 participants with account balances; approximately 20,000 of those participants also had an account balance in the VRSP.

**Plaintiffs**

11.     Chandra Cates resides in New York, New York. She is a participant in the Plans under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plans. She has been a participant in the Plans since approximately 2008.

12.     Kelly Stuart resides in Brooklyn, New York. She is a participant in the Plans under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plans. She has been a participant in the Plans since approximately 2001.

4

## Defendants

13.     Columbia University is an independent, privately supported, nonsectarian institution of higher education, with its main campus in New York, New York. It is a non-profit New York corporation, and its official corporate name is "The Trustees of Columbia University in the City of New York." Columbia University is the plan sponsor under 29 U.S.C. §1002(16)(B).

14.     Columbia University's Vice President for Human Resources is the Plans' administrator under 29 U.S.C. §1002(16)(A)(i) and named fiduciary under §1102(a) with the authority to control and manage the operation and administration of the Plans. Since 2010, Jeffrey Scott, Lucinda Durning, Louis Bellardine, William L. Innes, Barbara Hough, and Diane L. Kenney have served in that role.

15.     Columbia University is a fiduciary to the Plans because it hired and appointed the Plan Administrator and named fiduciary of the Plans. Moreover, acting through its Board of Trustees and as described in more detail below, Columbia University exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of its assets, including by contracting with the Plans' recordkeepers and investment providers, and has discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii).

## FACTS APPLICABLE TO ALL COUNTS

### I.    Plan investments

16.    Columbia University makes core contributions to the Officers' Plan on behalf of eligible employees, and employees have the option of contributing a percentage of their pay to the VRSP. Core contributions are made regardless of whether the employee contributes to the VRSP. Columbia University also matches certain VRSP contributions up to a specified percentage. The matching contributions are made to the Officers' Plan.

17.    Participants elect how to allocate these contributions by selecting from a menu of Plan investment options. Defendants exercise exclusive authority and control over the available options. Defendants are responsible for selecting the Plans' investment options, reviewing and monitoring those options, and determining whether each option should be retained or removed from the Plans.

18.    Both Plans have offered an identical investment menu, which currently includes 116 investment options. These options include fixed dollar annuities issued by the Teachers' Insurance Annuity Association ("TIAA"), the TIAA Real Estate Account, various College Retirement Equities Fund ("CREF") variable annuities, and various registered investment companies (*i.e.*, mutual funds) offered by TIAA-CREF, Vanguard Fiduciary Trust Company, and Calvert Trust Company.

19.    Many of the Plans' mutual funds offer multiple share classes. The share classes are identical in nearly all respects. They invest in the same portfolio of securities and provide identical investment management; the only difference

between the share classes is cost. "Retail" shares are designed for small individual investors and charge much higher fees, resulting in lower net investment returns. "Institutional" shares are designed for investors with a large amount of assets to invest, such as multi-billion dollar retirement plans. As explained more fully in Part III, Defendants selected dozens of mutual funds in higher cost share classes for the Plans even though identical lower-cost versions of the same funds were available.

20.     The TIAA Traditional Annuity offered in both Plans is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

21.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plans. For example, some participants who invest in the TIAA Traditional Annuity must pay a 2.5% surrender charge if they withdraw their investment in a single lump sum within 120 days of termination of employment. Participants who wish to withdraw their savings without penalty can only do so by spreading the withdrawal over a *ten-year period*.

22.     Both Plans include eight CREF variable annuity accounts: CREF Stock Account, CREF Equity Index Account, CREF Growth Account, CREF Global Equities Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account. These

7

funds invest in underlying securities that correspond to their respective investment style. The value of the Plans' investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

23. The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

    a. "administrative expense" charge (24 bps);[2]

    b. "distribution expense" charge (9.5 bps);

    c. "mortality and expense risk" charge (0.5 bps); and

    d. "investment advisory expense" charge (ranging from 4 to 12.5 bps).

24. The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan, with the assets segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2013, these charges consisted of the following:

    a. "administrative expense" charge (26.5 bps);

    b. "distribution expense" charge (8 bps);

    c. "mortality and expense risk" charge (0.5 bps);

    d. "liquidity guarantee" (18 bps); and

    e. "investment management expense" charge (36.5 bps).

---

[2] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses are stated as of May 1, 2014.

8

25.    The remaining investment options in the Plans are mutual funds offered by TIAA-CREF, Vanguard, and Calvert. These funds charge varying amounts for investment management, and also charge for distribution, marketing, and other expenses, depending on the type of investment and share class.

26.    Mutual funds have shareholders who are not participants in either of the Plans, or any retirement plan, and who purchase shares as a result of the funds' marketing efforts. However, all shareholders in the mutual funds, including the participants in the Plans, pay the same expenses.

27.    As of year-end 2014, the Plans' combined $4.6 billion in assets was allocated as follows: $3.2 billion invested in 23 TIAA-CREF options (Officers: $2.073 billion, VRSP: $1.125 billion); $1.4 billion invested in 76 Vanguard options (Officers: $722.4 million, VRSP: $655.7 million), and $69 million invested in 21 Calvert options (Officers: $41.8 million, VRSP: $27.4 million).

## II.    Defendants caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA.

28.    Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined contribution plans like the Plans. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

29.    To ensure that plan administrative and recordkeeping expenses are reasonable for the services provided, prudent fiduciaries of large defined

contribution plans obtain competitive bids for these services at regular intervals of approximately three years.

30. The cost of recordkeeping services depends on the number of participants in a plan, not on the amount of assets in a plan or in a participant's account. It costs no more to keep records for a $75,000 account than a $5,000 account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount that is based on the total number of participants in the plan rather than as a percentage of plan assets. Otherwise, as plan assets grow due to participant contributions or investment gains, recordkeeping fees increase even though the services have remained the same.

31. Jumbo defined contribution plans, like the Plans, possess tremendous economies of scale for recordkeeping and administrative services. As the number of participants in a plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a large number of participants.

