# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHANDRA CATES et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK et al., <br><br> *Defendants.* | Civil Action No. 1:16-cv-06524-KBF <br><br> Hon. Katherine B. Forrest |
| JANE DOE, <br><br> *Plaintiff,* <br><br> v. <br><br> COLUMBIA UNIVERSITY et al., <br><br> *Defendants.* | Civil Action No. 1:16-cv-06488-KBF |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT

Nancy G. Ross
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600

Jean-Marie L. Atamian
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500

Brian D. Netter
  bnetter@mayerbrown.com
Michelle N. Webster
Travis Crum
Matthew A. Waring
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION .............................................................................................................. ii

    A.    The Plans ................................................................................................1

    B.    Plaintiffs' Consolidated Amended Complaint ......................................2

ARGUMENT ......................................................................................................................3

I.    Plaintiffs Have Failed To State A Claim For Breach Of Fiduciary Duty ............................4

    A.    Plaintiffs' "Locking In" Claim Fails ......................................................5

    B.    Plaintiffs' Administrative Fees Claim Fails ...........................................6

        1.    Revenue sharing is a common industry practice that has survived numerous legal challenges by Plaintiffs' counsel ......................................6

        2.    Defendants' use of multiple recordkeepers also fails to support an inference of a flawed decision-making process ......................................7

        3.    Plaintiffs' allegation that the fees were too high is disproven by the disclosure on which they purport to rely ......................................9

    C.    Plaintiffs' Investment Fees Claim Fails ...............................................11

        1.    Plaintiffs do not adequately allege that the University failed to monitor investment fees ......................................11

        2.    Plaintiffs' allegations regarding the "layers of fees" in CREF investments fail to state a claim ......................................13

        3.    Plaintiffs' allegation that the Plans offered too many options fails to state a claim ......................................14

        4.    Plaintiffs' underperformance claims fail ......................................15

II.    Plaintiffs Have Failed To State A Claim For Breach Of The Duty Of Loyalty ...............20

III.    Plaintiffs Have Failed To State A Claim That Defendants Engaged In Prohibited Transactions ...............................................................................................................21

IV.    Plaintiffs Have Failed To State A Claim For Breach Of The Duty To Monitor ..............23

V.    Plaintiffs' Claims Are Time-Barred .............................................................................23

CONCLUSION ..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Group, Inc.*,
  99 F. Supp. 3d 1110 (C.D. Cal. 2015) ...................................................................4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................3, 11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).....................................................................................4

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................3

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ..............................................................................5, 12

*Brown v. Owens Corning Inv. Review Cmte.*,
  622 F.3d 564 (6th Cir. 2010)................................................................................23

*Caputo v. Pfizer, Inc.*,
  267 F.3d 181 (2d Cir. 2001)..................................................................................23

*Chao v. Merino*,
  452 F.3d 174 (2d Cir. 2006)...............................................................................4, 16

*In re Citigroup ERISA Litig.*,
  662 F.3d 128 (2d Cir. 2011)..................................................................................15

*Davis v. FEC*,
  554 U.S. 724 (2008)...............................................................................................13

*DeBruyne v. Equitable Life Assur. Soc'y of U.S.*,
  920 F.2d 457 (7th Cir. 1990) ................................................................................16

*Donovan v. Bierwirth*,
  680 F.2d 263 (2d Cir. 1982)..................................................................................20

*Fifth Third Bancorp. v. Dudenhoeffer*,
  134 S. Ct. 2459 (2014) .................................................................................. *passim*

*Gartenberg v. Merrill Lynch Asset Mgmt.*,
  694 F.2d 923 (2d Cir. 1982)...............................................................................9, 10

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ...............................................................7, 12, 14, 22

*IATSE Local 33 Section 401(k) Plan v. Bullock*,
2008 WL 4838490 (C.D. Cal. Nov. 5, 2008) .........................................................21

*Jenkins v. Yager*,
444 F.3d 916 (7th Cir. 2006) ...............................................................................16

*Jones v. Harris Assocs. L.P.*,
559 U.S. 335 (2010)...............................................................................................9

*Kendall v. Employees Retirement Plan of Avon Products*,
561 F.3d 112 (2d Cir. 2009)................................................................................13

*Kramer v. Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991)...............................................................................3, 4

*Laboy v. Bd. of Trs. of Building Serv. 32 BJ SRSP*,
513 F. App'x 78 (2d Cir. 2013) ...................................................................9, 10, 15

*Leber v. Citigroup, Inc.*,
2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ........................................................22

*Loomis v. Exelon Corp.*,
658 F.3d 667 (7th Cir. 2011) .........................................................................12, 14

*Mangiafico v. Blumenthal*,
471 F.3d 391 (2d Cir. 2006).................................................................................4

*Muehlgay v. Citigroup Inc.*,
649 F. App'x 110 (2d Cir. 2016) ....................................................................23, 24

*Pegram v. Herdrich*,
530 U.S. 211 (2000)............................................................................................20

*Renfro v. Unisys Corp.*,
671 F.3d 314 (3d Cir. 2011)......................................................................7, 11, 12

*Rinehart v. Akers*,
722 F.3d 137 (2d Cir. 2013).................................................................................22

*Rinehart v. Lehman Bros. Holdings Inc.*,
817 F.3d 56 (2d Cir. 2016) (per curiam)..........................................................15, 16

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
2016 WL 7494320 (D. Conn. Dec. 30, 2016)............................................. *passim*

*Skin Pathology Assocs. v. Morgan Stanley & Co.*,
    27 F. Supp. 3d 371 (S.D.N.Y. 2014).................................................................22

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv.*
    *Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) .............................................4, 5, 12, 16

*Taveras v. UBS AG*,
    612 F. App'x 27 (2d Cir. 2015) ...................................................................13

*Taylor v. United Techs. Corp.*,
    2009 WL 535779 (D. Conn. Mar. 3, 2009)) ...............................................18

*Tibble v. Edison Int'l*,
    729 F.3d 1110 (9th Cir. 2013) ...............................................................14, 17

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir. 2014) .....................................................................5, 7

*In re Unisys Sav. Plan Litig.*,
    74 F.3d 420 (3d Cir. 1996)............................................................................5

*White v. Chevron Corp.*,
    2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ..................................... *passim*

*White v. Marshall & Isley Corp.*,
    714 F.3d 980 (7th Cir. 2013) .....................................................................15

*Winfield v. Citibank, N.A.*,
    842 F. Supp. 2d 560 (S.D.N.Y. 2012).........................................................4

*In re WorldCom, Inc.*,
    263 F. Supp. 2d 745 (S.D.N.Y. 2003).......................................................20

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    550 F. Supp. 2d 416 (S.D.N.Y. 2008)....................................................23, 24

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    325 F. App'x 31 (2d Cir. 2009) ..............................................................9, 10

**Statutes, Rules, and Regulations**

15 U.S.C. § 80a-35(b) ...................................................................................9

I.R.C. § 403(b) .............................................................................................1

29 U.S.C.:
    § 1002(21)(B)................................................................................21
    § 1101(b)(1)..................................................................................22
    § 1104(a)(1)(B)...........................................................................3, 4
    § 1106(a)(1)....................................................................................3
    § 1106(a)(1)(A)............................................................................21
    § 1106(a)(1)(C)............................................................................21
    § 1106(a)(1)(D)...........................................................................21
    § 1108(b)(2)..................................................................................22
    § 1113(1)......................................................................................24
    § 1113(2)......................................................................................23

