## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHANDRA CATES, et al.,<br><br>　　　　　　　*Plaintiffs*,<br><br>v.<br><br>THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,<br><br>　　　　　　　*Defendant*. | Civil Action No. 16-cv-6524<br><br><br>Hon. George B. Daniels<br><br>Hon. Stewart D. Aaron |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS
## WENDY DOMINGUEZ AND GERALD BUETOW

Nancy G. Ross
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600

Jean-Marie L. Atamian
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500

Brian D. Netter
　bnetter@mayerbrown.com
E. Brantley Webb
Michelle N. Webster
Matthew A. Waring
Ankur Mandhania
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

    A.    Plaintiffs' Claims ............................................................................... 2

    B.    Plaintiffs' Experts ............................................................................. 3

        1.    Wendy Dominguez ................................................................. 3

        2.    Gerald Buetow ....................................................................... 5

ARGUMENT .......................................................................................................... 5

I.    Dominguez's Opinion Should Be Excluded As Unreliable............................. 7

    A.    Dominguez's report follows no known process............................... 7

    B.    Dominguez's report does not follow the process she uses at Innovest. .............. 10

    C.    The process reflected in Dominguez's report is unreliable. .............................. 13

        1.    Dominguez's process is internally inconsistent..................................... 13

        2.    Dominguez's process relies impermissibly on hindsight........................ 14

        3.    Dominguez's process is arbitrary and superficial.................................. 14

            (1)    CREF Stock ............................................................... 15

            (2)    TIAA Real Estate ...................................................... 18

            (3)    Other Funds................................................................ 22

    D.    Dominguez should not be allowed to offer testimony as to ultimate legal questions. ..................... 23

II.    Buetow's Opinion Should Likewise Be Excluded Because It Is Derivative Of Dominguez's Opinion. ...................... 25

CONCLUSION........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Commc'ns Ass'n v. Ret. Plan*,
   488 F. Supp. 479 (S.D.N.Y. 1980) ......................................................................14

*Beyer v. Anchor Insulation Co.*,
   238 F. Supp. 3d 270 (D. Conn. 2017) .................................................................10

*Browe v. CTC Corp.*,
   2017 WL 5992333 (D. Vt. 2017) ........................................................................24

*Caraker v. Sandoz Pharm. Corp.*,
   188 F. Supp. 2d 1026 (N.D. Ill. 2001) ................................................................13

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ....................................................................1, 6, 18

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)...........................................................................................6, 7

*Hygh v. Jacobs*,
   961 F.2d 359 (2d Cir. 1992)................................................................................24

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
   629 F. Supp. 2d 175 (D. Conn. 2009).................................................................13

*Jones v. O'Higgins*,
   1989 WL 103035 (N.D.N.Y. 1989) ....................................................................24

*Katsaros v. Cody*,
   744 F.2d 270 (2d Cir. 1984)................................................................................14

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..........................................................................................5, 6

*Levinson v. Westport Nat'l Bank*,
   2012 WL 4489260 (D. Conn. 2012) ...................................................................24

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018)...................................................................7

*Lynch v. J.P. Stevens & Co.*,
   758 F. Supp. 976 (D.N.J. 1991) ..........................................................................24

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Marini v. Adamo*,
    995 F. Supp. 2d 155 (E.D.N.Y. 2014) ......................................................................7

*Meineker v. Hoyts Cinemas Corp.*,
    154 F. Supp. 2d 376 (N.D.N.Y. 2001) ......................................................................6

*Nimely v. City of N.Y.*,
    414 F.3d 381 (2d Cir. 2005) .................................................................................24

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) .................................................................................23

*Troudt v. Oracle Corp.*,
    2019 WL 1398053 (D. Colo. Jan. 31, 2019) ............................................................7

*United States v. Duncan*,
    42 F.3d 97 (2d Cir. 1994) ....................................................................................24

*Zollinger v. Owens-Brockway Glass Container, Inc.*,
    233 F. Supp. 2d 349 (N.D.N.Y. 2002) ...................................................................24

**Statutes, Rules and Regulations**

Fed. R. Evid. 702 ......................................................................................................5, 7

IRC § 403(b) .................................................................................................................2

**Other Authorities**

Brightscope, *The Brightscope / ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* 13 (Dec. 2014),
    https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf ...................................7, 8

Brightscope, *The Brightscope / ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans* 12 (June 2015),
    https://www.ici.org/pdf/ppr_15_dcplan_profile_403b.pdf ......................................7

Morningstar, *The Morningstar Category Classifications* 12 (Apr. 29, 2016),
    http://morningstardirect.morningstar.com/clientcomm/Morningstar_Categories_US_April_2016.pdf .....................................................................................11, 14

iii

## INTRODUCTION

Plaintiffs assert $454.8 million in damages stemming from their allegations that defendant Columbia University ("Columbia") offered "underperforming" investment funds to participants in its retirement plans.

Plaintiffs intend to offer two expert witnesses in support of this claim: Wendy Dominguez, to opine that a reasonable fiduciary would have prevented participants from investing in 22 of the Plans' funds, and Gerald Buetow, to compute "damages" based on Dominguez's opinions.

Neither expert opinion satisfies *Daubert*'s standards for admissibility.  Dominguez's opinion in particular runs roughshod over the concept of reliability.  Dominguez did not follow any established process for assessing the funds on the Plans' investment lineup; indeed, she did not even follow the process that she herself uses in her non-litigation work.  An expert cannot craft a methodology out of whole cloth for the sole purpose of supporting a party's litigating position; the expert's failure to heed the practices of professionals in her field is disqualifying.

Here, the problem is not merely theoretical.  Dominguez has reviewed one of the funds covered by her expert report—TIAA Real Estate—for one of her non-litigation clients. Although the circumstances were the same, Dominguez reached irreconcilable conclusions.  For litigation purposes, she intends to tell the Court that a reasonable individual would have prohibited participants from accessing the TIAA Real Estate Account.  But for her actual clients, Dominguez described the fund as a "strong candidate on performance" endorsed *adding* it to the lineup, and then concluded that she had "No/Minimum Concerns" about keeping it there.  A "process" that yields such a striking disparity impels exclusion under *Daubert*.

Buetow's derivative report should also be stricken.  His opinions are entirely contingent on Dominguez's report; if her report is excluded, his must be, too.