32. Some investments engage in a practice known as revenue sharing. In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based fees, if prudent fiduciaries use revenue sharing (or asset-based charges) to

pay for recordkeeping, they must monitor the total amount of revenue received by the recordkeeper to ensure that the recordkeeper is not receiving unreasonable compensation. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can quickly result in excessive compensation. The difference in cost between a mutual fund's retail and institutional share classes is often attributable to a larger amount of revenue sharing in the higher cost retail shares. Therefore, funds that share revenue may use these payments as kickbacks to induce recordkeepers to use the higher-cost retail share classes as plan investment options.

33.    Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

34.    According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. See LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[3]

35.    It is well known in the defined contribution industry that plans with dozens of choices and multiple recordkeepers "fail" based on two primary flaws:

---

[3] Available at
http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/
News_Center/Reports/130329-01exec.pdf.

**1. The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.
**2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[4]

36.     The benefits of using a single recordkeeper are clear:

By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[5]

37.     In a study titled "How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It," AonHewitt, an independent investment consultant, similarly recognized:

403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:

– Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.

– Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

– Leveraging aggregate plan size and scale to negotiate competitive pricing.

---

[4] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.
[5] *Id.*

AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[6]

38.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

> high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight…Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[7]

39.     Other industry literature makes the same points. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different

---

[6] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[7] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

recordkeepers.");[8] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[9]

40.  Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[10]

41.  Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants continued to contract with two separate recordkeepers for the Plans: TIAA-CREF and Vanguard. There was no loyal or prudent reason for Defendants to maintain this inefficient and costly structure of multiple recordkeepers, which has caused the Plans' participants to pay excessive and unreasonable fees for recordkeeping and administrative services.

---

[8] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[9] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[10] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

42.     The Plans' recordkeepers receive compensation through revenue sharing payments from the Plans' investments.

43.     Upon information, belief, and data from industry experts, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plans' TIAA-CREF and Calvert investments are set forth below.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |
| Calvert mutual funds, A class shares | 25–50 bps |

44.     Upon information and belief, Vanguard is compensated for recordkeeping services based on revenue sharing payments it receives from the higher-cost retail share classes of the Vanguard mutual funds that Defendants included in the Plans instead of the available lower-cost institutional class shares.

45.     In addition, TIAA-CREF and Vanguard also receive additional indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

46.     As noted, the Plans had approximately 27,000 unique participants with account balances as of year-end 2014 (about 20,000 of whom had an account in both Plans). Individuals with accounts in both Plans receive a single account statement. Based on the Plans' features, the nature of the administrative services

provided by the Plans' recordkeepers, and the recordkeeping market, a reasonable annual recordkeeping fee for these 27,000 participant Plans would have been approximately $950,000 in the aggregate for both Plans combined (based on a flat fee of $35 per participant).

47.    The Plans' annual reports filed with the Department of Labor (Form 5500) show that TIAA-CREF and Vanguard received indirect compensation from the Plans, but do not disclose the amount of that compensation. Upon information and belief regarding the amount of revenue sharing paid to each of the Plans' recordkeepers from their proprietary investment options and the Calvert mutual funds and the amount of Plan assets invested in each option, the Plans paid a net total of between $2.9 and $5.8 million per year for recordkeeping services from 2010 through 2014 (approximately $116 to $234 for each of the Plans' unique participants that year), up to *over six times higher* than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year. Although the Plans' annual reports for 2015 and 2016 are not yet publicly available, Plaintiffs allege upon information and belief that the Plans have continued to pay similarly excessive rates after 2014.

48.    Even when considered on a per-account basis rather than a per-participant basis, the Plans paid between $69 and $139 for the roughly 42,000 to 47,000 combined accounts in the Plans from 2010 through 2014, still up to four times higher than a reasonable market rate for these services, again resulting in millions of dollars in excessive recordkeeping fees each year.

16

49.     The impact of excessive fees on participants' retirement savings is dramatic. The U.S. Department of Labor has noted that just a 1% difference in annual fees makes a 28% difference in retirement assets over the course of a 35-year career. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013);[11] see also *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015)(noting that expenses can "significantly reduce the value of an account in a defined-contribution plan.").

50.     Upon information and belief, Defendants also failed to conduct a competitive bidding process for the Plans' recordkeeping services. Soliciting competitive bids would have shown Defendants that the amounts the Plans were paying were unreasonable and excessive, and would have allowed Defendants to negotiate a reduction in recordkeeping fees for the benefit of the Plans.

51.     By failing to monitor and control the compensation paid to TIAA-CREF and Vanguard for recordkeeping and administrative services, Defendants caused the Plans to pay unreasonable expenses for administration, resulting in Plan losses of at least $15–$20 million.[12]

## III.   Defendants failed to consider or offer dramatically lower-cost investments that were available to the Plans, including identical mutual funds in lower-cost share classes.

52.     Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken

---

[11] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

[12] The Plans' losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in the Plans' investments growing with the market.

into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[13] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs…in terms of net returns to investors, active investment must be a negative sum game.").

53.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; see also Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

54.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain

---

[13] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

55. Academic and financial industry literature further demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

56. Accordingly, investment costs are a paramount consideration in prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

57.     Similarly, when a given mutual fund offers multiple share classes that provide identical investment management, a prudent investor will select the available share class that charges the lowest fee, because doing so saves money and results in greater net investment returns. Jumbo retirement plans have massive bargaining power that enables them to avoid retail shares and obtain lower-cost institutional shares. Fiduciaries must wield that size to benefit their plans:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[14]

58.     Institutional investors can obtain institutional share class mutual funds that are less costly than retail shares, and jumbo investors like the Plans can obtain even lower-cost share classes. In addition, insurance company pooled separate accounts are available to jumbo defined contribution plans that can significantly reduce investment fees compared to mutual funds.