68A Stat. 1 ..........................................................................................1

88 Stat. 829 ........................................................................................2

26 C.F.R.:
    § 1.408-3................................................................................17, 24
    § 2509.75-3..................................................................................21
    § 2550.404a-5..............................................................................24
    § 2550.404a-1(b)(2)(i).................................................................12

Amendment to Prohibited Transaction Exemption 84-24,
    71 Fed. Reg. 5887 (Feb. 3, 2006) ............................................21

**Other Authorities**

James S. Almond, Purdue Univ., *403(b) Plan Redesign–Making a Good
    Retirement Plan Better*, http://www.cacubo.org/wp-content/uploads/2016/02/
    10_403b_Plan_Redesign_Making_a_Good_Retirement_Plan_Better.docx .............................8

AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and
    What Can Be Done to Fix It* (Jan. 2016),
    https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-
    4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_
    Billion_Annually_Whitep.....................................................................8

CREF Notice of Application, SEC Release No. IC-31092, 2014 WL 2858566
    (June 23, 2014).................................................................................22

GEORGE G. BOGERT & GEORGE T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES
    (3d ed. 2016) ..................................................................................20

Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper: University of Notre Dame* (Feb. 2014), https://workplacecontent.fidelity.com/bin-public/070_NB_ PreLogin_Pages/documents/ND_403(b)%20Plan%20Redesign% 20White%20Paper.pdf ................................................................................................. 9

2A AUSTIN SCOTT & WILLIAM FRATCHER, THE LAW OF TRUSTS (4th ed. 1987) ......................... 20

SEC, *Variable Annuities: What You Should Know*, https://www.sec.gov/ investor/pubs/varannty.htm .......................................................................................... 17

Standard Retirement Servs., Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach* (Nov. 2009), https://www.standard.com/pensions/ publications/fixing_your_403b.pdf; ............................................................................. 8

*Vendor Consolidation in Higher Education: Getting More from Less*, Plansponsor (July 29, 2010), http://www.plansponsor.com/Vendor-Consolidation-in-Higher-Education ............................................................................................................ 8

## INTRODUCTION

"ERISA protects plan participants' reasonable expectations *in the context of the market that exists.*" *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 2016 WL 7494320, at *17 (D. Conn. Dec. 30, 2016) (emphasis added), *appeal docketed*, No. 17-239 (2d Cir. filed Jan. 23, 2017). The statute offers no relief to plaintiffs who "seek to transform the market itself." *Id.*

In this action—along with the eleven other cut-and-paste complaints filed against prominent universities—plaintiffs seek to transform the market for university retirement plans, to make them resemble corporate 401(k) plans. But litigation under ERISA is not a vehicle for systemic reform; it permits an action only where plan fiduciaries have failed to act as did their peers in like circumstances. Under Second Circuit precedent, to survive a motion to dismiss, ERISA plaintiffs must plausibly allege that fiduciaries employed flawed processes—or that the outcomes of those fiduciary processes are so striking that a defective process can reasonably be inferred. The consolidated complaint ("CC")[1] satisfies neither standard and should therefore be dismissed.

Moreover, even if Plaintiffs could state a claim, they have waited too long. The factual allegations that form the backbone of the CC were known to Plaintiffs long ago, as can be deciphered on a motion to dismiss through materials that are subject to judicial notice.

## BACKGROUND

### A.    The Plans

Section 403(b) of the Internal Revenue Code was enacted in 1954 to grant tax-preferred status to contributions by nonprofit employers to annuities for their employees. 68A Stat. 1, 138. The annuity system permitted nonprofits—including universities—to approximate the pensions granted to employees of for-profit corporations. Annuities were the exclusive vessel for tax-preferred retirement savings for university employees until 1974, when tax-preferred treatment

---

[1]    Two versions of the consolidated complaint were filed—one by the attorneys for the *Cates* plaintiffs and another by the attorneys in *Doe*. References herein are to the *Cates* version, ECF No. 76-1.

was extended to investments in custodial mutual funds. 88 Stat. 829, 940.

Columbia University (the "University") offers a generous array of benefits to its employees, including two 403(b) plans: the Retirement Plan for Officers of Columbia University and the Columbia University Voluntary Retirements Savings Plan (collectively, "the Plans"). The differences between the Plans are immaterial, for present purposes, except that the University's contributions on behalf of employees fund the Officers' Plan, and employees fund the Voluntary Plan.

In the Plans, participants may choose among three types of options for their individual accounts: (1) fixed annuities, offered by TIAA; (2) variable annuities, offered by CREF; and (3) mutual funds, offered by TIAA, Vanguard, and Calvert. CC ¶ 101. Until 2013, TIAA, Vanguard, and Calvert each provided separate statements to Plan participants who invested in their respective products. In April 2013, however, Columbia engaged TIAA to maintain the records for participants who invested in Calvert funds. Request for Judicial Notice ("RJN") Ex. A-3, Financial Statements at 8 (2012 Form 5500) ("Effective April 2, 2013 TIAA-CREF took on recordkeeping and custodial responsibilities related to the Calvert Trust Company funds.").

**B.       Plaintiffs' Consolidated Amended Complaint**

On August 9, 2016, complaints were filed against New York University, Yale University, and the Massachusetts Institute of Technology. The two actions consolidated herein were filed the following week, on August 17 (*Doe*, No. 16-6488) and August 18 (*Cates*, No. 16-6524). After the University filed a pre-motion letter in *Cates*, the *Cates* plaintiffs sought to amend their complaint, which, after minor changes resulting from the consolidation with *Doe*, contains the allegations now governing:

*First*, Plaintiffs allege that the University[2] improperly agreed to a bundled-services

---

[2]       Except where indicated, references herein to the University include the other defendants, who have been sued in their official capacities as employees or former employees.

agreement with TIAA that required the Plans to offer participants the opportunity to invest in two of TIAA's variable annuities and to use TIAA as a recordkeeper. CC ¶¶ 110-22.

*Second*, Plaintiffs allege that the University permitted unreasonable administrative fees to be assessed against the accounts of plan participants. CC ¶¶ 123-42.

*Third*, Plaintiffs allege that the University offered investment options with excessive fees, and that it offered two investment funds—the CREF Stock Account and the TIAA Real Estate Account—that supposedly underperformed. CC ¶¶ 143-202.

*Fourth*, Plaintiffs allege that the University breached its fiduciary duties by failing to monitor unidentified delegates who administered the Plans. CC ¶¶ 253-59.

Plaintiffs allege that the practices they describe (other than the alleged failure to monitor) both violated Defendants' fiduciary duty of prudence under Section 404 of ERISA (29 U.S.C. § 1104(a)(1)(B)) and constituted prohibited transactions under Section 406 (*id.* § 1106(a)(1)).