1

## BACKGROUND

### A.    Plaintiffs' Claims

This case involves two defined contribution retirement plans at Columbia University: the Retirement Plan for Officers of Columbia University and the Columbia University Voluntary Retirement Savings Plan (collectively, the "Plans"). The Plans are individual-account, defined-contribution retirement plans organized under section 403(b) of the Internal Revenue Code. In such a plan, fiduciaries select a menu of investment options; plan participants then elect how to invest their retirement assets among the available options. Reflecting the diversity of its participant population, Columbia offers a wide array of annuities and mutual funds to Plan participants. *See* Dkt. 41 at 2-3 (noting variety of investment options available to participants).

In 2016, seven participants in the Plans ("Plaintiffs") filed suit on behalf of a putative class, alleging that Columbia violated various provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). Although the majority of Plaintiffs' claims were dismissed with prejudice for failure to state a claim, the Court allowed Plaintiffs to proceed to discovery on two main claims for breach of fiduciary duty: one related to allegedly excessive administrative fees (Count III) and one related to the inclusion of allegedly imprudent investment options (Count V). Dkt. 41 at 3. The expert opinions at issue in this motion (Dominguez's and Buetow's) relate only to Count V.

In Count V, Plaintiffs allege that Columbia breached its fiduciary duties under ERISA by allowing certain supposedly underperforming investments to remain in the Plans. The complaint discusses, at length, two allegedly imprudent funds—CREF Stock Account and TIAA Real Estate Account. Consolidated Complaint ("Compl.") ¶¶ 173-202, Dkt. 76-1. The complaint also alleges, in a single paragraph, that 74 other funds in the Plans (listed in a table) "underperformed their respective benchmarks" over the five years preceding June 30, 2016. *Id.* ¶ 172.

**B.      Plaintiffs' Experts**

In support of these allegations, Plaintiffs seek to introduce expert testimony from Wendy Dominguez and Gerald Buetow.

**1.      Wendy Dominguez**

Wendy Dominguez is the President of Innovest Portfolio Solutions, a Denver-based consultancy.  At Innovest, Dominguez "evaluate[s] funds ... based … on a process."  Ex. A, Dominguez Dep. at 108:3-5.  That process accounts for qualitative considerations (like evaluations of a fund manager's aptitude, experience, and strategy) and quantitative data.  Quantitative assessments depend, in turn, on how a fund is benchmarked; Innovest has a process for identifying benchmarks that represent apples-to-apples comparisons and for identifying meaningful comparisons between funds and their peers.  For these quantitative assessments, Innovest relies primarily on data from the analytics firm Lipper.  *Id.* at 28:17-20.

For this case, Dominguez was retained by Plaintiffs to evaluate 22 of the Plans' investment funds.  Ex. A at 110:10-11; Ex. B, Expert Report of Wendy Dominguez  ¶¶ 24-26.  For that assessment, Dominguez did not use "the system that [she] use[s] for evaluating funds for Innovest," which she described as "just different."  Ex. A at 107:25-108:2.  For litigation purposes, she followed "an easy way to evaluate funds using Morningstar."  *Id.* at 108:2-3.  Under her process for this case, Dominguez skipped the qualitative reviews altogether.  *Id.* at 101:1-7.  For the quantitative data, she did not follow her typical Lipper-based process; instead, she reviewed data from Morningstar.  *Id.* at 101:18-24.  For the crucial benchmarking phase, Dominguez did not follow her typical practice:

> Q: So it wasn't your methodology here to pick your own
> benchmark?
>
> A. Correct. … [A]gain, if this was our client and we were building
> a menu using a process, we would have selected funds that are best

3

> in breed, benchmark them correctly using the way that we
> benchmark funds.  But in this case, this is, you know, a different
> approach.

*Id.* at 137:13-20.  Rather than "benchmark the[] [funds] correctly," Dominguez "relied on what

Morningstar did" in assigning funds to categories.  *Id.* at 137:6-7.  Dominguez could not identify

"how Morningstar assigns those categories" (*id.* at 149:5-6) or "the methodology that

Morningstar used in order to assign" benchmarks to categories (*id.* at 137:4-7).  Because

Dominguez does not ordinarily use Morningstar data, she was unaware that Morningstar

identifies *multiple* benchmarks for each of its categories (*id.* at 114:4-18); she could not identify

which of those benchmarks she had relied upon—a subset of indices that is proprietary to

Morningstar—and had no justification for that particular choice.  *Id.* at 114:4-21.  In many

instances, Dominguez relied on benchmarks that Morningstar had not created until after June

2010 (*i.e.*, data that nobody *could* have relied upon at the time).[1]

Armed with a dataset that Dominguez acknowledged was "probably not" the best (Ex. A

at 137:9), Dominguez did not have a fixed process for evaluating the 22 funds.  Some of the

funds outperformed their Morningstar category peers, so she criticized their performance against

the Morningstar benchmark (*e.g.,* Ex. B ¶¶ 139, 174); some of the funds outperformed the

Morningstar benchmark, so she criticized their performance against their Morningstar category

peers (*e.g., id.* ¶ 154); and some of the funds beat their Morningstar benchmarks and

---

[1] *See, e.g.*, Ex. C (Ex. 3 to Expert Report of Wendy Dominguez), tab "June 2010 performance"
(listing eight benchmarks with inception dates after June 2010). In these cases, Dominguez
appears to be relying on Morningstar's "backfilled" returns for its benchmarks. "Backfilling"
refers to Morningstar's practice of presenting what its benchmarks' returns would have been
prior to inception using historical data. *See, e.g.*, Selecting a Target-Date Benchmark,
https://www.morningstar.com/content/dam/marketing/shared/cit-lifetime-index-
funds/Selecting_Target-Date_Benchmark_Report_0118.pdf, at p. 8 (noting that target date
benchmarks presented have "historical backfilled return data going back at least five years").

outperformed their Morningstar category peers, so she described them as "dangerous" (*e.g., id.* ¶¶ 82, 91).

For each of the funds, then, Dominguez chose a replacement fund to which, she said, the fund's assets should have been mapped.  Ex. A at 132:11-15. *But see* Ex. D, Dominguez Supp. Dep. at 26:19-22 (indicating that "counsel provided" list of alternate funds to Dominguez).  But she did not review any information or conduct any analysis to support her mapping opinions. *Id.* at 32:3-8.