59.     Even if a plan's investment in a given fund does not meet the minimum investment threshold to qualify for an institutional share class, fund providers will routinely waive the investment minimum if a large plan requests it, particularly when the plan's total investment in the provider's platform is significant.

---

[14] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

60.     Defendants did not use the Plans' bargaining power to obtain the lowest-cost institutional share classes that were available to the Plans. Instead, for dozens of the Plans' mutual funds, Defendants selected and retained the higher cost retail share classes, even though a less expensive, but otherwise identical institutional share class was available.

61.     Identical, lower cost versions of the Plans' Vanguard mutual funds that were available to the Plans included the following:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard 500 Index (Inv) (VFINX) | 17 bps | Vanguard 500 Index (Instl Plus) (VIIIX) | 2 bps | 750.00% |
| Vanguard Asset Allocation (Inv) (VAAPX) | 27 bps | Vanguard Asset Allocation (Adm) (VAARX) | 19 bps | 42.11% |
| Vanguard Balanced Index (Inv) (VBINX) | 26 bps | Vanguard Balanced Index (Adm) (VBAIX) | 8 bps | 225.00% |
| Vanguard Capital Opportunity (Inv) (VHCOX) | 48 bps | Vanguard Capital Opportunity (Adm) (VHCAX) | 41 bps | 17.07% |
| Vanguard Developed Markets Index (Inv) (VDMIX) | 20 bps | Vanguard Developed Markets Index (Instl Plus) (VDMPX) | 6 bps | 233.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 35 bps | Vanguard Emerging Markets Stock Index (Instl) (VEMIX) | 15 bps | 133.33% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX)[15] | 33 bps | Vanguard Emerging Markets Stock Index (Instl Plus) (VEMRX) | 10 bps | 230.00% |
| Vanguard Energy (Inv) (VGENX) | 38 bps | Vanguard Energy (Adm) (VGELX) | 31 bps | 22.58% |
| Vanguard Equity-Income (Inv) (VEIPX) | 31 bps | Vanguard Equity-Income (Adm) (VEIRX) | 22 bps | 40.91% |
| Vanguard European Stock Index (Inv) (VEURX) | 26 bps | Vanguard European Stock Index (Instl) (VESIX) | 10 bps | 160.00% |
| Vanguard Explorer (Inv) (VEXPX) | 49 bps | Vanguard Explorer (Adm) (VEXRX) | 32 bps | 53.13% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 26 bps | Vanguard Extended Market Index (Instl Plus) (VEMPX) | 8 bps | 225.00% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 24 bps | Vanguard Extended Market Index (Instl Plus) (VEMPX) | 6 bps | 300.00% |
| Vanguard FTSE Social Index (Inv) (VFTSX) | 29 bps | Vanguard FTSE Social Index (Instl) (VFTNX) | 16 bps | 81.25% |
| Vanguard GNMA (Inv) (VFIIX) | 23 bps | Vanguard GNMA (Adm) (VFIJX) | 13 bps | 76.92% |
| Vanguard Growth & Income (Inv) (VQNPX) | 32 bps | Vanguard Growth & Income (Adm) (VGIAX) | 21 bps | 52.38% |

---

[15] Certain of the Plans' Vanguard funds are listed more than once because there were multiple available lower-cost share classes.