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "plausibility" standard is satisfied only if a complaint alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

At this stage of the proceedings, a court may consider "facts stated in the complaint," materials "incorporated in the complaint by reference," or "matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). Under Second Circuit precedents, a court may consider "documents possessed by or known to

the plaintiff and upon which it relied in bringing the suit" (*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007)), and any document "where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006). Consistent with these standards, courts routinely rely upon formal plan documents and disclosures required by statute when resolving motions to dismiss in ERISA cases.[3]

## I.     Plaintiffs Have Failed To State A Claim For Breach Of Fiduciary Duty.

To begin, the CC fails to state a claim on the merits for breach of the duty of prudence. Motions to dismiss duty-of-prudence claims are a crucial "mechanism for weeding out meritless [ERISA] claims," requiring "careful judicial consideration of whether the complaint states a claim that the defendant has acted imprudently." *Fifth Third Bancorp. v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014). "'Prudence,' as required by ERISA, 'is measured according to the objective prudent person standard developed in the common law of trusts.'" *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006). The duty looks to what "a prudent man acting in a *like capacity* and familiar with such matters would [do] in the conduct of an *enterprise of a like character and with like aims*." 29 U.S.C. § 1104(a)(1)(B) (emphases added). So long as the fiduciary's conduct is reasonable "under the circumstances then prevailing," "ERISA does not impose a duty to take any particular course of action if another approach seems preferable." *Merino*, 452 F.3d at 182.

ERISA's duty of prudence "'focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate *methods* to investigate and determine the merits of a particular investment.'" *PBGC ex rel. St. Vincent*

---

[3]     *Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 568 n.3 (S.D.N.Y. 2012) (plan and summary plan description are integral to ERISA cases); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Group, Inc.*, 99 F. Supp. 3d 1110, 1126 (C.D. Cal. 2015) (DOL Form 5500 subject to judicial notice); *Kramer*, 937 F.2d at 773-74 (prospectuses subject to judicial notice).

*Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (emphasis added) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)).

Ordinarily, then, a claim for breach of fiduciary duty must allege shortcomings in the fiduciary's *processes* that led the fiduciary to deviate from industry customs. A complaint that lacks "allegations relating directly to the methods employed by the ERISA fiduciary" may survive a motion to dismiss only "if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'" *St. Vincent*, 712 F.3d at 718, 727 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)).

Like the original complaints, the CC lacks any allegations about the University's fiduciary process. Nor, for that matter, do Plaintiffs plausibly allege an inference of inferior process: Plaintiffs' counsel have effectively conceded the absence of any breach of fiduciary duty by making the same allegations against virtually an entire peer group of universities, thereby demonstrating "the context of the market that exists." *Rosen*, 2016 WL 7494320, at *17.

## A. Plaintiffs' "Locking In" Claim Fails.

Plaintiffs first allege, in Count I, that the University breached its fiduciary duty by agreeing to include certain TIAA investments in the Plans and to employ TIAA as recordkeeper for those investments. According to Plaintiffs, this locked the Plans into an "imprudent arrangement" where the University could no longer remove the TIAA investments from the Plans and could not switch recordkeepers if it wished to do so. CC ¶ 211.

Contrary to Plaintiffs' assertions, however, there is nothing imprudent about a contract that bundles investment options together with recordkeeping services for those investments. Bundled arrangements are "common and acceptable investment industry practices that frequently inure to the benefit of ERISA plans." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (internal quotation marks omitted). The question is simply whether the overall decision to enter into

the agreement is prudent—and Plaintiffs have not alleged any facts suggesting that the bundled arrangement here was imprudent. While Plaintiffs allege that the bundled agreement required the Plans to offer the CREF Stock Account as an investment (CC ¶ 111), that does not suggest that the agreement was imprudent because, as we explain *infra* at pp. 16-18, they do not plausibly allege that the CREF Stock Account was imprudent.

At bottom, Plaintiffs are simply taking issue with TIAA's decision to offer its investment products and recordkeeping services as a package deal. That is insufficient to support a breach of fiduciary duty claim: Plaintiffs cannot show that it was imprudent for the University to do business with TIAA on those terms, as countless other 403(b) plans did.[4]

### B.    Plaintiffs' Administrative Fees Claim Fails.

In Count III, Plaintiffs allege that the University breached its fiduciary duty by overpaying for recordkeeping services. This count encompasses three related allegations: (1) that the Plans should not have permitted their recordkeepers to be paid through revenue sharing: (2) that the Plans should not have permitted TIAA and Vanguard to maintain separate records for their own accounts; and (3) that the overall costs of recordkeeping were excessive. But none of these allegations raises any inference of fiduciary misconduct. On the contrary, Plaintiffs' allegations show that Defendants' practices were in line with common industry practices.

### 1.    Revenue sharing is a common industry practice that has survived numerous legal challenges by Plaintiffs' counsel.

Plaintiffs first allege that the University acted imprudently by using a revenue-sharing arrangement to compensate the Plans' recordkeepers. Fees to compensate *investment managers* are typically computed as a percentage of the assets they manage, and are deducted directly from the

---

[4]    As a tangent to this claim, Plaintiffs allege that the University was motivated by "TIAA's financial interest." CC ¶ 112. That is quite implausible, given that TIAA's charter requires it to provide annuities and other products to employees of nonprofit institutions "on terms as advantageous to the holders and beneficiaries of such contracts and policies as shall be practicable … *all without profit* to [TIAA] or its stockholders." RJN Ex. B (TIAA's Restated Charter), art. VIII, § 1 (emphasis added).

assets they manage. When recordkeepers are paid in a similar fashion, it is sometimes called "revenue sharing." CC ¶¶ 55-56. Although Plaintiffs *say* that they are not claiming that this form of revenue sharing is "a *per se* violation of ERISA" (*id.* ¶ 55), that is effectively what they are arguing. Their position is that, although they do not object to the use of revenue sharing as a mechanism for paying expenses, a fiduciary violates ERISA by setting a price for recordkeeping on anything other than "a flat per-participant basis." *Id.* ¶ 57.

"[C]ourts across the country have generally found that the practice of revenue-sharing does not, in principle, constitute an ERISA violation." *Rosen*, 2016 WL 7494320, at *10. They have acknowledged that revenue sharing in retirement plans "violates no statute or regulation" (*Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009)), but, rather, is a "common and 'acceptable' investment industry practice[] that frequently inure[s] to the benefit of ERISA plans" (*Tussey*, 746 F.3d at 336). Courts have likewise rejected Plaintiffs' particular theory that recordkeeping must be valued on a per-participant basis (rather than as a percentage of plan assets). *Renfro v. Unisys Corp.*, 671 F.3d 314, 326-28 (3d Cir. 2011); *White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016).

### 2. Defendants' use of multiple recordkeepers also fails to support an inference of a flawed decision-making process.

Plaintiffs also allege that the Plans overpaid for recordkeeping services because they permitted TIAA and Vanguard to maintain separate records for their own funds. Plaintiffs allege, categorically, that "multiple recordkeeper platforms are inefficient and result in excessive fees." CC ¶ 125.