### 2.    Gerald Buetow

Gerald Buetow is a financial consultant (and a frequent expert in cases brought by Plaintiffs' counsel).  *See* Ex. E, Expert Report of Gerald Buetow ¶ 21 (disclosing expert testimony in six cases, all of which were brought by Plaintiffs' counsel).  His opinion consists solely of calculations; he did not opine on the prudence of any fund in the plan or the appropriateness of the mapping alternatives identified by Dominguez.  According to Buetow, the "damages" that Plaintiffs suffered in this case from Columbia's failure to remove the 22 challenged funds are $454.8 million—$376 million of which is attributable to CREF Stock and TIAA Real Estate.

### ARGUMENT

Federal Rule of Evidence 702 authorizes testimony from a qualified expert witness only if the testimony is "the product of reliable principles and method" and "based on sufficient facts or data."  Although the particulars of the reliability inquiry will vary depending on the nature of the expert, a court must, in all circumstances, "make certain that an expert … employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

When an expert invents a new technique for litigation purposes, a court must exercise its gatekeeper function to exclude the testimony; the "most persuasive basis" for identifying the reliability of an expert's technique is its connection with "legitimate, preexisting research unrelated to the litigation."  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); *accord, e.g.*, *Meineker v. Hoyts Cinemas Corp.*, 154 F. Supp. 2d 376, 380 (N.D.N.Y. 2001) (rejecting expert testimony because expert had not "based his opinion on existing, independent research" and there was no other evidence "that 'the testimony is based on scientifically valid principles'" (internal citation omitted)).  More generally, courts will consider a number of factors:

> —Whether a "theory or technique ... can be (and has been) tested";
>
> —Whether it "has been subjected to peer review and publication";
>
> —Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
>
> —Whether the theory or technique enjoys "'general acceptance'" within a "'relevant scientific community.'"

*Kumho Tire*, 526 U.S. at 149-50 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993)).

Dominguez's report is unreliable.  In offering an opinion about how a fiduciary would have evaluated the Plans' funds in 2010 and 2012, Dominguez does not purport to follow any particular process—let alone a process that could be tested or replicated.  For her professional consulting work, she follows an entirely different process.  Dominguez's professional consulting work yields different outcomes than her opinion in this case.  And a review of her analyses of particular investment options proves them to be just the sort of junk science that *Daubert* forbids.

6

## I.     Dominguez's Opinion Should Be Excluded As Unreliable.

### A.     Dominguez's report follows no known process.

Because a trial court must ensure "that an expert's testimony … rests on a reliable foundation" (*Daubert*, 509 U.S. at 597), a district court must evaluate "whether the opinion is based upon reliable data and methodology" (*Marini v. Adamo*, 995 F. Supp. 2d 155, 179 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016)).  It is insufficient for an expert to claim "experience" and then to reveal her conclusions; she must disclose a defensible underlying methodology.  *See In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018); *Troudt v. Oracle Corp.*, 2019 WL 1398053 (D. Colo. Jan. 31, 2019); Fed. R. Evid. 702 adv. cmte. note (2000).

Dominguez seeks to testify about how a prudent fiduciary would have evaluated 22 of the Plans' investment options as of two points in time—2010 and 2012.  There are a massive number of fiduciaries to defined contribution retirement plans; as of 2012, the Department of Labor's Form 5500 database included 3,924 403(b) plans that were large enough to include audited financial statements, plus an additional 35,472 401(k) plans.[2]  But Dominguez has invented a process for litigation purposes only that is not based on the practices of any of the 40,000 actual exemplars, any academic literature, or even her own experience.  This process yields opinions that are directly at odds with the actions of *actual* fiduciaries, even Dominguez's own actions.

Despite her obligation to disclose the "basis and reasons" for her opinions, Dominguez did not disclose any particular process that she followed.  She did not identify any established

---

[2] Brightscope, *The Brightscope / ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans* 12 (June 2015), https://www.ici.org/pdf/ppr_15_dcplan_profile_403b.pdf; Brightscope, *The Brightscope / ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* 13 (Dec. 2014), https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (p.13).

process that she was following, nor did she even follow a uniform process across the 22 funds that she evaluated.

Indeed, with respect to critical issues, Dominguez could not even *identify* what her process was, let alone the justification for that process. She testified that "counsel alone" identified the funds for her to review, such that she did not know why she was evaluating certain funds and not others.[3] Ex. D at 12:15-17, 16:14-21. For those funds, Dominguez acknowledged that "[p]roper benchmarking" was the "key" to evaluation. Ex. A at 60:25-61:7. But she played no role in the benchmarking process. Although she acknowledged that "there's a lot of benchmarks available to use," she "relied on what Morningstar did" in assigning benchmarks to funds. *Id.* at 137:6-8. Dominguez does not know what process Morningstar uses to assign benchmarks (*id.* at 137:4-5); indeed, she was not even aware that Morningstar has *multiple* benchmarks for any particular fund (*id.* at 114:4-18). Because she was unfamiliar with Morningstar's platform, Dominguez did not select which of Morningstar's benchmarks to use (*id.* at 114:4-21) and could not even venture a guess as to which one she would have *preferred* (*id.* at 110:24-111:8). Dominguez similarly let others decide what variables to use in the risk statistics that appeared in her datasets—the Sharpe ratio, alpha, and beta—and could not identify the assumptions underlying any of those calculations. *Id.* at 106:24-107:13 (Dominguez could

---

[3] In her first deposition, Dominguez testified clearly and unambiguously that she selected which funds to opine on through "*a back and forth discussion with counsel*," Ex. A at 99:2-5 (emphasis added), and that she "*went back and forth with counsel to determine the funds that would be included here*." *Id.* at 127:3-9 (emphasis added). She filed a sworn statement consistent with this testimony in which she explained "counsel's *involvement* in arriving to the final number of funds I was asked to opine on." Dominguez Decl. ¶¶ 2-3, Dkt. 227-1. However, at her supplemental deposition ordered by this Court, she provided a new and inconsistent account of events: "*counsel alone*" selected the funds in her report. Ex. D at 12:15-17 (emphasis added).

not explain how to calculate a Sharpe ratio, nor which risk-free interest rate had been used in her calculations); 110:24-111:8 (for alpha, Dominguez would "have to rely on what [her employee] did"); *id.* at 115:15-116:1 (Dominguez did not know which benchmark had been used to calculate beta).[4]

Furthermore, Dominguez employed no process at all in selecting alternative funds to which Columbia's supposedly underperforming funds should be mapped. She contends that her mapping funds are "similar" and "acceptable alternative[s]" to the 22 deemed underperforming funds. *See, e.g.*, Ex. B ¶¶ 24, 69. Plaintiffs calculate damages for each of the 22 funds by comparing the fund's performance against the performance of the mapping fund specially chosen by Dominguez. But Dominguez did not employ a reliable methodology for selecting the mapping funds; in fact, she testified that she employed no methodology at all.