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Growth Index (Inv) (VIGRX) | 26 bps | Vanguard Growth Index (Instl) (VIGIX) | 8 bps | 225.00% |
| Vanguard Health Care (Inv) (VGHCX) | 36 bps | Vanguard Health Care (Adm) (VGHAX) | 29 bps | 24.14% |
| Vanguard High-Yield Corporate (Inv) (VWEHX) | 28 bps | Vanguard High-Yield Corporate (Adm) (VWEAX) | 15 bps | 86.67% |
| Vanguard Inflation-Protected Securities (Inv) (VIPSX) | 22 bps | Vanguard Inflation-Protected Securities (Instl) (VIPIX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index (Instl) (VBIMX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index (Instl Plus) (VBIUX) | 5 bps | 300.00% |
| Vanguard Intermediate-Term Investment-Grade (Inv) (VFICX) | 24 bps | Vanguard Intermediate-Term Investment-Grade (Adm) (VFIDX) | 11 bps | 118.18% |
| Vanguard Intermediate-Term Treasury (Inv) (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury (Adm) (VFIUX) | 12 bps | 108.33% |
| Vanguard International Growth (Inv) (VWIGX) | 49 bps | Vanguard International Growth (Adm) (VWILX) | 33 bps | 48.48% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 22 bps | Vanguard Long-Term Bond Index (Instl) (VBLLX) | 7 bps | 214.29% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 20 bps | Vanguard Long-Term Bond Index (Instl Plus) (VBLIX) | 5 bps | 300.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Long-Term Investment-Grade (Inv) (VWESX) | 26 bps | Vanguard Long-Term Investment-Grade (Adm) (VWETX) | 13 bps | 100.00% |
| Vanguard Long-Term Treasury (Inv) (VUSTX) | 25 bps | Vanguard Long-Term Treasury (Adm) (VUSUX) | 12 bps | 108.33% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 26 bps | Vanguard Mid Cap Index (Instl) (VMCIX) | 8 bps | 225.00% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 24 bps | Vanguard Mid Cap Index (Instl Plus) (VMCPX) | 6 bps | 300.00% |
| Vanguard Morgan Growth (Inv) (VMRGX) | 43 bps | Vanguard Morgan Growth (Adm) (VMRAX) | 29 bps | 48.28% |
| Vanguard Pacific Stock Index (Inv) (VPACX) | 26 bps | Vanguard Pacific Stock Index (Instl) (VPKIX) | 10 bps | 160.00% |
| Vanguard Prime Money Market (Inv) (VMMXX) | 23 bps | Vanguard Prime Money Market (Adm) (VMRXX) | 9 bps | 155.56% |
| Vanguard PRIMECAP (Inv) (VPMCX) | 45 bps | Vanguard PRIMECAP (Adm) (VPMAX) | 36 bps | 25.00% |
| Vanguard REIT Index (Inv) (VGSIX) | 26 bps | Vanguard REIT Index (Instl) (VGSNX) | 9 bps | 188.89% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 22 bps | Vanguard Short-Term Bond Index (Adm) (VBIRX) | 11 bps | 100.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 20 bps | Vanguard Short-Term Bond Index (Instl Plus) (VBIPX) | 5 bps | 300.00% |
| Vanguard Short-Term Federal (Inv) (VSGBX) | 22 bps | Vanguard Short-Term Federal (Adm) (VSGDX) | 12 bps | 83.33% |
| Vanguard Short-Term Investment-Grade (Inv) (VFSTX) | 24 bps | Vanguard Short-Term Investment-Grade (Instl) (VFSIX) | 9 bps | 166.67% |
| Vanguard Short-Term Treasury (Inv) (VFISX) | 22 bps | Vanguard Short-Term Treasury (Adm) (VFIRX) | 12 bps | 83.33% |
| Vanguard Small Cap Growth Index (Inv) (VISGX) | 26 bps | Vanguard Small Cap Growth Index (Instl) (VSGIX) | 8 bps | 225.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 26 bps | Vanguard Small Cap Index (Instl) (VSCIX) | 8 bps | 225.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 24 bps | Vanguard Small Cap Index (Instl Plus) (VSCPX) | 6 bps | 300.00% |
| Vanguard Small Cap Value Index (Inv) (VISVX) | 26 bps | Vanguard Small Cap Value Index (Instl) (VSIIX) | 8 bps | 225.00% |
| Vanguard Tax-Managed International (Inv) (VDVIX) | 20 bps | Vanguard Tax-Managed International (Instl) (VTMNX) | 7 bps | 185.71% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Instl) (VBTIX) | 7 bps | 214.29% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Instl Plus) (VBMPX) | 5 bps | 340.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Total International Stock Index (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index (Instl Plus) (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index (Inv) (VTSMX) | 17 bps | Vanguard Total Stock Market Index (Instl Plus) (VITPX) | 2 bps | 750.00% |
| Vanguard U.S. Growth (Inv) (VWUSX) | 45 bps | Vanguard U.S. Growth (Adm) (VWUAX) | 29 bps | 55.17% |
| Vanguard Value Index (Inv) (VIVAX) | 26 bps | Vanguard Value Index (Instl) (VIVIX) | 8 bps | 225.00% |
| Vanguard Wellesley Income (Inv) (VWINX) | 28 bps | Vanguard Wellesley Income (Adm) (VWIAX) | 21 bps | 33.33% |
| Vanguard Wellington (Inv) (VWELX) | 30 bps | Vanguard Wellington (Adm) (VWENX) | 22 bps | 36.36% |
| Vanguard Windsor  II (Inv) (VWNFX) | 35 bps | Vanguard Windsor  II (Adm) (VWNAX) | 27 bps | 29.63% |
| Vanguard Windsor (Inv) (VWNDX) | 33 bps | Vanguard Windsor (Adm) (VWNEX) | 22 bps | 50.00% |

62.    Identical, lower-cost versions of the Plans' TIAA-CREF and Calvert

mutual funds that were available to the Plans included the following:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Calvert Balanced Portfolio (A) (CSIFX) | 131 bps | Calvert Balanced Portfolio (I) (CBAIX) | 75 bps | 74.67% |
| Calvert Bond Portfolio (A) (CSIBX) | 114 bps | Calvert Bond Portfolio (I) (CBDIX) | 52 bps | 119.23% |
| Calvert Capital Accumulation (A) (CCAFX) | 176 bps | Calvert Capital Accumulation (I) (CCPIX) | 86 bps | 104.65% |
| Calvert Equity Portfolio (A) (CSIEX) | 122 bps | Calvert Equity Portfolio (I) (CEYIX) | 68 bps | 79.41% |
| Calvert Global Alternative Energy (A) (CGAEX) | 185 bps | Calvert Global Alternative Energy (I) (CAEIX) | 140 bps | 32.14% |
| Calvert Global Water (A) (CFWAX) | 185 bps | Calvert Global Water (Y) (CFWYX) | 160 bps | 15.63% |
| Calvert Government (A) (CGVAX) | 104 bps | Calvert Government (I) (CVGIX) | 73 bps | 42.47% |
| Calvert High Yield Bond (A) (CYBAX) | 165 bps | Calvert High Yield Bond (I) (CYBIX) | 97 bps | 70.10% |
| Calvert Income (A) (CFICX) | 123 bps | Calvert Income (I) (CINCX) | 55 bps | 123.64% |
| Calvert International Equity (A) (CWVGX) | 180 bps | Calvert International Equity (I) (CWVIX) | 106 bps | 69.81% |
| Calvert International Opportunities (A) (CIOAX) | 166 bps | Calvert International Opportunities (I) (COIIX) | 120 bps | 38.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Calvert Large Cap Core Portfolio (A) (CMIFX) | 138 bps | Calvert Large Cap Core Portfolio (I) (CMIIX) | 81 bps | 70.37% |
| Calvert Large Cap Growth (A) (CLGAX) | 127 bps | Calvert Large Cap Growth (I) (CLCIX) | 67 bps | 89.55% |
| Calvert Large Cap Value (A) (CLVAX) | 123 bps | Calvert Large Cap Value (Y) (CLVYX) | 98 bps | 25.51% |
| Calvert Short Duration Income (A) (CSDAX) | 108 bps | Calvert Short Duration Income (I) (CDSIX) | 51 bps | 111.76% |
| Calvert Small Cap (A) (CCVAX) | 169 bps | Calvert Small Cap (I) (CSVIX) | 92 bps | 83.70% |
| Calvert Social Index (A) (CSXAX) | 75 bps | Calvert Social Index (I) (CISIX) | 21 bps | 257.14% |
| Calvert Ultra-Short Income (A) (CULAX) | 89 bps | Calvert Ultra-Short Income (Y) (CULYX) | 67 bps | 32.84% |
| TIAA-CREF Lifecycle 2010 (Retire) (TCLEX) | 65 bps | TIAA-CREF Lifecycle 2010 (Instl) (TCTIX) | 40 bps | 62.50% |
| TIAA-CREF Lifecycle 2015 (Retire) (TCLIX) | 67 bps | TIAA-CREF Lifecycle 2015 (Instl) (TCNIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2020 (Retire) (TCLTX) | 67 bps | TIAA-CREF Lifecycle 2020 (Instl) (TCWIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2025 (Retire) (TCLFX) | 69 bps | TIAA-CREF Lifecycle 2025 (Instl) (TCYIX) | 44 bps | 56.82% |
| TIAA-CREF Lifecycle 2030 (Retire) (TCLNX) | 71 bps | TIAA-CREF Lifecycle 2030 (Instl) (TCRIX) | 46 bps | 54.35% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2035 (Retire) (TCLRX) | 72 bps | TIAA-CREF Lifecycle 2035 (Instl) (TCIIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2040 (Retire) (TCLOX) | 72 bps | TIAA-CREF Lifecycle 2040 (Instl) (TCOIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2045 (Retire) (TTFRX) | 72 bps | TIAA-CREF Lifecycle 2045 (Instl) (TTFIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2050 (Retire) (TLFRX) | 71 bps | TIAA-CREF Lifecycle 2050 (Instl) (TFTIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle 2055 (Retire) (TTRLX) | 74 bps | TIAA-CREF Lifecycle 2055 (Instl) (TTRIX) | 49 bps | 51.02% |
| TIAA-CREF Lifecycle Retirement Income (Retire) (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income (Instl) (TLRIX) | 40 bps | 62.50% |