Once again, however, Plaintiffs assail a common industry practice—as even the authorities cited by Plaintiffs confirm. "The traditional 403(b) plan has historically been implemented

through a multi-provider recordkeeper platform."[5] That arrangement remains "[t]he most prevalent model by far."[6] Plaintiffs' sources advocate for "[a] move to **two vendors** [to] allow for centralized remitting of participant data and contributions, integrated communications and education programs, simplified investment offerings, 403(b) audit support, and integrated compliance services while still providing participants with the choice they value."[7] And that is precisely what Columbia did. Prior to April 2013, Columbia offered a choice among three recordkeepers. Effective April 2, 2013, Calvert was discontinued as a recordkeeping vendor, leaving TIAA and Vanguard. RJN Ex. A-3, Financial Statements at 8.

Plaintiffs endeavor to show that other universities have transitioned to a single recordkeeper, instead of to two recordkeepers. But their obligation is to show that Columbia had a defective process that was out of step with its peers; Columbia's decision to actually reduce the number of recordkeepers defeats any such suggestion. *See Chevron*, 2016 WL 4502808, at *14 (crediting changes made by plan fiduciaries in dismissing ERISA complaint).

Moreover, the examples cited by Plaintiffs of universities that consolidated to a single recordkeeper are, by their own admissions, exceptions rather than the rule. In the review of Purdue's plan redesign cited by Plaintiffs, Purdue acknowledged that *"[n]o higher education institution of Purdue's size and level of assets ha[d] implemented a single service provider/open architecture structure."*[8] Columbia's plans are even larger than Purdue's.[9] And the AonHewitt study

---

[5]  AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It*, at 3 (Jan. 2016), https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitep; *see* CC ¶ 94.
[6]  Standard Retirement Servs., Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 (Nov. 2009), https://www.standard.com/pensions/publications/fixing_your_403b.pdf; *see* CC ¶ 161.
[7]  *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010), http://www.plansponsor.com/Vendor-Consolidation-in-Higher-Education (emphasis added); *see* CC ¶ 97.
[8]  James S. Almond, Purdue Univ., *403(b) Plan Redesign–Making a Good Retirement Plan Better* at 9, http://www.cacubo.org/wp-content/uploads/2016/02/10_403b_Plan_Redesign_

of university plan redesigns touted by Plaintiffs noted that, while a few universities had "imple-

ment[ed] a single recordkeeper model to make it easier to comply with [Section] 403(b) regula-

tions," other universities, including the University of Texas, the University of Washington, and

the University of Oklahoma, had retained multiple recordkeepers even after taking some steps to

consolidate their recordkeeping.[10]

### 3. Plaintiffs' allegation that the fees were too high is disproven by the disclosure on which they purport to rely.

Because neither the Plans' use of revenue sharing nor their use of two recordkeepers sug-

gests impropriety, the real gist of Plaintiffs' recordkeeping claim is that recordkeeping costs were

too high.

In view of the parallels between ERISA's fiduciary duty to monitor fees and the fiduciary

obligations prescribed by the Investment Company Act when investment advisers set mutual

fund fees (15 U.S.C. § 80a-35(b)), in considering a motion to dismiss, courts within the Second

Circuit "consider the standard for excessive fee claims articulated in the context of the Invest-

ment Company Act ('ICA') useful for reviewing [a] claim that excessive fees violated ERISA."

*Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (Sotomayor, J.); *ac-

cord Laboy v. Bd. of Trs. of Building Serv. 32 BJ SRSP*, 513 F. App'x 78, 80 n.4 (2d Cir. 2013).

Under the ICA standard, to give rise to an excessive fees claim, "the adviser-manager must

charge a fee that is so disproportionately large that it bears no reasonable relationship to the ser-

vices rendered and could not have been the product of arm's-length bargaining." *Gartenberg v.

Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982); *see Jones v. Harris Assocs. L.P.*,

---

Making_a_Good_Retirement_Plan_Better.docx; *see* CC ¶ 85 n.25.

9      *Compare id.* at 2 (Purdue's plan serves 15,000 participants), *with* CC ¶ 125 (Columbia's Plans serve between 42,000 and 47,000 accounts for 27,000 participants).

10      Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper: University of Notre Dame* at 4 (Feb. 2014), https://workplacecontent.fidelity.com/bin-public/070_NB_PreLogin_Pages/documents/ ND_403(b)%20Plan%20Redesign%20White%20Paper.pdf; *see* CC ¶ 88 n.28.

559 U.S. 335, 345-46 (2010) (endorsing *Gartenberg*); *see also Laboy*, 513 F. App'x at 80 (suggesting that a claim that a fiduciary exposed an ERISA plan to excessive fees will typically exist only where there are plausible allegations of self-dealing).

Plaintiffs face a hefty burden to allege plausibly that Columbia overpaid its recordkeeping vendors, both of which operate on an at-cost basis.[11] Yet, nothing in the CC plausibly alleges such a disconnect between the services that the Plans received and what it paid for those services. For one thing, the CC does not allege what services the Plans received.

Plaintiffs face a hefty burden to allege plausibly that Columbia overpaid its recordkeeping vendors, both of which operate on an at-cost basis.[1] Yet, nothing in the CC plausibly alleges such a disconnect between the services that the Plans received and what it paid for those services. For one thing, the CC does not allege what services the Plans received—even though Columbia apprised Plaintiffs of their obligation to make such allegations in its pre-motion letter.  ECF No. 45, at 4. Plaintiffs plainly cannot "allege that the fees were excessive *relative 'to the services rendered*,'" as they must (*Young*, 325 F. App'x at 33), without identifying the services.

On the costs side of the ledger, Plaintiffs allege that "the Plans paid a net total of between $2.9 and $5.8 million" for recordkeeping services each year, based on their undisclosed assumptions about the amounts of revenue sharing. CC ¶ 136. They allege that Defendants failed to negotiate "rebates … based on the Plans' economies of scale." *Id.* ¶ 139. But the same "annual reports filed with the Department of Labor (Form 5500)" that Plaintiffs cite as support for the alleged overpayments flatly disprove their allegations by disclosing that Columbia *did* negotiate

_____

11      *See* RJN Ex. C-1, at 6 (Vanguard operates "on an at-cost basis") (incorporated by reference at CC ¶ 147 n.48); Ex. C-2, at 16 ("Vanguard provides services to its member funds on an at-cost basis, with no profit component, which helps to keep the funds' expenses low."); *see also* note 4, *supra* (TIAA).

millions of dollars of rebates that inured to the benefit of Plan participants—with $2.9 million in rebates for the first full plan year covered by Plaintiffs' allegations and $2.2 million for the most recent plan year. [12]

Far from demonstrating that recordkeeping costs were "so disproportionately large" that one can plausibly infer a breakdown of process, the Forms 5500 support only the opposite inference—that the University had appropriate processes in place to monitor and negotiate fees. Allegations resting on Plaintiffs' sloppy due diligence do not "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678. [13]

### C.    Plaintiffs' Investment Fees Claim Fails.

In Count V, Plaintiffs allege that the University breached its fiduciary duties (1) by offering mutual funds that were too expensive; (2) by offering CREF variable annuities that charged fees they believe were unnecessary; (3) by offering too many investment options; and (4) by offering the CREF Stock Account and the TIAA Real Estate Account, which they allege to have been underperformers. None of those allegations states a plausible claim of fiduciary breach.

#### 1.    Plaintiffs do not adequately allege that the University failed to monitor investment fees.

Plaintiffs first seek to impose liability on the University for allegedly failing to include the lowest-fee options within the mutual-fund menu.