First, she testified that counsel provided her with a list of "names and tickers [of funds] that we could use for mapping." Ex. D at 26:9-22. She testified that she "was told" to use these funds, and didn't recall why counsel limited her universe of possible mapping funds. *Id.* at 27:3-8. Worse, she explained that she reviewed no "data" or "any other kind of information" about the mapping funds when she selected them. *Id.* at 31:16-32:8. She reviewed "[j]ust the name and the ticker" and claimed, "I am familiar with them." *Id.* at 31:20-23. In response to questions from Plaintiffs' counsel, she clarified that, with respect to the Vanguard Institutional Index Fund, even though she hadn't reviewed any information when she chose it, she is "aware of its performance and other things without reviewing data." *Id.* at 34:1-9. But familiarity with the

---

[4] Dominguez asserted in her deposition that she "instructed" her employee, Kenny Senour, on how to conduct these analyses but could not "recall specifically" any of the instructions she had given. Ex. A at 13:7-11.

general performance of a fund does not amount to a rigorous or comparative analysis of the mapping fund, its holdings, or whether and why it was an appropriate alternative at a particular point in time.  And, in any event, Dominguez selected numerous and diverse mapping funds beyond the Vanguard Institutional Index Fund, including the Vanguard Balanced Index Fund, the Vanguard Developed Markets Index Fund, the Vanguard Social Index Fund, the Vanguard Capital Opportunity Fund, the Vanguard Extended Market Index Fund, and the Vanguard Intermediate-Term Bond Index.  Based on her testimony, she picked each of these mapping funds—and stated the only basis for Plaintiffs' claims for $454.8 million in damages—without reviewing any information at all.[5]

In summary, Dominguez disclosed no process.  She was not following an established process, because her process was internally inconsistent.  And even though critical decisions about benchmarking were made by others, Dominguez did not evaluate those decisions—or even realize that they were being made.  Each of these threshold failures requires the exclusion of her testimony.  *See Beyer v. Anchor Insulation Co.*, 238 F. Supp. 3d 270, 285-86 (D. Conn. 2017).

**B.      Dominguez's report does not follow the process she uses at Innovest.**

Notably, Dominguez did not even follow her *own* established processes in preparing her opinion in this case.  She admitted repeatedly in her deposition that she had come up with an "easy way to evaluate funds" for this case that was *not* "the system that [she] use[s] for evaluating funds for Innovest."  Ex. A at 107:25-108:3; *accord id.* at 68:21-69:1 ("Q.  So it's not your standard practice just to use the benchmark assigned by Morningstar, right?  A.  No….");  *id.*

---

[5] Dominguez's sworn testimony is inconsistent with her report, which indicates that additional analyses of several mapping funds was done.  For example, her Report states, "I conducted a holdings analysis to determine whether an index fund within the Plans was comparable to the CREF Stock Account."  Ex. B ¶ 182.

at 108:10-11 ("So the evaluation [for Innovest's clients] is—is just different."); *id.* at 137:13-20

("if this was our client," Dominguez would have used a different benchmarking process).

These differences are not merely theoretical; each of the disparities between

Dominguez's real-world methodology and her litigation-only methodology have the effect of

tilting the scales toward Plaintiffs.

For example, for Innovest, Dominguez relies primarily on Morningstar's competitor,

Lipper.  Ex. A at 28:17-20.  Like Morningstar, Lipper assigns funds to categories and supplies

benchmarking and peer group data for those categories.  *Id.*; *see also id.* at 190:5-15.

Dominguez compared the performance of CREF Stock to Morningstar's "Large Blend" category,

which covers funds that "are fairly representative of the overall US stock market in size, growth

rates and price."[6]  Lipper, by contrast, categorizes CREF Stock as "Global Multi-Cap Core."[7]

When Innovest provides a global comparison to its clients about CREF Stock, it proves to be a

stellar performer—significantly outperforming other global funds and global benchmarks over

extended periods of time.  Ex. G, *Portfolio Review for* REDACTED         at 40.  So

Dominguez's analysis was highly sensitive to the choice of benchmark, which makes her lack of

a benchmarking process even more problematic.[8]

---

[6] Morningstar, *The Morningstar Category Classifications* 12 (Apr. 29, 2016),
http://morningstardirect.morningstar.com/clientcomm/Morningstar_Categories_US_April_2016.
pdf.

[7] Ex. F, Lipper, *CREF Stock Account; R1.*

[8] At her deposition, Dominguez specifically acknowledged that it was unreasonable to use
domestic benchmarks for international funds (and vice versa), a prohibition that applies squarely
to her analysis of CREF Stock here.  Ex. A at 27:5-21.

Likewise, at Innovest, Dominguez employs a different process for evaluating quantitative data.  In stark contrast to her approach here—which suggests a "no tolerance" response to any period of underperformance against any arbitrary benchmark—Dominguez follows a different process in her professional existence.

One of Innovest's clients that publishes its quarterly reports online illustrates this fact. In a 2016 report, Dominguez gave an overall rating of "No/Minimum Concerns" to a fund that had underperformed its benchmark by an average of 3.02% per year over a five-year period. Ex. H,

REDACTED          *Portfolio Review 1st Quarter 2016* at 21, 28.  Similarly, Dominguez serves as one of two trustees for her company's 401(k) plan. Ex. A at 234:14-16. When one of the funds in the Innovest 401(k) plan underperformed its benchmark by 3.48% per year over a three-year period, Dominguez not only failed to *remove* the fund, she *required* participants to allocate 7% of their accounts to the fund.  Ex. I, *Participant Enrollment Guide* at 13.

Moreover, when evaluating funds for clients, Dominguez does a "more in-depth analysis" (Ex. A at 108:8) that looks far beyond just raw data.  Foremost among Innovest's practices is its belief that an investment fund cannot be properly evaluated by looking simply at its quantitative performance history.  Looking at "quantitative information alone," Dominguez explained, is insufficient, because "quantitative information alone can't dictate how a fund will perform in the future."  *Id.* at 37:14-17.  For that reason, Dominguez looks at a wide range of considerations— "[m]anager tenure, style, consistency, organizational stability, philosophy, process"—when analyzing a fund for an Innovest client. *Id.* at 37:18-22.  Evaluating funds at Innovest requires going through "a process" that involves extensive screening and qualitative analysis.  *Id.* at 107:25-108:11.  Dominguez did not follow that process here.