63.     These lower-cost share classes have been available for years, in many cases for a decade or longer.

64.     Because the share classes have identical portfolio managers, underlying investments, and asset allocations, and differ only in cost, Defendants' failure to select the lower-cost share classes for the Plans' mutual fund options demonstrates that Defendants failed to prudently consider and use the size and purchasing power of the Plans when selecting the Plans' investment options.

65.     Defendants' use of the higher-cost share classes instead of the available lower-cost versions caused millions of dollars in lost retirement savings.

### IV. Defendants selected and retained a large number of duplicative investment options, diluting the Plans' ability to pay lower fees and confusing participants.

66. Defendants provided a dizzying array of duplicative funds in the same investment style, thereby losing the bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees, and causing "decision paralysis" for participants. Defendants placed over 100 investment options in the Plans' core lineup, from the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market, real estate, and fixed guaranteed annuity.

67. In comparison, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[16] This reasonable number of options provides participants with a choice of investment styles while maintaining a larger pool of assets in each investment style and avoiding confusion.

68. A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plans would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

---

[16] Available at https://www.callan.com/research/files/990.pdf.

69.     Prudent fiduciaries of large defined contribution plans engage in a detailed due diligence process to select and retain investments for a plan based on the risk, investment return, and expenses of available investment alternatives. The investment lineup should provide participants with the ability to diversify their portfolio appropriately while benefiting from the size of the pooled assets of other employees and retirees.

70.     Within each asset class and investment style deemed appropriate for a participant-directed retirement plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. In contrast to the investment lineup assembled by Defendants, prudent fiduciaries do not select and retain numerous duplicative investment options for a single asset class and investment style. When many investment options in a single investment style are included in a plan, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

71.     In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. See The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE

31

RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[17]

72.     Moreover, having many actively managed funds in the Plans within the same investment style results in the Plans effectively having an index fund return even though the plan is paying fees for active management that are much higher than the fees of a passive index fund.

73.     Since 2010, the Plans have included duplicative investments in every major asset class and investment style, including balanced/asset allocation (13 options), fixed income and high yield bond (22 options), international (12 options), large cap domestic equities (22 options), mid cap domestic equities (7 options), small cap domestic equities (5 options), real estate (2 options), money market (4 options), and target date investments (2 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants, and leads to "decision paralysis."

74.     For illustration purposes, Defendants included eight large cap domestic blend investments in the Plans as of December 31, 2014. These investments are summarized below and compared to a far lower-cost alternative that was available to the Plans, the Vanguard Institutional Index Fund (Instl Plus). The Vanguard Institutional Index Fund (Instl Plus) (VIIIX), by definition, mirrors the market, and has an expense ratio of 2 bps.

---

[17] Available at
http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

| Large Cap Blend Investments | Assets | Fee | Institutional Index Fund (VIIIX) | Plan's Excess Cost |
|---|---|---|---|---|
| CREF Stock Account | $987,634,856 | 46 bps | 2 bps | 2200% |
| CREF Equity Index Account | $117,300,581 | 37 bps | 2 bps | 1750% |
| Vanguard Dividend Growth Fund (Inv) (VDIGX) | $15,668,057 | 31 bps | 2 bps | 1450% |
| Vanguard Growth & Income (Inv) (VQNPX) | $16,617,835 | 37 bps | 2 bps | 1750% |
| Vanguard 500 Index Fund (Inv) (VFINX) | $107,658,689 | 17 bps | 2 bps | 750% |
| Vanguard Total Stock Market Index Fund (Inv) (VTSMX) | $42,687,462 | 17 bps | 2 bps | 750% |
| Vanguard FTSE Social Index (Inv) (VFTSX) | $2,118,442 | 27 bps | 2 bps | 1250% |
| Calvert Large Cap Core Portfolio (A) (CMIFX) | $3,817,692 | 120 bps | 2 bps | 5900% |
| **Total of Higher-Cost Alternatives** | **$1,293,503,614** | | | |

75.     With over *$1.1 billion* in participants' retirement assets invested in the

CREF Stock Account and the CREF Equity Index Account, these options were *23*

*and 18 times* more expensive than the 2 bps charged by the lower-cost Vanguard

option.