There should be little doubt, however, that the University was attentive to fees and offered low-cost options. Fiduciaries satisfy their duties under ERISA by "offer[ing] participants meaningful choices about how to invest their retirement savings," a standard that accounts for

---

[12]    *See* RJN Ex. A-1, Financial Statements at 10 (2011 Officers Plan: $1,929,944); Ex. A-2, Financial Statements at 8 (2011 Voluntary Plan: $981,924); Ex. A-4, Financial Statements at 12 (2015 Officers' Plan: $1,411,704); Ex. A-5, Financial Statements at 9 (2015 Voluntary Plan: $774,708).

[13]    Plaintiffs separately contend that Columbia was required to "conduct a competitive bidding process." CC ¶ 141. But "nothing in ERISA compels periodic competitive bidding" (*Chevron*, 2016 WL 4502808, at *14), and Plaintiffs' other allegations show that the process the University did use was appropriately designed to track recordkeeping fees and keep them reasonable.

"the range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees." *Renfro*, 671 F.3d at 327. The standard is thus whether a fiduciary has given "'appropriate consideration' to whether an investment 'is reasonably designed, as part of the portfolio … to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment.'" *St. Vincent*, 712 F.3d at 716 (quoting 29 C.F.R. § 2550.404a-1(b)(2)(i)).

Plaintiffs' myopic focus on price alone has been rejected by other courts, which have recognized that:

> where, as here, a plan offers a diversified array of investment options, the fact that some other funds might offer lower expense ratios is not relevant, as ERISA does not require fiduciaries to scour the market to find and offer the cheapest possible funds (which might, of course, be plagued by other problems).

*Chevron*, 2016 WL 4502808, at *10 (citations and internal quotation marks omitted). Applying that standard, the Third Circuit affirmed the dismissal of a claim challenging the inclusion of retail mutual funds because the expense ratios ranged from 0.10% to 1.21%. *Renfro*, 671 F.3d at 319, 327-28. The Seventh Circuit affirmed the dismissal of a similar claim, where the fees ranged from 0.07% to "just over 1%." *Hecker*, 556 F.3d at 586; *accord Loomis v. Exelon Corp.*, 658 F.3d 667, 671 (7th Cir. 2011); *cf. Braden*, 588 F.3d at 596 (acknowledging that a fiduciary might "have chosen funds with higher fees for any number of reasons, including potential for higher return, lower financial risk, more services offered, or greater management flexibility").

Here, the Plans offered investment options with fees as low as 0.09%, and participants allege that they elected funds with fees ranging from 0.31% to 0.87%.[14] That alone guts Plaintiffs' allegation that Defendants breached the duty of prudence by offering retail share classes. *See*

---

[14]     *Compare* CC ¶ 8, *with* RJN Ex. D-1 (2016 fee disclosure) (0.31% is the expense ratio for CREF Growth Account R3; 0.87% is the expense ratio for the Calvert Ultra-Short Income Fund A).

*Rosen*, 2016 WL 7494320, at *15 (granting motion to dismiss excessive fees claim because, "[t]aken as a whole, the total menu of investment options resulted in expense ratios ranging from 0.04% to 1.02%.").

Again, here, a minimal level of probing demonstrates that Plaintiffs' specific claims are implausible. Plan participants invested only in TIAA and Calvert funds, so they have no standing[15] to challenge the Vanguard options.[16] With respect to TIAA, the documents relied upon by Plaintiffs in the CC show that the University *was* attentive to share-class considerations. The University moved all of TIAA's mutual funds to the lowest-fee share class in 2013[17] and adopted the lowest-fee class of variable annuities as soon as share classes were introduced, in 2015.[18] For Calvert, two Plaintiffs claim that they should have been entitled to invest in Class Y of the Calvert Ultra-Short Income Fund, but that share class was not available to retirement plans until 2015.[19]

## 2. Plaintiffs' allegations regarding the "layers of fees" in CREF investments fail to state a claim.

Plaintiffs relatedly allege that the CREF variable annuities offered by the Plans charged several "layers" of fees that they argue were either unreasonable or unnecessary. CREF's total

---

[15] To satisfy Article III of the Constitution, Plaintiffs must allege that one of them personally sustained an injury with respect to each of their claims for relief. *Davis v. FEC*, 554 U.S. 724, 734 (2008). It is not sufficient for Plaintiffs to allege that they participated in the Plans. *Kendall v. Employees Retirement Plan of Avon Products*, 561 F.3d 112, 120 (2d Cir. 2009); *Taveras v. UBS AG*, 612 F. App'x 27, 29 (2d Cir. 2015) (summary order). Nor is it sufficient for Plaintiffs to allege that they purchased non-Vanguard funds that were supposedly too expensive, given that Plaintiffs have not alleged a single fiduciary act or omission that implicated Vanguard and TIAA simultaneously.

[16] In any event, Vanguard's prospectuses show why Plaintiffs' allegations are implausibly simplistic: "Vanguard may charge additional recordkeeping fees for institutional clients whose accounts are recordkept by Vanguard." RJN Ex. C-2, at 24 (Vanguard REIT Index Fund Prospectus). So Plaintiffs are not making an apples-to-apples comparison between different share classes.

[17] RJN Ex. D-2 (required disclosure); *see also* Ex. A-4, Auditor's Report, at 21 (showing current investment in institutional funds).

[18] *See* RJN Ex. C-6, at 10 ("Prior to April 24, 2015, CREF offered only one class of units."); Ex. A-4, Financial Statements, at 21 (showing that the Plans invested in Class R3 shares as of December 31, 2015).

[19] *Compare, e.g.*, RJN Ex. C-5, at 5 (2015 prospectus), *with* Ex. C-4, at 4 (2014 prospectus).

fees are attributable to (a) recordkeeping, (b) distribution, (c) mortality and expense risk, and (d) investment management. Plaintiffs, in turn, have a grievance about each of those components. They allege (a) that the recordkeeping fees should have been per-participant instead of pro rata; (b) that distribution fees paid for marketing services they did not need; (c) that the mortality and expense risk fee—0.005%—does not benefit plan participants who ultimately opt for a lump-sum payment of their benefits; and (d) that investment management fees should have included tiered discounts for large accounts. CC ¶ 117.

Plaintiffs notably do *not* allege that CREF offered equivalent products at a lower cost—or that any other annuity provider did, either. Again, Plaintiffs cannot state a claim by wishing that the market were more to their liking. They must demonstrate that fiduciaries to other, comparable plans—*i.e.*, plans offered by Columbia's peer institutions—would have acted differently. But their lower-fees wish list has no basis in the real market; they thus cannot pursue market reforms on the shoulders of the universities they have chosen to target.

### 3. Plaintiffs' allegation that the Plans offered too many options fails to state a claim.

Next, Plaintiffs argue that the Plans offered participants too many options. They allege that, if the Plans had offered participants fewer choices of funds, they could have lowered their costs and avoided "unnecessary complexity [in] the investment lineup," which Plaintiffs allege caused "confusion" and "decision paralysis" for Plan participants. CC ¶¶ 155-161.