**C.      The process reflected in Dominguez's report is unreliable.**

Even if it could be assessed in a vacuum, Dominguez's process would prove to be hopelessly unreliable, because it lacks internal consistency, it relies irretrievably on hindsight, and the process is needlessly superficial.

**1.      Dominguez's process is internally inconsistent.**

To be reliable, a process must be predictable; there must be a method to deploy the same process on an unidentified fund and know what outcome will result.  *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 188-89 (D. Conn. 2009); *Caraker v. Sandoz Pharm. Corp.*, 188 F. Supp. 2d 1026, 1030 (N.D. Ill. 2001) ("The hallmark of this reliability prong is the scientific method, *i.e.,* the generation of testable hypotheses that are then subjected to the real world crucible of experimentation, falsification/validation, and replication.").  But Dominguez's approach fails even this basic indicator.  Dominguez purports to defer to Morningstar's process for identifying the benchmark for each fund (which, itself, is a dubious decision, given that she follows a different approach for Innovest).  But Morningstar does not assign benchmarks to individual funds; rather, it assigns funds to broad categories and then identifies multiple benchmarks for each category.  Ex. J, *At-Issue Fund Morningstar Indices and Dominguez Ex. 3 Benchmarks*.  Dominguez did not reliably use even the same Morningstar benchmark; sometimes (apparently unbeknownst to her) she chose benchmark indices that were neither the "Morningstar Index" nor the "Morningstar Category Index."

Armed with this inconsistent dataset, Dominguez then cherry-picked from it, presenting only the data which supported her pre-determined opinions and ignoring the rest.  For some funds, she looked at 3-year benchmarks; for others, 5-year benchmarks.  *Compare, e.g.*,  Ex. B ¶¶ 68, 76, 146 (examining 3-year performance relative to prospectus benchmark) *with id.* ¶¶ 153, 186, 188, 195, 197, 202, 219, (discussing 5-year performance relative to prospectus benchmark);

*see also id.* ¶¶ 82-84, 90-92, 161 (failing to discuss any benchmark at all).  For some funds, she looked at comparisons to peer groups; for others, she did not.  *Compare, e.g.*, *id.* ¶¶ 133, 140 *with id.* ¶¶ 68, 76, 82, 90, 111, 118, 124.  It is therefore impossible to know what factors or data Dominguez would rely upon to review other funds.

### 2.   Dominguez's process relies impermissibly on hindsight.

For Dominguez to offer probative testimony about decisions that real-world fiduciaries would have made in 2010 or 2012, then she necessarily must follow a process that could have been followed in 2010 or 2012.  ERISA does not permit trial from "the vantage point of hindsight."  *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (quoting *Am. Commc'ns Ass'n v. Ret. Plan*, 488 F. Supp. 479, 483 (S.D.N.Y. 1980)).

But Dominguez remarkably did not follow a process that could have been deployed in 2010 or 2012.  The centerpiece of her process was (supposedly) letting Morningstar assign benchmarks.  As discussed above, the benchmarks that she invoked were primarily (but not exclusively) the "Morningstar Index" for the category to which Morningstar assigned the fund.  But Morningstar did not assign a "Morningstar Index" to its categories until April 29, 2016.[9] And even if a fiduciary, sitting in 2010 or 2012, could have divined which benchmark would *become* the applicable Morningstar Index for each fund, eight of the benchmarks relied upon by Dominguez *had not been created* as of June 30, 2010.  *See supra* note 1.  No fiduciary could have assessed these funds against benchmarks that had not yet been created.

### 3.   Dominguez's process is arbitrary and superficial.

A review of several of the particular funds evaluated by Dominguez proves her process to be arbitrary and superficial.

---

[9] *The Morningstar Category Classifications, supra* n.6.

(1)    **CREF Stock**

Plaintiffs assert $316.7 million in damages stemming from the claim that Columbia was

required to remove CREF Stock from its investment lineup in 2010.  In support of this assertion,

she cites four data points:

*First*, she asserts that, "[a]s of June 30, 2010, the fund had underperformed its

Morningstar assigned 3-year benchmark by 1.93% and its 5-year benchmark by 1.73%."  Ex. B

¶ 174 (citing Ex. C).  By the "Morningstar assigned 3-year benchmark," Dominguez is

referencing the "Morningstar Aggressive Target Risk" index, which is Morningstar's category

index for the category "Allocation—85%+ Equity."  But CREF Stock was not in the

"Allocation—85%+ Equity" category as of June 30, 2010.  Rather, Morningstar assigned CREF

Stock to the "U.S. Open-End Large Blend" category.  *See* 2014 CREF Stock Account Profile,

https://www.tiaa.org/public/pdf/CREF_Stock_Account_Profile.pdf, at n. 4 (noting that, as of

March 31, 2014, CREF Stock Account's fees are lower than 90% of funds in its Morningstar

category, "U.S. Open-End Large Blend"). If it were a reliable process to compare CREF Stock to

its "Morningstar assigned" benchmark, then Dominguez would have compared CREF Stock to

the benchmark for the "U.S. Open-End Large Blend" category, which (she says elsewhere) was

the Morningstar U.S. Large Cap Index.  Ex. C, tab "June 2010 Performance."  As of June 30,

2010, CREF Stock had *outperformed* the Large Cap Index by 0.96% per year over the previous

5-year period.  Dominguez acknowledged at her deposition that, "as of the end of 2009," CREF

Stock "outperformed a reasonable index on a one-year, five-year, and ten-year basis."  Ex. A at

198:12-23.  If Dominguez's analysis is sensitive to the choice of benchmark, then she would

need to have some justification for why a reasonable fiduciary in 2010 (or in 2012) would have

chosen that benchmark, but Dominguez has no such explanation.