76.     Many other large cap index funds are also available at far lower costs than the Plans' large cap blend funds. Had the amounts invested in the Plans' large cap blend options been consolidated into a single large cap blend investment such as the Vanguard Institutional Index Fund (Instl Plus), Plan participants would have avoided losing well in excess of $5 million dollars in fees for 2014 alone, and many more millions since 2010.

77.     In addition, Defendants selected and continue to retain multiple passively managed index options in the same investment style. In contrast to an actively-managed fund, in which the investment manager selects stocks or bonds in an attempt to generate investment returns in excess of the fund's benchmark, passively managed index funds simply attempt to replicate a market index, such as the S&P 500, by holding a representative sample of securities in the index. Because

34

no stock selection or research is needed, index funds fees are much lower than the fees of actively-managed funds in the same investment style.

78.     For example, in the large cap blend investment style, Defendants included three separate index funds in the Plans that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market and do not involve stock selection. Defendants also retained three separate index funds for the fixed income and intermediate-term bond investment style.

79.     Since index funds merely hold the same securities in the same proportions as the index,[18] having multiple index funds in the Plans provides no benefit to participants. Instead, it hurts participants by diluting the Plans' ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

80.     Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, the Plans would have generated higher investment returns, net of fees, and participants would not have lost significant retirement assets.

81.     Defendants failed to pool the assets invested in duplicative investment options for the same investment style into a single investment option, which caused

---

[18] Another example of an index is the Dow Jones Industrial Average.

Plan participants to pay millions of dollars in unreasonable investment expenses, thereby depleting their retirement assets.

## V. Defendants disloyally and imprudently retained historically underperforming Plan investments.

82.     The higher-cost share class mutual funds, as well as other TIAA and CREF non-mutual fund options, were included in the Plans not based on their merits or as the result of a reasoned decision-making process, but because they provided a steady stream of millions of dollars in annual revenue to the Plans' recordkeepers. Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plans' investments resulted in Defendants retaining numerous investment options that historically underperformed for years lower-cost alternatives that were available to the Plans.

### A.     Defendants imprudently and disloyally retained the CREF Stock Account.

83.     The CREF Stock Account is one of the Plans' largest investment options by asset size with nearly *$988 million* in total assets between the two Plans as of year-end 2014. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has been offered to participants throughout the period from 2010 to date, and has, for years, consistently underperformed and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plans.

84.     TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plan. Under these terms, TIAA-CREF required that

36

the CREF Stock Account be offered to Plan participants, in addition to the TIAA

Traditional and the CREF Money Market Account. Plan fiduciaries provided these

mandatory offerings in the Plan without a prudent process to determine whether

they were prudent alternatives and in the exclusive best interest of Plan

participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be

included in the Plan to drive very substantial amounts of revenue sharing payments

to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps in

revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15

bps).

85.     As generally understood in the investment community, passively

managed investment options should be used or, at a minimum, thoroughly analyzed

and considered in efficient markets such as large capitalization U.S. stocks. This is

because it is unheard of, or extremely unlikely, to find actively managed mutual

funds that outperform a passive index, net of fees, particularly on a persistent basis,

as set forth in ¶¶**Error! Reference source not found.**–**Error! Reference

source not found.**. This extreme unlikelihood is even greater in the large cap

market because such big companies are the subject of many analysts' coverage,

unlike smaller stocks that are not covered by many analysts, leading to potential

inefficiencies in pricing.

86.     The efficiencies of the large cap market hinder an active manager's

ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a
> belief that securities markets are remarkably efficient. Most investors

37

would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

87.    Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50 J. FIN. 549, 571 (1995).[19]

88.    Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index.

Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks…The median active fund underperformed the passive index in 12 out of 18 years [for the large-cap fund universe]…The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.

****

Most of the dismal comparisons for active managers are for large-cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*, ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

89.    Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer

---

[19] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

an actively managed large cap option for the particular investment style and asset class.

90.     Defendants failed to undertake such analysis when they selected and retained the actively managed CREF Stock Account, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. Defendants also provided the fund option without conducting a prudent analysis despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market, and that active managers do not outperform passive managers net of fees in this investment style.

91.     Had such an analysis been conducted by Defendants, they would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

92.     Rather than poor performance in a single year or two, historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style, for the one-, five-, and ten-year periods ending December

39

31, 2014.[20] The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Plus) (VITPX) and the Vanguard Institutional Index (Inst Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.



93.     The CREF Stock Account with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better

---

[20] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plan's Form 5500 with the Department of Labor.

performing index alternatives: the Vanguard Total Stock Market Index Fund (Instl Plus) (2 bps) and the Vanguard Institutional Index (Instl Plus) (2 bps).

94.    Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one, five-, and ten-year periods ending December 31, 2014. These large cap blend alternatives have similar underlying asset allocations to the CREF Stock Account, and include the Vanguard Diversified Equity (Inv) (VDEQX), Vanguard PRIMECAP (Adm) (VPMAX), and Vanguard Capital Opp. (Adm) (VHCAX).



95.    The CREF Stock Account also had a long history of substantial underperformance compared to actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[21]



21 Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.





96.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing actively managed alternatives: Vanguard Diversified Equity (Inv) (40 bps), Vanguard PRIMECAP (Adm) (35 bps), and Vanguard Capital Opp. (Adm) (40 bps).

97.    Besides this abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plans. AonHewitt, *TIAA-CREF Asset Management*, InBrief, at 3 (July 2012).[22] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time.  *Id*. at 4–5. Defendants have even used an AonHewitt affiliate as a Plan consultant, yet the CREF Stock Account remains in the Plans.

98.    The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to

---

[22] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

monitor the CREF Stock Account and continues to retain the fund despite its continuing to underperform lower-cost investment alternatives that were readily available to the Plans.