None of the named Plaintiffs alleges that he or she was unable to make an election. More fundamentally, the suggestion that Plan participants would have benefited from *less* choice is anathema to the free choice that is the hallmark of ERISA plans. "Because participant choice is the centerpiece of what ERISA envisions for defined-contribution plans, these sorts of paternalistic arguments have had little traction in the courts." *Tibble v. Edison Int'l*, 729 F.3d 1110,

1134-35 (9th Cir. 2013), *vacated and remanded on other grounds*, 135 S. Ct. 1823 (2015). Indeed, courts have *encouraged* rather than *penalized* increased choice. Choice is important because different investment vehicles have different features and characteristics that will make them attractive to different investors. *See id.* at 1135; *Loomis*, 658 F.3d at 671-72; *Hecker*, 556 F.3d at 586. Thus, the number of investment options offered by the Plans does not in any way suggest that Defendants' investment-management process was inadequate.

### 4.    Plaintiffs' underperformance claims fail.

Among more than one hundred investment options in the Plans, Plaintiffs allege that two should have been removed from the Plans for underperformance—the CREF Stock Account and the TIAA Real Estate Account. Plaintiffs do not state a claim for relief with respect to either.

"It is well-established that allegations of poor results alone do not constitute allegations sufficient to state a claim for" breach of fiduciary duty. *Laboy*, 513 F. App'x at 80. That is because "[t]he test of prudence is … one of conduct rather than results." *In re Citigroup ERISA Litig.*, 662 F.3d 128, 140 (2d Cir. 2011).

A plaintiff faces a particularly high bar when alleging that public information should have prompted fiduciaries to remove an investment option that was available on the open market. As the Supreme Court recently recognized, differences in performance between investment vehicles are the result of differences in investment structures and risk profiles—not questions of prudence and imprudence. *Dudenhoeffer*, 134 S. Ct. at 2471-72. In so holding, the Court credited the efficient market hypothesis—the theory that investors vote with their feet, such that investments in securities reflect the consensus of the market that the securities have the prescribed value. *Id.*; *see also Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 66 (2d Cir. 2016) (per curiam). The Court emphasized that a fiduciary need not "outsmart a presumptively efficient market," in which the actions of other self-interested investors confirm the prudence and appro-

priate pricing of particular investment options. *Dudenhoeffer*, 134 S. Ct. at 2472 (quoting *White v. Marshall & Isley Corp.*, 714 F.3d 980, 992 (7th Cir. 2013)).

Moreover, looking after the fact at the performance of an investment as the measure of whether the fiduciary was prudent is inappropriate. "[A] fiduciary's obligation is to exercise care prudently and with diligence under the circumstances then prevailing"; thus, "his actions are not to be judged from the vantage point of hindsight." *Merino*, 452 F.3d at 182 (internal quotation marks and citations omitted). Put differently, "ERISA's 'fiduciary duty of care … requires prudence, not prescience.'" *Rinehart*, 817 F.3d at 63-64 (quoting *St. Vincent*, 712 F.3d at 716). ERISA does not fault fiduciaries for failing to outguess the market or for retaining investments that underperformed the market. *Dudenhoeffer*, 134 S. Ct. at 2471-72.[20]

Under this standard, claims against funds that have *lost* much of their principal are routinely dismissed. *E.g., St. Vincent*, 712 F.3d at 721; *Jenkins*, 444 F.3d at 926; *DeBruyne v. Equitable Life Assur. Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) ("We cannot say that Equitable was imprudent merely because the Balanced Fund lost money."). Plaintiffs' challenges to the CREF Stock Account and the TIAA Real Estate Account—both of which have appreciated considerably—likewise fail to state a claim.[21]

    *a.*    ***The CREF Stock Account.*** The CREF Stock Account ("Stock Account") is a variable-annuity investment fund. According to its prospectus, the Stock Account seeks to achieve "[a] favorable long-term rate of return through capital appreciation and investment income by

---

[20]    Indeed, as one court has noted, "a fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy." *Chevron*, 2016 WL 4502808, at *17; *see also, e.g., Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (defendant did not breach fiduciary duties by retaining the same mutual funds in 401(k) plan lineup even though those funds lost money over a three-year period, because it can be reasonable "to stay with … mutual funds even during years of lower performance").

[21]    Plaintiffs also allege in passing that 76 other Plan funds "underperformed their respective benchmarks over [a] 5-year period" and thus should have been removed from the Plan. CC ¶ 172. But that allegation should be rejected. It is based totally on hindsight, and as explained in the previous footnote, there is nothing imprudent about retaining an investment through a period of underperformance.

investing primarily in a broadly diversified portfolio of common stocks." RJN Ex. C-6, at 27. The Stock Account is globally diversified and "seeks to maintain the weightings of its holdings as approximately 70-75% domestic equities and 25-30% foreign equities." *Id.* at 28. Because of this blended strategy, the prospectus explains that no single benchmark appropriately gauges the Stock Account's performance:

> The benchmark for the Stock Account is a composite index composed of two unmanaged indices: the Russell 3000® Index and the MSCI All Country World ex-USA Investable Market Index ("MSCI ACWI ex-USA IMI"). The weights in the composite index change to reflect the relative sizes of the domestic and foreign segments of the Account and to maintain its consistency with the Account's investment strategies.

*Id.* at 28-29. As Plaintiffs allege, all universities that offer certain TIAA fixed annuities are required to offer the Stock Account. CC ¶ 77. Plaintiffs contend that the Stock Account should have been removed as a Plan investment option because "[i]ts historical performance has been persistently poor for many years compared to both available lower-cost index funds and the Russell 3000 Index benchmark." CC ¶ 187.

This claim fails for numerous reasons. *First*, as explained *supra* (at 5–6), Plaintiffs allege that the Stock Account could have been removed only if *all* TIAA annuities were discontinued (CC ¶ 77), but they do not allege that all TIAA annuities should have been discontinued.

*Second*, the Stock Account is an investment vehicle for a variable annuity. Plaintiffs assert that mutual funds performed better, but none of those mutual funds support a variable annuity. *See Tibble*, 729 F.3d at 1134 (rejecting comparison between different types of investment products because "[m]utual funds … have a variety of unique regulatory and transparency features that make it an apples-to-oranges comparison").[22]

---

[22]      *See also* SEC, *Variable Annuities: What You Should Know*, https://www.sec.gov/investor/pubs/varannty.htm ("variable annuities differ from mutual funds in several important ways").

*Third*, Plaintiffs presume, without basis, that Plan fiduciaries had the *authority* to remove Plan investments from the Stock Account. But the contracts governing the rights of the named Plaintiffs who invested in the Stock Account prove otherwise—"a retirement plan may *not* limit participation in the CREF Stock Account."[23]

*Fourth*, market forces establish that offering participants the opportunity to invest in this account was not imprudent. More than $100 *billion* is invested in the Stock Account[24]—which powerfully gives the lie to any claim that investing in the Stock Account is an imprudent decision.