*Second*, she asserts that CREF Stock underperformed "a passive benchmark that mimics

the CREF Stock Account's stated investment strategy in its 2010 prospectus." Ex. B ¶ 175. But the benchmark that she used mimicked the fund's composition in *2017*, not in 2010. Ex. A at 205:9-24. It is not difficult to spot the differences between the *actual* composition of the CREF Stock Account (which is reflected in the CREF Stock Account's composite benchmark) and the custom benchmark that Dominguez invented:

| | CREF Stock Benchmark[10] | Dominguez's Benchmark[11] |
|---|---|---|
| **Russell 3000** (U.S. Stocks) | 70.1% | 70.0% |
| **MSCI EAFE+Canada** (Stocks from Europe, Australasia, Far East, and Canada) | 21.9% | 0.0% |
| **MSCI Emerging Markets** (Stocks from emerging markets) | 5.4% | 7.0% |
| **MSCI EAFE+Canada Small Cap** (Small-cap stocks from Europe, Australasia, Far East, and Canada) | 2.6% | 0.0% |
| **MSCI EAFE** (Stocks from Europe, Australasia, and Far East) | 0.0% | 23.0% |

Dominguez was "not certain" where her benchmark had come from. Ex. A at 205:12. No fiduciary sitting in 2010 would have compared the CREF Stock Account to a benchmark reflecting its 2017 investment strategy, looking only at a cherry-picked 9½-year review period. *See Sacerdote*, 328 F. Supp. 3d at 282 n.20 (excluding expert testimony for comparing funds to invalid benchmarks).

*Third*, Dominguez cites CREF Stock's performance compared to its "prospectus benchmark," which actually did reflect the composition of the fund. Ex. B ¶ 179. She observed that, in 2008, "the CREF Stock Account took losses larger than its passive prospectus benchmark by 0.49%," in 2009, it "gained a mere 0.80% [more than] the passive prospectus benchmark,"

---

[10] CREF Form N-CSR at 7 (Aug. 31, 2010), http://pdf.secdatabase.com/51/0000930413-10-004679.pdf.

[11] Ex. K, Ex. 5 to the Expert Report of Wendy Dominguez.

and, in 2010, it outperformed its benchmark, net of fees, by 0.20% (a result that she described as "show[ing] no sign of active management skill").  *Id.* In other words, the CREF Stock Account had beaten its benchmark in two of the previous three years and was ahead of the benchmark overall during the three-year review period.  Such results surely do not support an opinion that the fund was underperforming.

*Fourth*, and finally, Dominguez purports to have performed a "holding analysis" to compare the CREF Stock Account to the Vanguard Total Stock Market Index.  Ex. B ¶ 182; Ex. L, Ex. 6 to the Expert Report of Wendy Dominguez.  Based on this holding analysis, she concluded that it would have been reasonable to "map[] participant balances and future contributions" to the Vanguard Total Stock Market Index. Ex. B ¶ 183. She claimed that "[i]n 2010 a fiduciary would have observed that the Vanguard Total Stock Market Index Fund had appropriate performance as a passive index."  *Id.* ¶ 183 n.153.  But as of the 2010 prospectuses she cited (with data as of December 31, 2009), the CREF Stock Account had *outperformed* the Vanguard Total Stock Market Index:[12]

|  | One Year | Five Years |
|---|---|---|
| **Vanguard Total Stock Market Index** | 28.84% | 1.07% |
| **CREF Stock Account** | **32.04%** | **1.62%** |

Indeed, for the eight calendar years for which the prospectuses both provide data, the CREF Stock Account outperformed the Vanguard Total Stock Market Index *seven* times:[13]

---

[12] *Compare Form N-1-A, Vanguard Institutional Total Stock Market Index Fund Prospectus* 4 (Apr. 29, 2010), https://www.sec.gov/Archives/edgar/data/862084/000093247110002021/ institutionalindex_485b.htm, *with* Ex. M, *Form N-3, College Retirement Equities Fund Prospectus* 41 (May 1, 2010).

[13] *Compare* Ex. M at 39, *with Vanguard Institutional Total Stock Market Index Fund, supra* n. 12, at 4.

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|
| Vanguard Total Stock Market Index | -20.77 | 31.7 | 12.65 | 6.14 | 15.74 | 5.6 | -36.9 | 28.84 |
| CREF Stock Account | -20.73 | 31.97 | 13.03 | 7.49 | 17.24 | 7.99 | -39.68 | 32.04 |

Dominguez did not herself evaluate CREF Stock in 2010.  Ex. A at 83:2-4.  She developed a process that bears no resemblance to real-world fiduciary activities.  But the data that she cites uniformly supports the CREF Stock Account.  Real-world fiduciaries agreed; at least 37 of the 40 largest university 403(b) plans offered CREF Stock at the time.  Ex. N, Expert Report of John Chalmers, Ex. 4a.  And yet, Dominguez insists that a *reasonable* fiduciary would have removed the fund, and that Plaintiffs are entitled to more than a quarter of a billion dollars as recompense.

If this is not the sort of junk science that *Daubert* sought to eliminate, then nothing is.

### (2)      TIAA Real Estate

Dominguez's assessment of TIAA Real Estate is even more egregious.  Dominguez reviewed the same fund for one of Innovest's clients under similar circumstances and reached precisely the opposite conclusion.

Dominguez evaluated the TIAA Real Estate Account for the REDACTED           in early 2018.  At the time, the TIAA Real Estate Account was not on the REDACTED           's lineup, which instead offered the Morgan Stanley Institutional Global Real Estate Fund.  Ex. O, *Investment Menu Design Considerations* at 7.  After conducting an in-depth analysis that examined the TIAA Real Estate Account's performance, investment guidelines, investment strategy, personnel, fees, contract terms, and performance history, Dominguez identified five "pros" to offering the Real Estate Account favor—"broad exposure to the U.S. real estate market," the investment's "strong diversification benefits," its use "as a strong hedge to inflation risks," the "liquidity guarantee," and the management's "extensive research team." Ex. A at 210:18-211:12; Ex. O at 16.  Dominguez also noted three qualitative points against the Real

Estate Account, none of which apply to Columbia's Plans. Ex. A. at 211:13-213:10.  On the strength of Dominguez's assessment—as well as a quantitative assessment that accounted for TIAA Real Estate's unique liquidity structure, *id.* at 191:13-19—Dominguez explained to her client that replacing its "current REIT option with the TIAA Real Estate [Account] may be attractive if [the client's] committee is comfortable with liquidity restrictions." *Id.* at 216:18-24. In other words, the only considerations that caused Dominguez hesitation in her professional context was (1) the fact that the REDACTED        's plan already had real-estate exposure; and (2) the limitations on withdrawing money quickly when investing in actual real estate.