99.     Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better-performing and reasonably priced options.

100.     Defendants' imprudent and disloyal inclusion and retention of the CREF Stock Account caused the Plans to lose over $242 million compared to what the Plans would have earned had the same amount of assets instead been invested in certain of the prudent lower-cost alternatives identified above.[23]

**B.     Defendants imprudently and disloyally retained the TIAA Real Estate Account.**

101.     Defendants selected and continue to include the TIAA Real Estate Account as one of the real estate investment options in the Plans. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Instl) (VGSNX).

---

[23] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

102.   With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real Estate Account is also over *10 times more expensive* than the Vanguard REIT Index (Instl), which has an expense ratio of 8 bps.



103.   The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[24] Despite this, Defendants selected and to date has retained it in the Plans.

---

[24] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Instl) was 5.49%.







104.   This underperformance continued for years before 2009 and has continued after 2009. The TIAA Real Estate Account significantly underperformed the Vanguard REIT Index (Instl) over the one-, five-, and ten-year periods ending December 31, 2014.



105.    As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. *Tibble*, 135 S. Ct. at 1829. In contrast, Defendants failed to conduct such a process and continue to retain the TIAA Real Estate Account as an investment option in the Plans, despite its continued dramatic underperformance and far higher cost than available investment alternatives.

106.    Defendants' imprudent and disloyal inclusion and retention of the TIAA Real Estate Account caused the Plans to lose nearly $60 million compared to what the Plans would have earned had the same amount of assets instead been

invested in the lower-cost and better-performing Vanguard REIT Index (Instl) from

August 17, 2010 to date.[25]

## ERISA'S FIDUCIARY STANDARDS

107.    ERISA imposes strict fiduciary duties of loyalty and prudence upon

Defendants as the fiduciaries of the Plans. 29 U.S.C. §1104(a)(1), states, in relevant

part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the
> interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of:
>
>       (i) providing benefits to participants and their
> beneficiaries; and
>       (ii) defraying reasonable expenses of administering the
> plan; [and]
>
> (B)    with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting
> in a like capacity and familiar with such matters would
> use in the conduct of an enterprise of like character and
> with like aims.

108.    Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any
> employer and shall be held for the exclusive purposes of
> providing benefits to participants in the plan and their
> beneficiaries and defraying reasonable expenses of
> administering the plan.

---

[25] Losses in the Plans have been brought forward to the present value using the
investment returns of the Vanguard REIT Index (Instl) to compensate participants who
have not been reimbursed for their losses.

109.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

110.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

111.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who
> breaches any of the responsibilities, obligations, or duties
> imposed upon fiduciaries by this subchapter shall be personally
> liable to make good to such plan any losses to the plan resulting
> from each such breach, and to restore to such plan any profits of
> such fiduciary which have been made through use of assets of
> the plan by the fiduciary, and shall be subject to such other
> equitable or remedial relief as the court may deem appropriate,
> including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

112.  29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. §1109(a).

113.  In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Retirement Plan for Officers of
> Columbia University and the Columbia University Voluntary
> Retirement Savings Plan from August 17, 2010 through the date of
> judgment, excluding the Defendants.

114.  This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.  The Class includes over 27,000 individuals and is so large that joinder of all its members is impracticable.

52

b.      There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.      Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plans were harmed by Defendant's misconduct.

d.      Plaintiffs are adequate representatives of the Class because they was a participant in the Plans throughout the Class period, has no interest that is in conflict with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their

fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

115.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, it would be impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

116.    Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.      Schlichter, Bogard & Denton has been appointed as class

counsel in 15 other ERISA class actions regarding excessive fees in large

defined contribution plans. As a district court in one of those cases recently

observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its

well-earned reputation as a pioneer and the leader in the field". *Abbott v.*

*Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4 (S.D. Ill.

July 17, 2015). Other courts have made similar findings: "It is clear to the

Court that the firm of Schlichter, Bogard & Denton is preeminent in the

field" "and is the only firm which has invested such massive resources in this

area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS

166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee

litigation, Schlichter, Bogard & Denton has achieved unparalleled results on

behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS

184622 at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable

defendants and their sophisticated attorneys required Class Counsel to

demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper*

*Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D. Ill. Jan. 31, 2014).

b.      The U.S. District Court Judge G. Patrick Murphy recognized the

work of Schlichter, Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation
> illustrates an exceptional example of a private attorney general
> risking large sums of money and investing many thousands of
> hours for the benefit of employees and retirees. No case had
> previously been brought by either the Department of Labor or
> private attorneys against large employers for excessive fees in a

> 401(k) plan. Class Counsel performed substantial work[,]
> investigating the facts, examining documents, and consulting
> and paying experts to determine whether it was viable. This
> case has been pending since September 11, 2006. Litigating the
> case required Class Counsel to be of the highest caliber and
> committed to the interests of the participants and beneficiaries
> of the General Dynamics 401(k) Plans.

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at

8–9 (S.D.Ill. Nov. 22, 2010).

    c.    Schlichter, Bogard & Denton handled the only full trial of an

ERISA excessive fee case, resulting in a $36.9 million judgment for the

plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB,*

*Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the

district court concluded that "Plaintiffs' attorneys are clearly experts in

ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS

157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court

again awarded Plaintiffs' attorney's fees, emphasizing the significant

contribution Plaintiffs' attorneys have made to ERISA litigation, including

educating the Department of Labor and federal courts about the importance

of monitoring fees in retirement plans.

> Of special importance is the significant, national contribution
> made by the Plaintiffs whose litigation clarified ERISA
> standards in the context of investment fees. The litigation
> educated plan administrators, the Department of Labor, the
> courts and retirement plan participants about the importance of
> monitoring recordkeeping fees and separating a fiduciary's
> corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

      d.     Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015), in which the Supreme Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

      e.     The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[26] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[27] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[28] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y.