*Fifth*, Plaintiffs' argument is premised on a misunderstanding of the investment strategy of the Stock Account. Plaintiffs condemn the non-removal of the Stock Account based on performance comparisons to two passively managed index funds (the Vanguard Total Stock Market Index Fund and the Vanguard Institutional Index) and the Russell 3000 index. CC ¶ 189. Plaintiffs neglect, however, to mention that those "benchmarks" invest only in *domestic* equities, whereas the Stock Account is a 70/30 blend of domestic and *foreign* equities. So differences in performance are explained by differences in performance between domestic and foreign stocks. In other words, the Stock Account has a different risk profile from the proposed comparators, which means that their comparisons do nothing to discredit the processes employed here by Plan fiduciaries.[25]

> **b.** **The TIAA Real Estate Account.** Plaintiffs' challenge to the TIAA Real Estate Account fails for similar reasons. The Real Estate Account is a variable annuity account that "seeks favorable long-term returns primarily through rental income and appreciation of real es-

---

[23] RJN Ex. E, at H063, C057, F057, A075; 26 C.F.R. § 1.408-3; *see* CC ¶¶ 103, 113, 130.
[24] RJN Ex. C-6, at 10-11.
[25] Plaintiffs also criticize the Stock Account's use of active management. Many other courts have rejected the theory that fiduciaries breached their fiduciary duty by offering actively managed funds. *See, e.g.*, *Rosen*, 2016 WL 7494320, at *13-15; *Taylor v. United Techs. Corp.*, 2009 WL 535779, at *10 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F. App'x 525 (2d Cir. 2009).

tate and real estate-related investments."[26] In particular, the Real Estate Account invests primarily in commercial real estate.[27]

Plaintiffs allege that Defendants should have replaced the Real Estate Account with the Vanguard REIT Index mutual fund. CC ¶ 197. The Vanguard REIT Index tracks an index of REITs that "represent[s] a broadly diversified range of property types," not just commercial real estate.[28]

Again, the Vanguard REIT Index is a mutual fund; the Real Estate Account is not. Moreover, although both the Vanguard REIT Index and the Real Estate Account invest in real estate, they have different strategies. The Real Estate Account focuses on investments in commercial real estate, whereas the Vanguard REIT indexes real-estate securities, making it a different creature entirely.[29]

As one might expect, the historical performance of these investment vehicles shows that they reflect different strategies with different investment objectives. In the past six years, the Real Estate Account has performed better than the Vanguard REIT Index three times, and the Vanguard REIT Index has performed better than the Real Estate Account three times.[30] Indeed, the *Doe* complaint's comparison plot between the Real Estate Account and the Vanguard REIT Index shows that Plaintiffs' proposed "better" option is far more volatile. *Doe* ECF No. 3, ¶ 99.

Plaintiffs' allegations establish that there are mutual funds with strategies that differ from the $22.4 billion Real Estate Account—not that the Real Estate Account is inferior; and certainly not that Plan fiduciaries lacked appropriate processes for reviewing the Real Estate Account (a

---

[26]    RJN Ex. C-7, at 3.
[27]    *Id.* at 36-37.
[28]    RJN Ex. C-2, at 12.
[29]    *Id.* at 8 (explaining how REITs differ from investments in real estate and disclosing that "returns from REITs may not correspond to returns from direct property ownership").
[30]    *Compare id.* at 11, *with* Ex. C-2, at 12.

topic about which the Complaint says nothing at all).[31]

## II. Plaintiffs Have Failed To State A Claim For Breach Of The Duty Of Loyalty.

Plaintiffs also allege that the University's agreement to a bundled-services arrangement with TIAA constitutes a breach of the duty of loyalty. But this allegation is inadequately pled and utterly implausible.

ERISA "charges fiduciaries with a duty of loyalty to guarantee beneficiaries' interests" by invoking a common law trustee's duty to "'administer the trust solely in the interest of the beneficiaries.'" *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (quoting 2A AUSTIN SCOTT & WILLIAM FRATCHER, THE LAW OF TRUSTS § 170, at 311 (4th ed. 1987)). Thus, in order to state a claim for breach of the duty of loyalty, Plaintiffs must allege that Defendants acted self-interestedly—or to further a third party's interests—and thereby failed to "act with an 'eye single' to the interests of the Plan beneficiaries." *In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)); GEORGE G. BOGERT & GEORGE T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 543 (3d ed. 2016) ("The trustee must exclude all self-interest, as well as the interest of a third party, in his administration of the trust solely for the benefit of the beneficiary.").

Plaintiffs attempt to carry this burden by alleging that the bundled-services arrangement furthered *TIAA's* interests rather than those of Plan participants, in that the inclusion of TIAA funds in the Plans benefited TIAA financially in the form of revenue-sharing payments. *E.g.*, CC ¶¶ 111-12. But Plaintiffs allege *no* facts that support a plausible claim that the University agreed to this arrangement *in order to* further TIAA's interests; they are repackaging their duty-of-

---

[31]     Plaintiffs allege, in passing, that the TIAA Real Estate Account charges a "liquidity guarantee" fee that the Vanguard REIT Index Fund does not. CC ¶ 119. But this allegation is meaningless. Plaintiffs do not allege anything about what services TIAA provides in exchange for this fee, and without that information, they cannot plausibly allege that the fee is unreasonable or that the Vanguard REIT fund is superior simply because it does not charge the fee.

prudence claim that the fees paid through revenue sharing were too high. This is insufficient to state a claim for breach of the duty of loyalty. *See, e.g.*, *Chevron*, 2016 WL 4502808, at *5 ("Because the complaint does not differentiate between breach of the duty of prudence and breach of the duty of loyalty, and includes no separate allegations to support the duty of loyalty claim, the court finds the allegations in the complaint insufficient to sustain the disloyalty claim.").

In any event, given TIAA's nonprofit character, any claim that the Plans acted to boost TIAA's nonexistent profitability is implausible.

## III. Plaintiffs Have Failed To State A Claim That Defendants Engaged In Prohibited Transactions.

In addition to alleging that the practices they identify breached the University's fiduciary duties, Plaintiffs also allege that they constituted "prohibited transactions" under Section 406(a) of ERISA. As relevant here, Section 406 prohibits transactions between a plan and a "party in interest" that involve "sale or exchange, or leasing, of any property" (29 U.S.C. § 1106(a)(1)(A)); the "furnishing of goods, services, or facilities" (*id.* § 1106(a)(1)(C)); and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" (*id.* § 1106(a)(1)(D)). Plaintiffs allege that the University engaged in each of these kinds of prohibited transactions (CC ¶¶ 214-19, 229-33, 248-52), but they are wrong on all counts.

To begin with, neither TIAA nor Vanguard is a party in interest by virtue of the investment management services they provide to the Plans. *See* 29 U.S.C. § 1002(21)(B) (investment companies do not become parties-in-interest by providing investment advisory services to mutual funds); *accord* 29 C.F.R. § 2509.75-3; *see also IATSE Local 33 Section 401(k) Plan v. Bullock*, 2008 WL 4838490, at *6 (C.D. Cal. Nov. 5, 2008); Amendment to Prohibited Transaction Exemption 84-24, 71 Fed. Reg. 5887, 5889 (Feb. 3, 2006) ("[T]he purchase, with plan assets, of an insurance or annuity contract from an insurance company" is not a prohibited transaction.).