Upon review of Dominguez's analysis, the REDACTED        decided to *add* TIAA Real Estate to its lineup.  Dominguez did not advise the REDACTED        that its decision to do so was "imprudent." Ex. A at 181:17-182:5. Dominguez then began to conduct periodic monitoring review of the Real Estate Account.  As of September 30, 2018, the TIAA Real Estate Account was in the bottom percentile of its peer group for the previous 1-, 3-, 5-, 7-, and 10-year periods, and it underperformed all benchmarks during those periods, too.  Ex. P, *Innovest Product Analysis* at 44.  But Dominguez did not recommend that the fund be *removed*.  Although she acknowledged that "[t]he TIAA Real Estate Account has underperformed in recent years," she concluded, "[n]onetheless," that "the TIAA Real Estate Account remains a unique option for participants, providing liquid access to core private real estate."   Ex. G at 28.  Although she noted a "Minor Concern" about the fund's performance, she concluded on the basis of her complete review that she had "No/Minimum Concerns" about the Real Estate Account's overall suitability.  *Id.* at 27.

Dominguez did not consult her company's preexisting research on TIAA Real Estate in preparing her opinion for this case. Ex. A at 85:8-13. Nor did Dominguez "follow the same

methodology for evaluating the Real Estate Account for [her] Innovest clients that [she] followed here." *Id.* at 175:16-22. Instead, she ignored the very factors that establish her qualifications as an expert and formulated an opinion for purposes of this litigation based on cherry-picked quantitative data points outside of their proper context.

*First*, Dominguez invokes a quarterly investment review prepared by Cammack LaRhette Consulting (which had been used as a trial exhibit in *Sacerdote*) to support her proposition that TIAA Real Estate underperformed its peer group as of 2010. This is a classic example of exalting raw, quantitative data in a manner that would never pass muster for Innovest's clients.

When Cammack issued the report in 2010, it conducted a holistic assessment of the Real Estate Account, concluding that it was a fund worth keeping: "After steep losses in 2009, fund is predicted to recover with commercial real estate market." *Sacerdote*, ECF No. 253-106, at 48. Dominguez did not evaluate Cammack's assessment that the Real Estate Account was predicted to recover. Ex. A at 171:10-19. Nor was she aware whether Cammack had suggested to Columbia, after its retention in 2012, that the Real Estate Account be removed. *Id.* at 171:23-172:1. Instead, Dominguez looked only at a page that purported to rank TIAA Real Estate at the bottom of a peer group. For the REDACTED , Dominguez was unbothered by the exact same peer ranking. Like Innovest, Cammack determined in 2010 that the peer group was inapt and did not meaningfully measure the performance of the Real Estate Account. Trial Tr. 1269-70, *Sacerdote*, ECF No. 334. But for litigation purposes, Dominguez considered the peer-group comparison to be dispositive, even though she could not even identify the peer group that appeared in Cammack's report. Ex. A at 170:5-12.

*Second*, Dominguez asserts that, "[a]s of the end of 2009, the TIAA Real Estate Account consistently underperformed its own benchmarks for the preceding 3 and 5 years." Ex. B ¶ 97.

But that is just a flat-out mischaracterization of the document she cites. TIAA's December 2009 quarterly analysis for the Real Estate Account explains that there are differences between TIAA's standard methods for pricing its real estate portfolio and the benchmark's methodology for pricing real estate. Accordingly, TIAA provides both the returns under its typical pricing methodology and the returns under the benchmark's pricing methodology, explaining that, "[i]n order to compare the performance of the TIAA Real Estate Account with the returns of the REA Composite Index, the Account's direct real estate property returns must first be calculated using NCREIF's methodology."[14] As TIAA's quarterly analysis reflects, following that methodology shows that the Real Estate Account *outperforms* its benchmark on a 3-year, 5-year, and 10-year basis, and since inception.[15] Dominguez read this disclaimer, but did the comparison TIAA counsels against anyway.  Ex. A at 160:9-11.  Worse, she misrepresents a comparison that TIAA recommends *against* as being a comparison to the "prospectus benchmark" that TIAA itself had identified. Ex. B ¶ 97.

In any event, this contortion of TIAA's quarterly analysis cannot be reconciled with Innovest's work for the REDACTED , in which she reviewed benchmarks and then accounted for *why* the figures were different.  *See*, *e.g.*, Ex. G at 28; Ex. P at 44; Ex. O at 16, 50. Courts have previously found that this mistake justifies exclusion.  In *Sacerdote*, for example, Judge Forrest excluded Buetow's testimony on TIAA Real Estate because he did not evaluate the Real Estate Account against the benchmark established by TIAA, 328 F. Supp. 3d at 311–12. Here, Dominguez acknowledged that she has done the same thing. Ex. A at 161:11-162:1. Such

---

[14] *TIAA Real Estate Quarterly Analysis* 2 (Dec. 31, 2009), https://www.sec.gov/Archives/edgar/data/946155/000093041310001296/c60587_ex99-1.htm.

[15] *Id.* at 3.

testimony should be similarly excluded by this Court.

**Third**, Dominguez's failure to conduct a qualitative assessment of the Real Estate Account in this case is completely at odds with her out-of-litigation opinions.  Dominguez's work for the REDACTED  is proof positive that the numbers do not tell the whole story.  If a fiduciary can reasonably determine that qualitative factors override a less-than-perfect quantitative report, then it is not reliable for a litigation expert to draw conclusions based only on the quantitative data.  Dominguez's self-described "easy" approach is not suitable for court.

### (3)   Other Funds

Dominguez's analysis of the remaining funds shows the same inconsistent, incomplete analysis as her analysis of CREF Stock and TIAA Real Estate, as she agreed that the process she followed for all of the funds at issue was not consistent with her out-of-litigation practice. Ex. A at 107:25-108:22.  But Dominguez did not simply repeat these mistakes when analyzing other funds; instead, she made some new mistakes, as well.

For example, Dominguez criticized a number of funds for having a short manager tenure. Ex. A at 105:24-106:4.  But she was not reviewing the tenure of the managers *as of 2010*; she was reviewing the tenure of the managers *as of 2018*, which a fiduciary in 2010 obviously would not have evaluated.  *Id.* at 122:18-24.