---

[26] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[27] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[28] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

TIMES (Oct. 16, 2014);[29] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[30] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [31] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[32] Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[33] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[34]

## COUNT I

### Breach of Duties of Loyalty and Prudence
### Unreasonable Administrative Fees

117.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

118.    The scope of the fiduciary duties and responsibilities of these Defendants include discharging their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants

---

[29] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[30] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[31] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[32] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[33] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[34] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

119.    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

120.    Defendants failed to engage in a prudent and loyal process for selecting a recordkeeper. Rather than consolidating the Plans' administrative and recordkeeping services under a single service provider, Defendants retained two recordkeepers to provide recordkeeping services. This failure to consolidate the recordkeeping services eliminated the Plans' ability to obtain the same services at a lower cost with a single recordkeeper. This conduct was a breach of the duties of loyalty and prudence.

121.    Moreover, Defendants failed to solicit competitive bids from vendors on a flat per-participant fee. Defendants allowed the Plans' recordkeepers to receive asset-based revenue sharing and hard dollar fees, but failed to monitor those payments to ensure that only reasonable compensation was received for the services provided to the Plans. As the amount of assets grew, the revenue sharing payments to the Plans' recordkeepers grew, even though the services provided by the

recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of the duties of loyalty and prudence.

122.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

123.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

## COUNT II

## Breach of Duties of Loyalty and Prudence

## Unreasonable Investment Management Fees and Performance Losses

124.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

125.   The scope of Defendants' fiduciary duties and responsibilities includes managing the assets of the Plans for the sole and exclusive benefit of participants and beneficiaries of the Plans, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

126.   As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

127.   Defendants selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with high expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times.

128.   Rather than consolidating the Plans' 116 investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plans of their ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion. In addition, because Defendants as fiduciaries are held to the standard of a prudent financial expert, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), they knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return while paying much higher fees than an index fund, thereby resulting in significant underperformance. The Plans' investment offerings included the use of mutual funds and variable annuities with expense ratios far in excess of other lower-cost options available to the Plans. These lower-cost options included lower-cost share

class mutual funds with the identical investment manager and investments, lower-cost insurance company variable annuities and insurance company pooled separate accounts. In so doing, Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge their duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans. Therefore, Defendants breached their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

129.   The same conduct by Defendants shows a failure to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

130.   Defendants failed to engage in a prudent process for the selection and retention of investment options for the Plans. Rather, Defendants used more expensive funds with inferior historical performance compared to other investments that were readily available to the Plans.

131.   CREF Stock Account: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to actively managed investments with similar underlying asset allocations.

132.   <u>TIAA Real Estate Account</u>: Defendants selected and retained the TIAA Real Estate Account for the real estate investment in the Plans despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

133.   Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

134.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

135.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

**COUNT III**

**Failure to Monitor Fiduciaries**

136.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

137.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to plans fees

63

and investments, and must take prompt and effective action to protect the plan and participants if necessary.

138.   Defendant Columbia University had the responsibility to monitor the Vice President of Human Resources in its capacity as the Plans' fiduciary and Administrator, to determine whether it had fulfilled its fiduciary duties in managing the operation and administration of the Plans.

139.   To the extent the Administrator delegated any of its fiduciary responsibilities to another individual or entity, the Administrator had a duty to monitor its delegee to ensure that any delegated tasks were being performed prudently and loyally.

140.   Defendants breached their fiduciary monitoring duties by, among other things:

a.   Failing to monitor their appointees and co-fiduciaries, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plans;

b.   Failing to monitor their appointees' and co-fiduciaries' process for reviewing and monitoring the Plans' fees and investments, which would have alerted any prudent fiduciary to the potential breaches of fiduciary duties because of the Plans' excessive administrative and investment management fees and consistently underperforming investments;

c.   Failing to ensure that their appointees and monitored

fiduciaries had a prudent process in place for evaluating the Plans'
administrative fees and ensuring that the fees were competitive, including a
process to identify and determine the amount of all sources of compensation
to the Plans' recordkeepers and the amount of any revenue sharing
payments; a process to prevent the recordkeepers from receiving revenue
sharing that would increase the recordkeepers' compensation to unreasonable
levels even though the services provided remained the same; and a process to
periodically obtain competitive bids to determine the market rate for the
services provided to the Plans;

     d.    Failing to ensure that their appointees and monitored
fiduciaries considered the ready availability of comparable and better
performing investment options that charged significantly lower fees and
expenses than the Plans' investments;

     e.    Failing to remove appointees whose performance was
inadequate in that they continued to maintain imprudent, excessively costly,
and poorly performing investments, all to the detriment of Plan participants'
retirement savings.

141.   Had Defendants discharged their fiduciary monitoring duties
prudently as described above, the Plans would not have suffered these losses.
Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the
Plans lost hundreds of millions of dollars of retirement savings.

## JURY TRIAL DEMANDED

142.    Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendants breached their fiduciary duties as described above;

- Find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

- Determine the method by which losses to the Plans under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive, or in violation of ERISA;

- Require Defendants to include only prudent investments;

- Require Defendants to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- Award Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

August 17, 2016                     Respectfully submitted,

                                    /s/ Andrew D. Schlichter
                                    SCHLICHTER, BOGARD & DENTON LLP
                                    Andrew D. Schlichter, Bar No. 4403267
                                    Jerome J. Schlichter*
                                    Michael A. Wolff*
                                    Troy A. Doles*
                                    Heather Lea*
                                    100 South Fourth Street, Suite 1200
                                    St. Louis, Missouri 63102
                                    Telephone: (314) 621-6115
                                    Facsimile: (314) 621-5934
                                    aschlichter@uselaws.com
                                    jschlichter@uselaws.com
                                    mwolff@uselaws.com
                                    tdoles@uselaws.com
                                    hlea@uselaws.com

                                    *Pro Hac Vice forthcoming

67