With respect to recordkeeping, none of the alleged transactions with TIAA or Vanguard involved the "sale or exchange, or leasing, of any property" within the meaning of § 1106(a)(1)(A). Nor, for that matter, did any transactions involve "assets of the [P]lans" within the meaning of § 1106(a)(1)(D), because TIAA and Vanguard were compensated from assets held by the mutual funds and annuities in their possession, which are expressly excluded from the definition. *Id.* § 1101(b)(1).[32] *See Hecker*, 556 F.3d at 584 (holding that service provider fees "drawn from the assets of the mutual funds" did not involve plan assets).

Moreover, *all* of Plaintiffs' prohibited-transaction claims fail because the alleged transactions fall within the safe harbor of Section 408(b). Section 408(b) exempts certain categories of transactions from Section 406—including, as relevant here, payments for "services necessary for the establishment or operation of the plan," as long as "no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2). Because they have failed to allege *any* facts about the services that TIAA and Vanguard provided to the Plans, Plaintiffs have failed plausibly to allege that the payments to TIAA and Vanguard were unreasonable and thus have not stated a claim for any kind of prohibited transaction. *See, e.g.*, *Leber v. Citigroup, Inc.*, 2010 WL 935442, at *10 (S.D.N.Y. Mar. 16, 2010) ("[W]here the complaint does not allege any basis for presuming that a defendant's conduct fell outside a statutory exemption—and therefore that a defendant's conduct might plausibly entitle plaintiff to relief—it is deficient."); *see also Skin Pathology Assocs. v. Morgan Stanley & Co.*, 27 F. Supp. 3d 371, 378 (S.D.N.Y. 2014) (dismissing complaint for failure to allege that § 408 exemption was not satisfied). As explained elsewhere, the compensation structure for the Plans' service providers was objectively reasonable.

---

[32]     *See* CREF Notice of Application, SEC Release No. IC-31092, 2014 WL 2858566 (June 23, 2014).

## IV. Plaintiffs Have Failed To State A Claim For Breach Of The Duty To Monitor.

Plaintiffs' remaining allegations claim that Defendants breached their duty to monitor by failing to monitor: the fees paid to Plan recordkeepers (*e.g.*, CC ¶ 258(c)), the investment options available (*id.* ¶ 258(d)), and the performance of those options (*e.g.*, *id.*). Plaintiffs' duty-to-monitor claims are derivative of their other claims; accordingly, because their duty-of-loyalty and duty-of-prudence claims fail, their duty-to-monitor claims fail as well. *See, e.g.*, *Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor … absent an underlying breach of the duties imposed under ERISA" by the party being monitored), *vacated on other grounds*, 134 S. Ct. 2900 (2014), *and reaff'd sub nom. Rinehart v. Lehman Bros. Holdings, Inc.*, 817 F.3d 56 (2d Cir. 2016).

In any event, Plaintiffs once again fail to allege any facts about what the University's monitoring processes were—or what monitoring procedures it should have had in place. Absent such process allegations, a monitoring claim fails to state a plausible claim for breach of fiduciary duty. *See, e.g.*, *Chevron*, 2016 WL 4502808, at *19 (dismissing duty-to-monitor claim because "plaintiffs allege[d] no facts showing how the monitoring process was deficient").

## V. Plaintiffs' Claims Are Time-Barred.

Plaintiffs' claims also fail because they are time-barred. Under ERISA's statute of limitations, claims must be brought within "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2). "A plaintiff has 'actual knowledge' of a breach or violation 'when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the act." *Muehlgay v. Citigroup Inc.*, 649 F. App'x 110, 111 (2d Cir. 2016) (quoting *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001)). In the ERISA context, a plaintiff has actual knowledge of the contents of all disclosures he has received, regardless of "whether individual Plaintiffs ac-

tually saw or read the documents." *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 n.3 (S.D.N.Y. 2008), *aff'd on other grounds*, 325 F. App'x 31, 33 (2d Cir. 2009); *accord Brown v. Owens Corning Inv. Review Cmte.*, 622 F.3d 564, 571 (6th Cir. 2010).

Looking to the face of Plaintiffs' CC and to participant disclosures mandated by law, which are subject to judicial notice, each of Plaintiffs' claims is time-barred:

Count I concerns whether the University breached its fiduciary duty by permitting TIAA to require that the CREF Stock and Money Market Accounts be offered to plan participants. Plaintiffs Carr, Silverstein, Hulen, and Valentine allege that they invested in those funds, which they contend should not have been bundled with other TIAA services. But individuals who purchase annuities are entering into contractual agreements. *See* 26 C.F.R. § 1.408-3; CC ¶¶ 65, 67, 103, 113, 130. Those contracts (from 1995, 2005, 2006, and 2009) explain that the University had no discretion to discontinue the Stock and Money Market Accounts.[33] Plaintiffs therefore had knowledge that the challenged funds were mandatory more than three years ago.[34]

In Counts III and V, Plaintiffs allege that they paid excessive fees, which they say could have been reduced if they had been offered fewer choices with more favorable share classes. But, as required by law (29 C.F.R. § 2550.404a-5), Plaintiffs received (1) annual disclosures detailing the options available, their fees, and performance metrics; (2) notices whenever investment options were changed; and (3) prospectuses for the investment options that they elected.[35] Those disclosures plainly identify the *number* of options available and the *fees* associated with those investment options. Thus, as another court in this district concluded in an analogous case, "[t]he allegedly excessive fees that form the central basis of this claim were readily apparent from the

---

[33]    *See* RJN Ex. E, at H063, C057, F057, A075; *cf.* CC ¶¶ 103, 113, 130 (incorporating the contracts by reference).

[34]    Likewise, because the annuity contracts are more than six years old, these claims are time-barred irrespective of Plaintiffs' knowledge, under ERISA's six-year statute of repose. *See* 29 U.S.C. § 1113(1); *Muehlgay*, 649 F. App'x at 111.

[35]    *E.g.*, RJN Exs. C, D.

information provided to all Plan participants more than three years before Plaintiffs filed th[eir] suit" because "the quarterly performance summaries provided to Plan participants clearly disclosed the fees and expenses associated with [certain] [f]unds." *Young*, 550 F. Supp. 2d at 420.

Moreover, Plan disclosures explained when different share classes were available. The Plaintiffs who invested in the TIAA mutual funds received notice on March 1, 2013, that the funds would be transitioned to the lower share classes.[36] Calvert investors had knowledge, through their prospectuses, about the share class alternatives and their fee profiles.[37]

Finally, to the extent that Plaintiffs have re-packaged their breach-of-fiduciary duty claims as prohibited-transaction claims, these claims, too, are time-barred under Plaintiffs' theory of the case. The same disclosures amply demonstrated that TIAA and Vanguard were providing services to the Plans and that they were being compensated for those services, and that Calvert had been discontinued as a recordkeeper.

## CONCLUSION

For the foregoing reasons, the CC should be dismissed.


Dated: February 15, 2017

Respectfully submitted,

Nancy G. Ross
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600

Jean-Marie L. Atamian
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500

*/s/ Brian D. Netter*
Brian D. Netter
 bnetter@mayerbrown.com
Michelle N. Webster
Travis Crum
Matthew A. Waring
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants*

---

[36]     RJN Ex. D-1.
[37]     RJN Ex. C-3, at 1 (Calvert Ultra-Short Income Portfolio Summary Prospectus, Jan. 2013).

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 15, 2017, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.

By:  /s/ *Brian D. Netter*
Brian D. Netter