On the quantitative side, Dominguez noted that her analysis of one fund, CREF Global Equities, was not even consistent *within* her report: she used "a different process" to analyze the fund's performance in 2010 and 2012. Ex. A at 152:1-17. Dominguez had no explanation for why she chose to do so. She nevertheless opined that CREF Global Equities should have been replaced with a "50%-50% split between the Vanguard Institutional Index Fund and the Vanguard Total International Stock Index." Ex. B ¶ 157.  Relying on Buetow's calculations, Dominguez asserted that the Plans had sustained up to $15.3 million in damages because the

22

Plans offered CREF Global Equities.  *Id.* ¶ 158.  When it was revealed that Buetow had done his calculations with the wrong replacement fund, such that Dominguez's mapping fund generated *negative* damages (Ex. N ¶¶ 127-28), Dominguez's response was revealing.  An expert following a reliable process would have stood by her result, even if it was unfavorable to her client.  Dominguez, instead, issued a rebuttal report proposing a new benchmark—a 60%/40% blend— to resuscitate Plaintiffs' damages claim.  Ex. Q, Rebuttal Expert Report of Wendy Dominguez ¶ 58.  If the absence or existence of damages dictates the contours of Dominguez's opinion, it is definitionally not a reliable indicator of what a reasonable fiduciary would have done contemporaneously.

Dominguez's review of other funds is just as shoddy.  She compared the Calvert Global Energy Solutions Fund, which invests "in equity securities of companies active in the alternative energy sector" (Ex. R, *The Calvert Fund Form N-1 A* at 49 (Jan. 31, 2010)), to a benchmark of small- and mid-cap stocks.  She admitted that her choice of benchmark was "probably not" the best (Ex. A at 137:8-9) and that she would "have to look at the underlying holdings" to figure out an appropriate benchmark (*id.* at 125:4-9).  But she did not choose benchmarks by evaluating the "underlying holdings"—for this fund or for the others.  She said that a fiduciary would have removed the Vanguard Healthcare Fund (which outperformed its benchmark and its peer group) just because it was a "sector fund" (*id.* at 126:9-18), even though the Plans offered other "sector funds" that she did not designate for removal (*id.* at 127:3-128:23).

### D.  Dominguez should not be allowed to offer testimony as to ultimate legal questions.

Plaintiffs seek to use Dominguez to tell the jury that Plaintiffs are entitled to hundreds of millions of dollars of damages. The superficial faux-analysis that led her to that opinion should be disqualifying in full. In any event, Dominguez's opinion must also be excluded to the extent

Dominguez reaches the ultimate legal question that is reserved for this Court.

Specifically, Dominguez impermissibly opines on the legal question whether Columbia acted prudently. Whether a plan fiduciary acted prudently "is measured according to the objective prudent person standard." *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (citations omitted). Application of that standard presents a legal question, which is why expert opinion on that topic is often excluded. *See, e.g.*, Order at 2, *Sacerdote*, ECF No. 270 (excluding expert testimony on "the ultimate legal conclusion regarding prudence"); *Lynch v. J.P. Stevens & Co.*, 758 F. Supp. 976, 1014 (D.N.J. 1991) (rejecting expert opinion regarding compliance with ERISA rule because such testimony "constitutes a legal conclusion"); *Jones v. O'Higgins*, 1989 WL 103035, at *7-8 (N.D.N.Y. 1989) (dismissing opinion on whether investment strategy "comport[ed] with fiduciary standards" because expert "really testified to a legal opinion"); *see also Browe v. CTC Corp.*¸ 2017 WL 5992333, at *3 (D. Vt. 2017) (excluding testimony regarding characterization of plan under ERISA as "legal opinions" which "seek to advise the court how to interpret the pleadings and deposition testimony in this case"); *Levinson v. Westport Nat'l Bank*, 2012 WL 4489260, at *5-6 (D. Conn. 2012) (excluding expert opinion concluding that defendant "breached its fiduciary duties to the Plaintiffs" as "inadmissible legal conclusion").

It is well settled in the Second Circuit that experts may not express legal conclusions that invade the province of the court. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("this Court requires the exclusion of testimony which states a legal conclusion"); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."). The exclusion of legal conclusions extends to expert testimony that "usurp[s] either the role of the trial judge in

24

instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Duncan*, 42 F.3d at 101 (citations omitted). Impermissible legal opinions "tell [the] jury what result to reach" and "attempt[] to substitute the expert's judgment for the jury's." *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005).

Thus, Dominguez's analysis of "prudence" amounts to an impermissible legal opinion that would need to be stricken irrespective of the quality of her analysis. *See Zollinger v. Owens-Brockway Glass Container, Inc.*, 233 F. Supp. 2d 349, 354 (N.D.N.Y. 2002) (permitting causation testimony but excluding testimony "on the ultimate issue" of prudence because "[t]he trier of fact is perfectly capable of evaluating the totality of the evidence in this regard").

## II.      Buetow's Opinion Should Likewise Be Excluded Because It Is Derivative Of Dominguez's Opinion.

Buetow's opinions should also be excluded in this case. By Buetow's own account, his opinions are entirely derivative of Dominguez's analysis (Ex. E ¶¶ 1, 22-23); if her opinions are excluded, then, his report and testimony must be excluded as well. Indeed, Dr. Buetow explained that "any issue other than the provision of calculations is outside the scope" of his opinions in this case. Ex. S, Deposition of Gerald Buetow at 36:23-37:1.  Dr. Buetow was not prepared to testify at deposition, and does not plan to testify at trial, regarding any of Dominguez's opinions. *Id.* at 38:4-9. As he put it, Dr. Buetow is "in a support role" to Dominguez. *Id.* at 42:16-24. Thus, the material in Buetow's report is relevant—if at all—only if the fund mapping opinions provided by Dominguez are admissible; since they are not, for the reasons provided above (*see* Part I, *supra*), Buetow's report should also be excluded.

## CONCLUSION

For the foregoing reasons, the Court should exclude the expert opinions of Wendy Dominguez and Gerald Buetow and order that neither may testify at trial.

Dated: April 29, 2019

Nancy G. Ross
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600

Jean-Marie L. Atamian
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500

Respectfully submitted,

*/s/ Brian D. Netter*
Brian D. Netter
  bnetter@mayerbrown.com
E. Brantley Webb
Michelle N. Webster
Matthew A. Waring
Ankur Mandhania
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that, on April 29, 2019, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.


By:  /s/ *Brian D. Netter*
Brian D. Netter