# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CHANDRA CATES, et al.,

Plaintiffs,

v.

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW
YORK,

Defendant.

No. 1:16-cv-06524-GBD-SDA

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S OBJECTIONS TO THE
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION RESPECTING
DISPOSITIVE MOTIONS [Doc. 352]**

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

Preliminary Statement ........................................................................................................ 1

Legal Standard .................................................................................................................... 1

I.      Summary Judgment Standard ................................................................................ 1

II.     ERISA's Fiduciary Duties ...................................................................................... 2

Argument ............................................................................................................................ 4

I.      Defendant Caused the Plans to Pay Excessive Recordkeeping Fees ................... 4

        A.      Defendant's Imprudent Process for Monitoring Recordkeeping Fees .................. 4

                1.      Defendant failed to address two issues of fact ............................................ 6

                2.      Defendant did not act prudently in "rejecting" consolidation .................... 6

                3.      Defendant was not limited to TIAA as a sole recordkeeper ...................... 8

        B.      The Plans Paid Excessive Fees ............................................................................ 9

II.     Minnich and Otto Are Qualified Experts ............................................................. 10

III.    Defendant Caused the Plans to Include Imprudent Investment Options ........... 15

        A.      *Sacerdote* and *Cunningham* Do Not Support Defendant's Motion ................. 16

        B.      Defendant's Own Advisors' Recommendations Create Issues of Fact .............. 19

        C.      Sector and Regional Funds Are Within Plaintiffs' Complaint ........................... 21

IV.     Dominguez's and Buetow's Opinions Are Admissible ....................................... 22

Conclusion ........................................................................................................................ 25

i

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Lockheed Martin Corp.*,
  No. 06-0701, Doc. 225 (S.D. Ill. Marc. 31, 2009) ................................................... 12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................................ 2

*Araujo v. Schron*,
  No. 07-6210, 2007 U.S.Dist.LEXIS 67628 (S.D.N.Y. Aug. 29, 2007) .................................. 22

*Baxter Diagnostics, Inc. v. Novatek Med., Inc.*,
  No. 94-5220 (AJP), 1998 WL 665138 (S.D.N.Y. Sep. 25, 1998) ........................................... 22

*Bd. of Trs. of the S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*,
  No. 09-6273, 2011 WL 6130831 (S.D.N.Y. Dec. 9, 2011) ..................................................... 3

*Chill v. Calamos Advisors LLC*,
  No. 15-1014 (ER), 2018 WL 4778912 (S.D.N.Y. Oct. 3, 2018) ........................................... 11

*Crowley v. Chait*,
  322 F. Supp. 2d 530 (S.D.N.Y. 2004) ................................................................................ 11

*Cunningham v. Cornell University*,
  No. 16-6525-PKC, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ................... 1, 5, 13, 17, 18

*DeFelice v. U.S. Airways, Inc.*,
  497 F.3d 410 (4th Cir. 2007) ............................................................................................. 21

*Donovan v. Bierwirth*,
  680 F.2d 263 (2d Cir. 1982) ............................................................................................... 2

*Emig v. Electrolux Home Prods. Inc.*,
  No. 06-4791, 2008 WL 4200988 (S.D.N.Y. Sept. 11, 2008) .............................................. 11

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014) ........................................................................................................... 3

*Gayle v. Gonyea*,
  313 F.3d 677 (2d Cir. 2002) ............................................................................................... 2

*Geisler v. Petrocelli*,
  616 F.2d 636 (2d Cir. 1980) ............................................................................................. 22

*George v. Kraft Foods Glob. Inc.*,
  641 F.3d 786 (7th Cir. 2011) .............................................................................................. 7

*In re Beck Indus., Inc.*,
  605 F.2d 624 (2d Cir. 1979) ............................................................................................. 16

*In re Meridian Funds Grp. Sec. & ERISA Litig.*,
  917 F. Supp. 2d 231 (S.D.N.Y. 2013) ................................................................................ 3

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
    146 F.3d 66 (2d Cir. 1998) ................................................................................. 1, 8

*Katsaros v. Cody*,
    744 F.2d 270 (2d Cir. 1984) ................................................................................. 2, 3

*La Scala v. Scrufari*,
    479 F.3d 213 (2d Cir. 2007) ................................................................................. 2

*Mahoney v. JJ Weiser & Co*,
    No. 04-2592 (VM) (HBP), 2007 WL 3143710 (S.D.N.Y. Oct. 25, 2007) ....................... 11, 12

*Marvel Characters, Inc. v. Simon*,
    310 F.3d 280 (2d Cir. 2002) ................................................................................. 2

*McCullock v. H.B. Fuller Co.*,
    61 F.3d 1038 (2d Cir. 1995) ................................................................................. 25

*Merck Eprova AG v. Gnosis S.P.A.*, No. 07-5898 (RJS),
    2011 WL 10818492 (S.D.N.Y. June 8, 2011) .......................................................... 10

*Moreno v. Deutsche Bank Am. Holding Corp.*,
    No. 15-9936 (LGS), 2018 WL 2727880 (S.D.N.Y. June 6, 2018) ............................... 2

*N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*,
    18 F.3d 179 (2d Cir. 1994) ................................................................................. 2

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    691 F. Supp. 2d 448 (S.D.N.Y. 2010) ................................................................... 11, 13

*Pfeil v. State Street Bank & Tr. Co.*,
    806 F.3d 377 (6th Cir. 2015) ............................................................................... 3

*Ramos v. Banner Health*,
    No. 15-2556, 2019 WL 6327718 (D. Colo. Nov. 26, 2019) ....................................... 12

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
    2016 WL 7494320 (D. Conn. Dec. 30, 2016), *aff'd*, 718 F. App'x 3 (2d Cir. 2017) ........... 3

*Royal & Sun All. Ins. PLC v. UPS Supply Chain Sols., Inc.*,
    No. 09-5935 (MEA), 2011 WL 3874878 (S.D.N.Y. Aug. 31, 2011) ............................. 11

*Sacerdote v. New York Universit*y,
    328 F. Supp. 3d 273 (S.D.N.Y. 2018) ................................................................... 1, 9, 16, 18

*Securities and Exchange Commission v. Yorkville Advisors, LLC*,
    305 F. Supp. 3d 486 (S.D.N.Y. 2018) ................................................................... 15

*Sims v. BB&T*,
    No. 15-732, Doc. 386 (M.D.N.C. July 31, 2018) ................................................... 12

*Snyder v. Wells Fargo* Bank, N.A.,
    No. 11-4496-SAS, 2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012) ............................... 11, 12, 13

iii

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
    467 F.3d 107 (2d Cir. 2006) ............................................................................ 11

*Stagl v. Delta Air Lines, Inc.*,
    117 F.3d 76 (2d Cir. 1997) .............................................................................. 14

*Sweda v. Univ. of Pennsylvania*,
    923 F.3d 320 (3d Cir. 2019) ........................................................................ 2, 3

*The T.J. Hooper*,
    60 F.2d 737 (2d Cir. 1932) .............................................................................. 14

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015) ...................................................................................... 3

*Tibble v. Edison Int'l*,
    843 F.3d 1187 (9th Cir. 2016) .......................................................................... 4

*Tracey v. Massachusetts Inst. of Tech.*,
    404 F. Supp. 3d 356 (D. Mass. 2019) .............................................................. 6

*Trammell v. Keane*,
    338 F.3d 155 (2d Cir. 2003) ......................................................................... 1, 2

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir. 2014) ............................................................... 4, 5, 6, 7

*Tussey v. ABB, Inc.*,
    No. 06-4305, 2012 WL 1113291 (W.D. Mo. Mar. 31, 2012), *affirmed in relevant part*,
    746 F.3d 327 (8th Cir. 2014) .......................................................................... 12

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004) ........................................................... 25

*Ulico Cas. Co. v. Clover Capital Mgmt., Inc.*,
    335 F. Supp. 2d 335 (N.D.N.Y. 2004) ............................................................. 3

*Wildman v. Am. Century Servs., LLC*,
    362 F. Supp. 3d 685 (W.D. Mo. 2019) ............................................................ 3

**Statutes**

29 U.S.C. §1104(a)(1) ............................................................................................. 3

29 U.S.C. §1109(a) ................................................................................................. 2

**Rules**

Fed. R. Civ. P. 56(c) .............................................................................................. 2

Fed. R. Civ. P. 56(e) ............................................................................................ 17

**Regulations**

29 C.F.R. 2550.408b-2(c) (3) ................................................................................. 8

## PRELIMINARY STATEMENT

The Court should adopt Judge Aaron's Report and Recommendation denying Defendant's Motion for Summary Judgment and motions to exclude (Doc. 349). Judge Aaron's 30-page decision details a "myriad" of factual issues requiring trial. Doc. 349 at 13. While Defendant claims that Judge Aaron applied the "wrong" legal standard, it does not identify what standard was misapplied. Rather, Defendant claims that Judge Aaron should have ignored factual disputes because: (1) the weight of the evidence is in its favor; or (2) courts in other cases, with different records and applying different standards, came to different factual conclusions. Adopting either of Defendant's arguments would be reversible error. First, the Court cannot weigh the evidence and must "construe the evidence in the light most favorable to the non-moving party and [] draw all reasonable inferences in its favor." *Trammell v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003); *see also* Doc. 349 at 9. Second, the Court cannot merely adopt factual findings from *Sacerdote v. New York Universit*y, 328 F. Supp. 3d 273 (S.D.N.Y. 2018) and *Cunningham v. Cornell University,* No. 16-6525-PKC, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) and must make its own factual determinations from this case's record. *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc*., 146 F.3d 66, 68, 70–71. (2d Cir. 1998) (vacating a judgment "because the district court improperly relied on factual findings from an earlier" case). As Judge Aaron held, a myriad of evidence not only creates issues of fact but presents a compelling case that Defendant utterly disregarded its fiduciary duties. Defendant admitted it was not even "off the start-line" in complying with its fiduciary obligations merely a few months prior to filing this lawsuit. Doc. 349 at 24 n.19 (quoting Doc 296-24).

## LEGAL STANDARD

### I. Summary Judgment Standard

A court should grant summary judgment only when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

"[A] court is required to construe the evidence in the light most favorable to the non-moving

party and to draw all reasonable inferences in its favor." *Trammell*, 338 F.3d at 161. "An issue of

fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v.*

*Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). The party seeking summary judgment bears the

burden of demonstrating that there is no genuine issue of material fact. *Marvel Characters, Inc.*

*v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

## II.  ERISA's Fiduciary Duties

Remarkably, Defendant argues that Judge Aaron misapplied ERISA's standards without

describing them. ERISA assigns liability for any "losses to a plan" to "any person [1] who is a

fiduciary with respect to a plan and [2] who breaches any responsibility, obligations, or duties

imposed upon fiduciaries." 29 U.S.C. §1109(a). Plaintiffs' burden is to prove (1) a breach of

fiduciary duty and (2) "the fact of damages." *See N.Y. State Teamsters Council Health & Hosp.*

*Fund v. Estate of DePerno*, 18 F.3d 179, 182 (2d Cir. 1994); 29 U.S.C. §1109(a); *accord Sweda*

*v. Univ. of Pennsylvania*, 923 F.3d 320, 327–28 (3d Cir. 2019), *pet. for cert. pending*, No. 19-

784. Causation under ERISA is not "loss causation," a securities law concept, or objective

prudence, as Defendant argues, but would "Plaintiffs' investments have performed better had

Defendants not breached their fiduciary duties[.]" *Moreno v. Deutsche Bank Am. Holding Corp.,*

No. 15-9936 (LGS), 2018 WL 2727880, at *4–5 (S.D.N.Y. June 6, 2018); Doc. 349 at 14 n.11.

ERISA's fiduciary standard is "the highest duty known to the law." *La Scala v. Scrufari*,

479 F.3d 213, 219–21 (2d Cir. 2007) (citing *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)

and *Donovan v. Bierwirth*, 680 F.2d 263, 271–72 & n.8 (2d Cir. 1982)). "The fiduciary standard

imposed by ERISA requires the application of a reasonableness standard. Rarely will such a

determination be appropriate on a motion for summary judgment." *Bd. of Trs. of the S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, No. 09-6273, 2011 WL 6130831, at *3 (S.D.N.Y. Dec. 9, 2011). Reasonableness requires "'the care, skill, prudence, and diligence'" of a person "'acting in a like capacity and familiar with such matters.'" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (quoting 29 U.S.C. §1104(a)(1)).

Contrary to Defendant's assertions that it can only be judged against its self-selected "peers", "lack of familiarity with investments is no excuse" and "prudence is measured against hypothetical sophisticated and prudent investment professionals." *Katsaros*, 744 F.2d at 279; *In re Meridian Funds Grp. Sec. & ERISA Litig.*, 917 F. Supp. 2d 231, 240 (S.D.N.Y. 2013); *see also Sweda,* 923 F.3d at 329; *Wildman v. Am. Century Servs.*, *LLC*, 362 F. Supp. 3d 685, 703 (W.D. Mo. 2019). The cases Defendant cites do not stand for the proposition that prudence is measured against the standards of a plan sponsor's industry, but the investment industry as a whole. *Ulico Cas. Co. v. Clover Capital Mgmt., Inc.*, 335 F. Supp. 2d 335, 340 (N.D.N.Y. 2004) ("This standard requires that the fiduciary's behavior be measured against *the standards in the investment industry*.") (emphasis added); *Rosen v. Prudential Ret. Ins. & Annuity Co.*, No. 15-2839-VAB, 2016 WL 7494320, at *17 (D. Conn. Dec. 30, 2016), *aff'd*, 718 F. App'x 3 (2d Cir. 2017) (discussing the entire market for mutual funds); *Pfeil v. State Street Bank & Tr. Co.*, 806 F.3d 377, 384 (6th Cir. 2015) (considering what other "[l]arge [institutional] investors" did). The Supreme Court has rejected arguments that certain types of plans have unique or "special" features that warrant a "loosened" standard of conduct. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 418–19 (2014). "Rather, the same standard of prudence applies to all ERISA fiduciaries[.]" *Id.* The Third Circuit recently rejected a similar argument that looser standards apply to universities and held "ERISA fiduciaries are held to one standard under § 1104." *Sweda*,

923 F.3d at 333 n.9. The Court must reject Defendant's contention that Judge Aaron could only

judge its conduct by the actions of a few "peer" institutions or TIAA clients.

## ARGUMENT

**I.    Defendant Caused the Plans to Pay Excessive Recordkeeping Fees**

### A.    Defendant's Imprudent Process for Monitoring Recordkeeping Fees

As Judge Aaron held, a "myriad" of evidence demonstrates that Defendant breached its

fiduciary duties and that the Plans'[1] recordkeeping fees were unreasonable. Doc. 349 at 13. A

fiduciary must "'incur only costs that are reasonable in amount and appropriate.'" *Tibble v.

Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (unanimous) (quoting

RESTATEMENT (THIRD) OF TRUSTS § 90 (c) (3)). "'Wasting beneficiaries' money is

imprudent [and] . . . trustees are obliged to minimize costs." *Tibble*, 843 F.3d at 1198 (quoting

Unif. Prudent Investor Act § 7). A fiduciary breaches its duty if it fails to "diligently investigate"

and "monitor" recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

*Tussey* upheld a district court's ruling that a fiduciary breached its duties by failing to:

> (1) calculate the amount the Plan was paying Fidelity for recordkeeping through
> revenue sharing, (2) determine whether Fidelity's pricing was competitive, (3)
> adequately leverage the Plan's size to reduce fees, and (4) make a good faith
> effort to prevent the subsidization of administration costs of ABB corporate
> services with Plan assets. . . .

*Id.* (internal quotations and citations omitted).

As Judge Aaron held, the evidence demonstrates that the three factors that *Tussey* identified

are industry-accepted practice. First, the Defendant's investment advisors and *all* the experts

agree that a request for proposal ("RFP") is necessary to determine a reasonable fee. Doc. 349 at

18–19; Doc. 294. ¶¶173–176. Second, prudent fiduciaries evaluate recordkeeping fees on a per-

---

[1] The "Plans" are the Retirement Plan for Officers of Columbia University and the Columbia University Voluntary
Retirement Savings Plan.

participant basis as opposed to a percentage of assets basis. Doc. 349 at 19; Doc. 294 ¶¶177–84.
Finally, professionals recognize that having only a single recordkeeper is accepted practice. Doc.
349 at 15–16; Doc. 294 ¶¶185–88. Defendant ignores this overwhelming evidence from
investment professionals and focuses only on what Defendant's self-selected "peers" did.

Judge Aaron found Defendant committed three of the four breaches recognized in *Tussey*.
First, Defendant's Vice President of Human Resources wrote in July 2012 "WE [sic] do believe
*fees* from TIAA are *too high and are currently working to determine the amount*." Doc. 349 at
18 n.15 (quoting Doc. 296-35). If Defendant had calculated the recordkeeping fees before 2012,
there would have been no need to "determine the amount" of fees that were admittedly
excessive. As the Eighth Circuit held in *Tussey*, failure to "calculate the amount the Plan[s]"
were paying is a breach. *Tussey*, 746 F.3d at 336. Second, Defendant failed to "determine
whether [TIAA's and Vanguard's] pricing was competitive." *Tussey*, 746 F.3d at 336. Defendant
failed to conduct a single RFP. *See* Doc. 294 ¶¶191-200. Third, Defendant never adequately
leveraged the Plans' size to reduce fees through use of a single recordkeeper. *Tussey*, 746 F.3d at
336.

Defendant, while discussing *Cunningham* extensively, ignores its holding that a fiduciary's
failure to take similar actions created issues of fact as to whether the process for monitoring
recordkeeping fees was prudent. *Cunningham*, 2019 WL 4735876, at *5–6. Defendant also
ignores that *Sacerdote* found that evidence that New York University ("NYU") failed to engage
in similar processes created an issue of fact as to its prudence. *Sacerdote v. New York Univ.*, No.
16- 6284, Doc. 174 (S.D.N.Y. Feb. 22, 2018). Additionally, a third court recently denied
summary judgment in a similar case and found issues of fact whether a plan sponsor's failure to
engage in an RFP or adopt per-participant fees constituted a breach of the duty of prudence. *See*

5

*Tracey v. Massachusetts Inst. of Tech.*, 404 F. Supp. 3d 356, 362–63 (D. Mass. 2019). Even if the Court must follow the factual findings of *Cunningham* and *Sacerdote* (which it does not), those cases and *Tracey* require the Court to find issues of fact as to prudence.

### 1. *Defendant failed to address two issues of fact*

First, Defendant mischaracterizes Judge Aaron's findings of breach as only related to consolidation to a single recordkeeper. Doc. 352 at 10–14. Plaintiffs make three allegations of imprudence in their complaint: "(1) failing to analyze or negotiate recordkeeping fees on a per participant basis; (2) failing to conduct competitive bidding for the Plans' recordkeeper; and (3) failing to consolidate to a single recordkeeper, all of which caused it to pay excessive recordkeeping fees." Doc. 349 at 14. Defendant ignores its failure to conduct competitive bidding and to monitor revenue sharing on a per-participant basis. Doc. 352 at 7–12. For this reason alone, issues of fact remain.

### 2. *Defendant did not act prudently in "rejecting" consolidation*

Even focusing only on consolidation to a single recordkeeper, significant issues of fact remain. The duty of prudence requires fiduciaries to "adequately leverage the Plan's size to reduce fees." *Tussey*, 746 F.3d at 336. First, Defendant is incorrect that there is no evidence that a prudent fiduciary would consolidate to a single recordkeeper. As Judge Aaron recognized, the record is replete with evidence that investment professionals, including Defendant's own investment advisors and expert, recommended recordkeeper consolidation. Doc. 349 at 15. Defendant's only evidence to contradict this evidence consists of the practices of a handful of "elite private universities." Doc. 352 at 12. At most, evidence of the practices of this small subset of peers creates an issue of fact.

Second, Defendant incorrectly ignores compelling evidence that it inadequately considered recordkeeper consolidation. Doc. 352 at 10. As Judge Aaron held, Plaintiffs dispute that the

"emails cited by Defendant show actual consideration of consolidation and instead . . . show[]
that Columbia continually put off the issue despite being aware that consolidation was a way to
reduce fees." Doc. 349 at 15 (citing Doc. 294 ¶¶52, 54, 57).

Defendant relies on testimony of a single member of the Investment Advisory Committee
("IAC") to argue it considered consolidation. Doc. 352 at 11. Defendant ignores that the meeting
minutes reflect no discussion of consolidation prior to this lawsuit, the keeper of the meeting
minutes recalled no such discussion, and the vast majority of the members of the IAC testified
that they recalled no discussion of consolidation. Doc. 294 ¶205. Defendant also ignores that in
2014 Defendant put off discussions of a single recordkeeper offer from TIAA to do a "pros/cons
analysis." Doc. 349 at 15; Doc. 294 ¶¶52, 54, 57 206–208; Doc. 269-1. However, a year later no
"real discussion" had taken place, so TIAA's offer was put off again without consideration. Doc.
294 ¶208; Doc. 296-21. This evidence more than creates an issue of fact.

Even if the Court were to ignore this overwhelming contrary evidence, merely "engag[ing]
in discussions" is not enough under the duty of prudence; instead, there must be record evidence
showing that the fiduciary "actually determined whether the costs" of a particular course of
action "outweighed the benefits, or vice versa." *George v. Kraft Foods Glob. Inc.*, 641 F.3d 786,
795 (7th Cir. 2011). As Judge Aaron held, TIAA was able to recordkeep all the funds in the
Plans in 2005, but Defendant did not receive a price quote for single recordkeeping services until
2014. Doc. 349 at 15–16. Despite TIAA's offer to reduce fees by nearly half, the offer was never
discussed by the IAC. *Id.* Defendant's purported conclusory determination in 2010 without even
a quote to determine whether the costs outweighed the benefits is insufficient. *George*, 641 F.3d
at 795; *Tussey*, 746 F.3d at 336.[2]

---

[2] Ty Minnich did not "agree[]" that Defendant should have stayed with a multiple recordkeeper arrangement. Doc.
352 at 11. Minnich testified that if TIAA was incompetent, Defendant "should have issued an RFP and looked for a

### 3. *Defendant was not limited to TIAA as a sole recordkeeper*

Contrary to Defendant's contention, numerous universities have consolidated from multiple recordkeepers to a single recordkeeper, as early as 2009. Doc. 294 ¶¶185–88. Defendant is incorrect that TIAA was the only possible single recordkeeper. Doc. 352 at 8–9. As Judge Aaron found, the plan documents explicitly give Defendant authority to remove any investment option and transfer the funds invested in it to another option ("mapping"). Doc. 349 at 17; Doc. 294 ¶¶151–54. The TIAA annuity contracts contain no provision that prevents plan sponsor mapping. Doc. 349 at 17. Defendant argues that "there was no way to escape TIAA" because "the annuities contracts run between TIAA and the Plan participant." Doc. 352 at 7. However, Defendant ignores that the annuity contracts include an express provision that "[t]he contract *is subject to the provisions, terms and conditions of the employer Plan.*" Doc. 294 ¶158. Therefore, the contracts incorporate by reference the terms of the Plans and plan sponsor mapping. Additionally, a contract is per se unreasonable "if *it does not permit termination by the plan* without penalty to the plan *on reasonably short notice* under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous." 29 C.F.R. 2550.408b-2(c)(3) (emphasis added). Defendant's argument that it can use its past imprudent choice to enter into interminable contracts to justify unreasonable fees is unconscionable.

Defendant improperly relies on factual findings from *Sacerdote* to argue that its failure to consolidate was justified by TIAA's annuity contracts. Doc. 352 at 8–9. Defendant's reliance on *Sacerdote* is misplaced. First, Defendant advocates that the Court adopt *Sacerdote*'s factual findings regarding TIAA annuities. Adopting *Sacerdote*'s factual findings would be reversible error, and Judge Aaron was correct to adjudicate this case on its own record. *Int'l Star Class*

---

competent record-keeper to act as the sole record-keeper." Doc. 261-1, Minnich Dep. 74:24–75:7.

*Yacht Racing Ass'n*, 146 F.3d at 68, 70–71. It is common practice to "recordkeep other vendors' fixed annuities." Doc. 349 at 17. The regular industry practice of recordkeeping other provider's annuities creates an issue of fact as to whether it was imprudent for Defendant not to explore another provider. Second, the portion of *Sacerdote* that Defendant cites has nothing to do with consolidation but involves a unique factual issue to *Sacerdote*—whether it was prudent to only place a portion of the plan in an RFP. *Sacerdote*, 328 F. Supp. 3d at 301–4. *Sacerdote* justified NYU's failure to consolidate to a single recordkeeper because NYU's antiquated human resources software made consolidation impossible. *Id.* at 293–98. Defendant does not argue that consolidation to a single recordkeeper was impossible.

### B.  The Plans Paid Excessive Fees

Compelling evidence demonstrates that Defendant's imprudence caused the Plans to pay unreasonable fees. Judge Aaron found expert opinion was not even necessary, because unsolicited offers from vendors and offers when Defendant belatedly engaged in competitive bidding in 2018 demonstrate loss. Doc. 349 at 16–17, 19–21. In 2014, TIAA offered Defendant significantly lower recordkeeping fees if it consolidated to a single recordkeeper. *Id.* at 16 (citing Doc. 294 ¶206; Doc. 296-6 at 8). TIAA's 2014 offer would also create over one million dollars in additional savings from "Vanguard funds by moving certain fund to lower cost share classes." Doc. 349 at 16. TIAA made a similar unilateral offer that would significantly reduce fees in 2018. *Id.* (citing Doc. 296-38). Defendant fails to even address these unilateral offers.

Further, Judge Aaron found, in response to Defendant's belated 2018 request for information ("RFI"), "TIAA lowered its fee by more than half per participant and Vanguard lowered its fee by over 25% per participant." Doc. 349 at 19. The 2018 RFI results demonstrate that Defendant "could have achieved similar savings by conducting competitive bidding sooner." *Id.* at 19 (citing Doc. 294 ¶75). Again, Defendant has no response to this evidence. Defendant

mischaracterized Judge Aaron's finding "as inferring that fees attained by Columbia in 2018 could have been attained in 2010." Doc. 352 at 16. Judge Aaron did not infer that Defendant could have achieved the exact same fees, but made the reasonable inference that Defendant could have achieved similar reductions earlier. Judge Aaron also relied upon Defendant's expert's testimony that if TIAA assets could be mapped (which is a disputed question of fact), the "'reasonable fee for the Plans' would be lower than the Vanguard fees [less than $40 per participant]." Doc. 349 at 17 (citing Doc. 294 ¶229). As Judge Aaron held, this myriad of factual evidence creates factual issues whether Defendant's breaches resulted in loss without even reaching Defendant's motion to exclude Plaintiffs' qualified experts. Neither *Sacerdote* nor *Cunningham* involved plan-specific evidence demonstrating lower fees were available if a prudent course had been followed.

## II. Minnich and Otto Are Qualified Experts

Relying solely on *Cunningham*, and ignoring binding Second Circuit authority and factual distinctions, Defendant argues that Minnich and Otto's opinions[3] regarding a reasonable fee for the Plans should be excluded. First, Defendant does not appear to challenge Judge Aaron's holding that Minnich and Otto's opinions regarding Defendant's imprudent process for monitoring recordkeeping fees is admissible, so they will testify at trial regardless. In a bench trial, "resolving *Daubert* questions at a pretrial stage is generally less efficient than simply hearing the evidence" at trial and disregarding it if unreliable. *Merck Eprova AG v. Gnosis S.P.A.*, No. 07-5898 (RJS), 2011 WL 10818492, at *1 (S.D.N.Y. June 8, 2011) (quotations omitted). "When the fact-finder is the court, expert evidence should be quite freely admitted so that the judge may have the benefit of live testimony and cross-examination to determine how

---

[3] Otto does not offer a reasonable fee opinion in this case, but adopts Minnich's reasonable fees. Doc. 255-5 ¶151.

much weight, if any, to give to the expert's conclusions." *Chill v. Calamos Advisors LLC*, No. 15-1014 (ER), 2018 WL 4778912, at *6 (S.D.N.Y. Oct. 3, 2018) (quoting *Royal & Sun All. Ins. PLC v. UPS Supply Chain Sols., Inc.*, No. 09-5935 (MEA), 2011 WL 3874878, at *2 (S.D.N.Y. Aug. 31, 2011)). Resolving Defendant's limited *Daubert* arguments would be less efficient here, because Judge Aaron denied summary judgment without even relying on Plaintiffs' experts and they will testify regardless.

Even if the Court considers Defendant's *Daubert* motions, Judge Aaron's decision should be adopted. Experience-based testimony is reliable if the expert "show[s] how his or her experience . . . led to his conclusion or provided a basis for his opinion." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props.*, LLC, 467 F.3d 107, 132 (2d Cir. 2006). "[C]ourts focus on the relationship between the experience and the opinion and whether the latter is rationally related to the former." *Mahoney v. JJ Weiser & Co*, No. 04-2592 (VM) (HBP), 2007 WL 3143710, at *5 (S.D.N.Y. Oct. 25, 2007) (quoting *Crowley v. Chait*, 322 F. Supp. 2d 530, 538 (S.D.N.Y. 2004)). A sufficient connection is demonstrated if the expert "articulated how the specifics of his experience led to his conclusions." *Snyder v. Wells Fargo* Bank, N.A., No. 11-4496-SAS, 2012 WL 4876938, at *3 n.35 (S.D.N.Y. Oct. 15, 2012) (quoting *Emig v. Electrolux Home Prods. Inc.*, No. 06-4791, 2008 WL 4200988, at * 8 (S.D.N.Y. Sept. 11, 2008)). Courts admit experience-based expert testimony when: (1) the proffered expert has the requisite experience in the field; (2) the proffered expert is following the same method as in practice; (3) the proffered expert offers corroborating sources to support his or her opinion. *See, e.g.*, *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 476–78 (S.D.N.Y. 2010) (admitting "a month-by-month recalculation of the values of restricted securities and . . . tables quantifying the overvaluation of the funds portfolios that resulted [because it] . . .[1] [i]s

grounded in the fact that it reflects the custom and practice of the industry . . . [2] [the expert] used this same methodology [at his employer]; [and] [3] [another vendor's] manuals confirm that using a twenty percent discount is appropriate"); *Snyder*, 2012 WL 4876938, at * 3 (similar); *Mahoney*, 2007 WL 3143710, at *2–3 (similar). Courts routinely admit recordkeeping experts who base a "reasonable per head fee for [recordkeeping services]" on their experience when those fees are consistent with similar plans. *Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 1113291, at *11–13 (W.D. Mo. Mar. 31, 2012), *affirmed in relevant part,* 746 F.3d 327 (8th Cir. 2014); *accord Abbott v. Lockheed Martin Corp.*, No. 06-0701, Doc. 225 at 3–4 (S.D. Ill. Mar. 31, 2009) (rejecting a *Daubert* motion by Columbia's counsel to exclude Otto); *Ramos v. Banner Health*, No. 15-2556, 2019 WL 6327718, at *3–4 (D. Colo. Nov. 26, 2019) (admitting similar experienced-based expert testimony on reasonable recordkeeping fees); *Sims v. BB&T*, No. 15-732, Doc. 386 (M.D.N.C. July 31, 2018) (same).

Minnich worked for over 30 years pricing recordkeeping fees at Transamerica Retirement Solutions and other recordkeepers. Doc. 252-1, Minnich Report, ¶¶6–10, Ex. A. As Minnich explained, Transamerica used the same pricing model for 401(k) and 403(b) plans, the same recordkeeping system, the same bidding process and the same pricing teams (the same method used here). *Id.* ¶74. Minnich explained that recordkeeping services include "payroll/contribution processing, maintaining plan records, tracking account balances and investment elections, transaction processing, call center support, participant education and participant communications." *Id.* ¶23. Because these services are commoditized and competitive, there are significant economies of scale and the cost of providing recordkeeping is based primarily upon the number of participants in a plan. *Id.* ¶¶24–25, 29; Doc. 261-1, Minnich Dep. 90:2-19. For example, Minnich references Fidelity's pricing model, which is a simple exponential curve based

only on participant count. Doc. 252-1 ¶119. In addition to participant count, enhanced services, such as education services, affect pricing. *Id.* ¶¶29, 73. Finally, Minnich considered ancillary revenue sources, known as "owning the participant," such as propriety investment options, IRA rollovers, the cross selling of products, and use of wealth advisors. *Id.* ¶¶74–76. Minnich used the same three factors he considered throughout his career, participant count, enhanced services and additional revenue sources, to price the Columbia Plans. *Id.* ¶121; Doc. 292-1, Minnich Dep. 191:24–192:22. Minnich also relied upon the breakout of pricing from the Plans' 2018 RFI responses. Minnich testified that the 2018 RFI responses demonstrated how the market priced the services provided to the Plans based on their complexities. Doc. 252-2, Minnich Dep. 84:1-20. Minnich did not have RFI responses for the plans at issue in *Cunningham*. In sum, Minnich "articulated how the specifics of his experience led to his conclusions" by applying the same methodology he used in practice. *Snyder*, 2012 WL 4876938, at *3.

The case Defendant relies upon almost exclusively, *Cunningham*, excluded the reasonable fee opinions offered in that case because their "conclusory statement[s] of applied knowledge of the industry's customs and practices is insufficient under Rule 702 because 'general references' to an expert's experience' [sic] 'do not provide a reliable basis for [their] proposed testimony." *Cunningham*, 2019 WL 4735876, at *9 (quoting *Montreal*, 691 F. Supp. 2d at 475–76). *Cunningham* suggested that experience-based expert testimony is admissible if the expert "articulated how the specifics of his experience led to his conclusions." *Cunningham*, 2019 WL 4735876, at *9 (quoting *Snyder*, 2012 WL 4876938, at *3). Minnich described how his experience led to his opinion by articulating his process of pricing recordkeeping fees in the real world, how he applied these same factors here, and providing corroborating sources.

Judge Aaron correctly held any other "defects" in Minnich's methodology go to the weight

of his testimony. There is nothing "disqualifying" about Minnich's statement that TIAA's *typical*
pricing practices—*i.e.*, the price it charges to fiduciaries like Columbia who make no effort to
negotiate or seek bids—are "irrelevant" to his opinion (Doc. 352 at 14), because Minnich is
providing an opinion on the price that *would have* been available to a prudent fiduciary of a $5
billion plan who put pressure on TIAA through competitive bidding and thorough negotiations.
Doc. 292-1, 75:2–23, 86:2–89:10, 188:20–192:22. Whether there was a "real world" example of
a plan paying TIAA $38 per account in 2010 is also not relevant. Doc. 352 at 14. As Minnich
explains, "[t]he fact that TIAA was overcharging a block of business in higher education doesn't
offset [Columbia's] fiduciary responsibility." Doc. 292-1 at 87:6–19, 88:11–89:10, 191:24–
192:22. Even in the higher education sector, "Columbia was paying fees well in excess of" other
plans. *Id*. at 87:18–19. Defendant asserts it is far-fetched that *all* of TIAA's clients were
overpaying, but the law has long recognized that an entire industry "may have unduly lagged" in
adopting prudent practices. *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997) (quoting
*The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932) (Learned Hand, J.)). Indeed, if TIAA's fees
were not excessive in prior years, why would it agree to slash its fee *by more than half* the first
time Columbia sought bids? Doc. 252-1, ¶¶103, 122; Doc. 276-8.

    Contrary to Defendant's assertions that Minnich used "the exact same" comparators as
*Cunningham*, Minnich relied on two real-world former clients that he did not rely upon in
*Cunningham*. Doc. 252-1 ¶114; Minnich Rebuttal Report, Doc. 292-2 ¶56. Minnich also
identified five additional, similar, 401(k) plans with 15,000 to 36,000 participants that paid
between $30 and $40 per-participant. Doc. 252-1 ¶¶115–118; Doc. 292-2 ¶22. Finally, Minnich
found it compelling that his reasonable fee of $34 fell within the range of bids in the 2018
multiple recordkeeper RFI. Doc. 252-1 ¶122. In short, Minnich considered more than double the

comparators at issue in *Cunningham* and plan-specific bids. Defendant also falsely claims that Minnich offers no data at all for 2010, 2011, 2012, 2015, or 2017. Doc. 352 at 14. Even a cursory review of Minnich's report demonstrates that Defendant is incorrect. Doc. 252-1 ¶115 (discussing Nike's fees in 2010); *id.* ¶118 (discussing Chevron's pricing in 2017).

Defendant is also wrong in asserting that *Securities and Exchange Commission v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486 (S.D.N.Y. 2018) is inconsistent with Judge Aaron's decision. *Yorkville* excluded in part an expert's opinion when he admittedly did not use the accepted valuation principles in his field, the Uniform Standards of Professional Appraisal Practice ("USPAP"). *Yorkville Advisors*, 305 F. Supp. 3d at 503–7. However, the Court rejected arguments that "defects" or "missteps" in an expert's assumptions, similar to those Defendant claim exist here, rendered his opinion inadmissible when he properly applied USPAP standards. *Id.* at 507–9. Here, Minnich applied the same three factors he did in practice to price recordkeeping services. Defendant's criticism—that he relied upon the wrong assumptions or lacked significant TIAA data—go to the weight rather than the admissibility of his testimony, as Judge Aaron held. Doc. 349 at 23–24; *Yorkville Advisors*, 305 F. Supp. 3d at 507–8 (holding alleged "missteps" and "defects" in application of a methodology "go to the weight rather than the admissibility"). Minnich and Otto's opinions as to the reasonable recordkeeping fees for the Plans are admissible.

## III. Defendant Caused the Plans to Include Imprudent Investment Options

Abundant evidence demonstrates that Defendant failed to monitor the investments in the Plans resulting in the retention of numerous imprudent investments. First, Defendant does not challenge the evidence adduced regarding its failure to monitor or review the investment options of the Plans. Doc. 262 at 19. In April 2016, the Plan Administrator, Dianne Kenney, was so concerned that Defendant and the IAC were not fulfilling their fiduciary obligations that she

wrote, "*I fear the IAC (Anne S. now Chair) will never get off the start line to meet it's [sic] fiduciary obligations at the rate it's going.*" Doc. 294 ¶149 (emphasis added) (quoting and citing Doc. 296-24); Doc. 296-8, Kenney Dep. 49:21–50:8; *id.* at 63:18–64:7. Kenney continued: "CUHR is willing to work with any outside counsel that Anne will listen to and work with, so that we can once and for all *get the IAC's fund monitoring work off the start line and at least up to that of a peer school (any peer school at this point!)*." Doc. 294 ¶149 (quoting Doc. 296-24) (emphasis added). Rather, Defendant only argues that a prudent fiduciary would make the same decision anyway. However, "[c]ourts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same." *In re Beck Indus., Inc.*, 605 F.2d 624, 636 (2d Cir. 1979).

### A. *Sacerdote* and *Cunningham* Do Not Support Defendant's Motion

Defendant relies on the factual findings of *Sacerdote* and *Cunningham* to argue that Judge Aaron's decision regarding Count V, the imprudence of various investment options, is incorrect. Neither case is applicable here.

*Sacerdote* is a trial decision determining credibility and weighing evidence. *Sacerdote*, 328 F. Supp. 3d at 281. At summary judgment, *Sacerdote* rejected identical arguments that (1) the funds at issue were objectively prudent because of the percentage of TIAA's 200 largest 403(b) clients having the funds; and (2) that the funds "closely tracked the performance" of the benchmarks that Defendant relies upon. *Sacerdote*, No. 16-0284-KBF at 22–24, Doc. 256; *Sacerdote*, No. 16-0284-KBF, Doc. 174. If anything, *Sacerdote* supports Judge Aaron's holding that summary judgment is inappropriate when questions of fact remain regarding the proper benchmark of a fund and its underperformance. Adopting *Sacerdote's* trial findings, rather than making an independent determination, as Judge Aaron did, would be reversible error.

*Cunningham* is also inapplicable here. Regarding Count V, the investment claims,

Defendant asserted that Plaintiffs failed to adduce evidence as to one element of the claim, "objective prudence." Doc. 262 at 19. Defendant conceded that the element of "procedural prudence" was "ill-suited to summary judgment" and it was "prepared to demonstrate its procedural prudence at trial if necessary." *Id. Cunningham* expressly stated that it was not ruling on objective prudence, the sole ground for which Columbia seeks summary judgment. 2019 WL 4735876, at *6 n.6. Judge Aaron could not and this Court cannot grant summary judgment on a ground that Columbia expressly disclaimed. Fed. R. Civ. P. 56(e).

Even if the Court were to permit Defendant's new arguments, factual issues exist here that *Cunningham* did not consider. *Cunningham* held Plaintiffs' allegations "lacked factual basis" because they were based upon underperformance against benchmarks without any evidence that a fiduciary used them. 2019 WL 4735876, at *11–13. In contrast, Plaintiffs here relied on evidence of underperformance against multiple benchmarks, multiple peer groups, alpha, Sharpe ratio, manager tenure, and style drift from 2001 to 2012. Doc. 294 ¶¶249–364. For example, the CREF Stock Account ("CREF Stock") underperformed its prospectus benchmark for the rolling five- and ten-year periods every year from 2003 until 2016. Doc. 294 ¶249. CREF Stock also underperformed its Morningstar assigned benchmark, had a negative Sharpe ratio, and a negative alpha at the beginning of the class period. Doc. 264-1 ¶174. CREF Stock also consistently underperformed a custom benchmark that Plaintiffs' expert Wendy Dominguez used in practice. Doc. 294 ¶261. The benchmark Dominguez used (70% U.S. equity, 23% international equity, and 7% emerging markets equity) is similar to the 70% domestic equity/30% international equity mix that TIAA has used since 2011 and that Aon Hewitt used. Doc. 264-1 ¶177 n.144; Doc. 263 ¶95; Doc. 297-5 at ECF 21. CREF Stock underperformed the Vanguard Total Stock Market Index, which a holding analysis demonstrated is a similar investment. Doc. 294 ¶261. Similarly,

Plaintiffs presented evidence that the TIAA Real Estate Account ("TIAA Real Estate") underperformed against multiple benchmarks and performance measures used by Defendant's advisors for years. Doc. 294 ¶¶351–64; Doc. 264-1 ¶¶96–108.

*Cunningham* also relied heavily on a finding that "Plaintiffs do not offer evidence that other fiduciaries removed" CREF Stock or TIAA Real Estate. 2019 WL 4735876, at *12. Here, that is not the case. There is an abundance of evidence here of fiduciaries removing CREF Stock and TIAA Real Estate. As discussed below, Defendant's chosen investment advisors recommended removal or expressed serious concerns about both funds. *See infra* at 19–21. Additionally, here there is record evidence of fiduciaries removing or freezing contributions to both funds including: the University of Colorado, Littleton Public Schools, Stanford University, Harvard University, the University of Chicago, Vanderbilt University, Northwestern University, Boston University, Georgetown University, Syracuse University, Carnegie Mellon University, the University of Notre Dame, the Medical College of Wisconsin, Dartmouth College, Brown University, Tufts College, Educational Testing Services, Rice University, the Rochester Institute of Technology, the University of Rochester, and Tulane University. Doc. 290-18 at 7; Doc. 290-19 at 3; Doc. 278-8, at Exs. 4a, 4c.

The other investments at issue here differ from those at issue in *Cunningham*.[4] *Cunningham* held that underperformance versus peer groups for three- and five-year periods beginning in August 2010 was insufficient. 2019 WL 4735876, at *16. Here, there is not only evidence of underperformance against peer groups but also: (1) underperformance against multiple benchmarks from over a decade; (2) a second set of peer groups; and (3) alpha, Sharpe ratio, beta, style drift and manager tenure. Doc. 264-1 ¶¶109–28, 137–61, 188–229.

---

[4] *Sacerdote* only involved CREF Stock and TIAA Real Estate. 328 F. Supp. 3d at 279.

Defendant's argument improperly assumes that (1) Plaintiffs can only demonstrate imprudence of CREF Stock by using one benchmark, the Russell 3000, and (2) the Russell 3000 is an improper benchmark. Doc. 352 at 19–20. Defendant is wrong on both counts. First, as Judge Aaron found, there is substantial evidence that the Russell 3000 is an appropriate benchmark for CREF Stock. *TIAA used the Russell 3000 as a benchmark for CREF Stock in its prospectuses for virtually the entire relevant period. See, e.g.,* Doc. 279-1, 2011 CREF Stock Prospectus at 51. In fact, Defendant admitted in its Answer that the Russell 3000 is used to benchmark CREF Stock. Doc. 117 ¶188. Defendant's claim that the Russell 3000 is an inappropriate benchmark is contradicted by TIAA's use of the Russell 3000.

Second, Defendant's argument about the appropriate benchmark is irrelevant. CREF Stock underperformed its prospectus benchmark, Morningstar benchmark, a custom benchmark similar to the one used by Defendant when it finally began monitoring the investments, and had a negative Sharpe ratio and alpha. *See supra* at 17. While Defendant may claim that CREF Stock's underperformance is too small to require removal (which is a question of fact), after this lawsuit was filed, Defendant removed CREF Stock based on its longstanding underperformance. Doc. 294 ¶¶256–57. Similarly, TIAA Real Estate underperformed a wide array of benchmarks and performance measures. *See supra* at 17–18.

### B.  Defendant's Own Advisors' Recommendations Create Issues of Fact

As Judge Aaron found, Defendant's own advisors' recommendations create issues of fact as to Count V. Doc. 349 at 26–28. In 2012, Cammack LaRhette ("Cammack") provided a free review of the Plans' investments to convince Defendant to hire it as a permanent investment advisor. Doc. 349 at 26 (citing Doc. 294 ¶232). Contrary to Defendant's assertions, Cammack's report was not limited to underperformance versus a benchmark. Doc. 352 at 20. As Judge Aaron found, "Cammack evaluated the Plans' investments using a custom report card methodology

19

based on, among other things, manager tenure, performance versus a benchmark index, and category ranking." Doc. 349 at 26 (citing Doc. 297-9 at 48, 57-64, 71-72). Cammack explicitly stated that it considered qualitative factors including "Investment Objectives," "Manager Tenure," and "Management Team." Doc. 297-9 at 45. "A fund that failed to meet four or more of the guidelines in Cammack's investment scorecard would cause 'concerns' and require 'more scrutiny.'" Doc. 349 at 26 (citing Doc. 294 ¶234).

Cammack identified serious issues with funds that Plaintiffs challenge. For example, it advised Defendant to "consider elimination of Calvert as a provider to the plans" because "virtually all Calvert funds have serious performance issues." Doc. 297-9 at 14. Cammack's analysis showed 16 of 21 Calvert funds failed more than four measures (Cammack's standard for concern). *Id.* at 71–72. Cammack's scorecard also showed TIAA Real Estate failing eight measures. *Id.* at 48.  Eight Vanguard funds failed more than four of Cammack's measures. *Id.* at 57–63. In July 2013, Cammack found that CREF Stock failed six guidelines and TIAA Real Estate failed eight. Doc. 349 at 26–27. Defendant speculates, based upon a 2009 exhibit from *Sacerdote*, that Cammack would have come to a different final conclusion. Doc. 352 at 20. Even if this document is considered, it does not justify TIAA Real Estate's underperformance. Defendant illogically relies upon Cammack stating that it "predicted" recovery for TIAA Real Estate "with the commercial real estate market" to justify its underperformance against a *real estate* benchmark, which would likewise recover with real estate generally. *Id.*[5]

Similarly, Defendant relegates to a footnote that Aon Hewitt had a sell rating, meaning Aon

---

[5] Defendant also falsely claims that Wendy Dominguez "green-lighted the TIAA Real Estate Account for one of her clients." Doc. 352 at 21. Dominguez's client actually *removed* TIAA Real Estate shortly after hiring her in 2015. *See* Doc. 290-18. Defendant speciously describes positive comments in Dominguez's analysis of TIAA Real Estate's pros and cons in 2018, but inexcusably omits her bottom-line recommendation against the use of TIAA Real Estate. Doc. 352 at 21. In actuality, Dominguez discussed at length TIAA Real Estate's underperformance and stated she "would not recommend these products [CREF Stock, CREF Growth and TIAA Real Estate] be added to [the client's] current investment menu." Doc. 258-17 at 29, 45, 50.

recommended termination of the investment, on CREF Stock (and the CREF Growth Account and CREF Global Equities Account) as early as July 2012. Doc. 349 at 26 (citing Doc. 294 ¶238). Aon's analysis was based on both qualitative and quantitative factors. *See* Doc. 297-4. Consistent with its earlier recommendations to other clients, Aon recommended termination of CREF Stock in Columbia's first investment review in September 2016, in addition to seven other funds. Aon also recommended numerous other funds be placed on a "watch list" for "[h]istorical underperformance," including TIAA Real Estate. Doc. 349 at 27 (Citing Doc. 294 ¶246). Ultimately, Defendant terminated CREF Stock in March 2017 and TIAA Real Estate in February 2018 due to the performance issues that Aon and Cammack had identified years earlier. Doc. 349 at 27 (citing Doc. 294 ¶¶254, 256, 269, 281, 364). As Judge Aaron held, these contemporaneous recommendations create issues of fact.

### C.  Sector and Regional Funds Are Within Plaintiffs' Complaint

Contrary to Defendant's contentions, its imprudent retention of sector and regional funds is relevant and within Plaintiffs' claims. First, Defendant takes an unreasonably narrow view of Plaintiffs' complaint. Plaintiffs allege a fiduciary "must 'initially determine, and continue to monitor, the prudence of *each* investment option.'" Doc. 76-1 ¶¶2, 27 (quoting *DeFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007)) (emphasis in original). Plaintiffs allege that this includes a duty to "independently assess whether each option was a prudent choice" and "to consider all relevant factors under the circumstances." Doc. 76-1 ¶¶236–37. As the record evidence demonstrates, Defendant was not even "off the starting line" in complying with its duties to monitor investments just four months prior to the filing of this lawsuit. Doc. 296-24. While Plaintiffs identified 76 underperforming funds as examples of the imprudent investment resulting from Defendant's misconduct, their complaint is not limited to underperformance

Second, the sector and regional funds are inappropriate for performance related reasons.

Dominguez's opinion is that sector and regional funds' volatility and risk makes them likely to underperform broader based market indexes. Doc. 290-1, Dominguez Dep. 95:20–96:9.

Third, a plaintiff need not plead every relevant fact in a complaint for those facts to be admissible. *See, e.g., Baxter Diagnostics, Inc. v. Novatek Med., Inc.*, No. 94-5220 (AJP), 1998 WL 665138, at *4–5 (S.D.N.Y. Sep. 25, 1998) (denying motion to exclude evidence of unalleged breaches of contract); *see also Geisler v. Petrocelli*, 616 F.2d 636, 640 (2d Cir. 1980); *Araujo v. Schron*, No. 07-6210, 2007 U.S.Dist.LEXIS 67628, at *4 (S.D.N.Y. Aug. 29, 2007). Here, Defendant does not argue that it was not put on notice that Plaintiffs alleged the sector and regional funds were imprudent, but rather Defendant argues that Plaintiffs did not plead all the evidence of their imprudence—their risk and volatility in addition to underperformance.

## IV. Dominguez's and Buetow's Opinions Are Admissible

Defendant presents no reason why Dominguez's or Buetow's opinions should be excluded. First, Judge Aaron found issues of fact as to Count V without reaching Dominguez or Buetow's opinion, so the Court need not even reach this motion. Second, Defendant's criticisms of Dominguez's and Buetow's opinions are either erroneous or go to the weight of the testimony.

Contrary to Defendant's assertions, Dominguez's opinion is not based on streamlining the Plans' investment lineup. Doc. 352 at 22. Dominguez's Report expressly states "opinions related to the investment decisions and related matters . . . in the selection, monitoring and retention of investment options included in the Plans." Doc. 290-22 ¶1. Dominguez never stated that she was determining what investments would be included in a streamlined lineup nor does she even offer a streamlined lineup. *See Id.* Rather, Dominguez merely mentioned that in her practice she would select only a streamlined lineup when discussing the factors considered when evaluating funds. *See* Doc. *Id.* ¶¶37–44. In fact, Dominguez noted that "Columbia's failure to consolidate to a 'core investment lineup' is not a claim in this case." *Id.* ¶37.

Wholly inconsistent with its argument that Dominguez applied her streamlining process to the Plans' lineup, Defendant then falsely argues Dominguez followed no prescribed methodology. Doc. 352 at 22–23. Dominguez opined investment options should be removed from the Plans for two reasons: (1) underperforming funds; (2) sector and regional funds. *Compare* Doc 290-22 ¶¶58–95, 129–136 *with id.* ¶¶96–128, 137–229. Dominguez followed a process she uses in practice based upon leading texts on investment analysis.

For the performance related opinions, Dominguez conducted an extensive analysis looking at multiple benchmarks, performance measures and relevant qualitative criteria. As Dominguez notes in her report, in practice she "perform[s] an evaluation of the fund's annualized and rolling historical performance over 1-, 3-, 5-, and (when available) 10-year periods, peer group rankings, risk metrics, expenses, and other quantitative and qualitative measures." Doc. 290-22, Dominguez Report ¶¶96–128, 137–229. The preeminent text on investment analysis, *The Management of Investment Decisions*, outlines a nearly identical process. Doc. 290-2, D. Trone, W. Allbright, *The Management of Investment Decisions*, McGraw-Hill. This book provides six due diligence factors: (1) performance numbers – net returns gross of fees; (2) performance relative to assumed risk – Sharpe ratio and alpha; (3) performance among peers; (4) performance of manager's adherence to stated investment style; (5) performance in both rising and falling markets; and (6) performance of key decision makers. *Id.* at 5.

First, consistent with her real-world process and *The Management of Investment Decisions*, Dominguez considered each investment option's performance against its prospectus benchmark, Morningstar benchmark, and additional benchmarks. *See, e.g.*, Doc. 290-22 ¶¶34, 97–99, 109, 116, 122, 137. Second, Dominguez considered Sharpe ratio and alpha. *See Id.* at ¶174, Ex. 3. Third, Dominguez considered performance against peer group for each investment. *Id.* at 79, Ex.

3. Fourth, Dominguez considered style consistency, *i.e.*, adherence to investment style, for each investment. *Id.* at 79, Ex. 3. Fifth, Dominguez considered performance in both rising and falling markets. *See, e.g.*, Doc. 290-22 ¶¶172–79. Finally, Dominguez considered manager tenure and change, *i.e.*, performance of key decision makers. *Id.* ¶¶139, 213–14, 225.[6]

Dominguez did not just rely "on what Morningstar did." Doc. 352 at 23. Dominguez relied in part on Morningstar benchmarking in Exhibit 3 to her report. Doc. 290-1, Dominguez Dep. 26:12–27:4, 68:21–69:2. However, it was not her only benchmarking data as Defendant suggests. For the TIAA-CREF annuity investment options, she used a second benchmark and asset-class grouping. *See, e.g., id.* at 147:18–148:9. She also looked at performance versus the prospectus benchmark from 2001 until 2012 for each non-sector fund.[7] Dominguez also compared the performance of some funds to passive index funds in the same asset class. *See, e.g.*, Doc. 290-22 ¶¶100, 106, 154. Finally, she also considered Defendant's advisors' contemporaneous analysis. *See, e.g.,* Doc. 290-22 ¶¶78, 103,106, 114, 121, 142, 149, 164, 186, 206, 212.

Defendant also misleadingly quotes Dominguez's testimony regarding sector and regional funds to suggest she deferred to Morningstar.[8] For sector and regional funds, Dominguez analyzed the holdings and strategies of the funds in 2010 to determine their volatility and risk. Doc 261-5 ¶¶58–61, 64–67, 81, 87–90, 129–131. Because performance against a benchmark was not the primary basis for her opinion, she did not conduct further benchmarking.

Defendant repeatedly uses out of context statements from Dominguez to falsely imply she was not following her regular practices. Doc. 352 at 23–24. For example, Defendant quotes one

---

[6] Defendant falsely claims that Dominguez "skipped the qualitative reviews altogether." Doc. 352 at 23. The portions of Dominguez's deposition Defendant cites say nothing about qualitative factors. Doc. 352 at 23 (citing Doc. 258-1 at 101:1-7) (discussing whether she created another "spreadsheet" with "a quantitative analysis of the funds that are highlighted").

[7] *See, e.g.*, Doc. 290-1, Dominguez Dep. 153:24–154:19; Doc. 290-22 ¶¶97–99, 109, 116, 122.

[8] *See* Doc. 352 at 23–24 (citing Doc 258-1 at 107:25–108:2, 114:4-21, 137:4-7, 149:5-6).

sentence of a four-sentence response to suggest that Dominguez's process was just an "easy way to evaluate funds" and not the system she uses to evaluate funds at Innovest. *Id.* at 23. The additional sentences in Dominguez's response explain that her normal process at Innovest was to do a "screening initially" to develop a best-in-class lineup and investment policy statement ("IPS") that allows for a "more in depth analysis" of the funds. Doc. 290-1, Dominguez Dep. 107:25–108:11. But Defendant had no IPS in 2010/2012 nor any ascertainable reason for the Plans' lineup. Defendant also quotes four words from a six-line response to suggest Dominguez uses a different benchmarking "'if it was [her] client.'" Doc. 352 at 23 (quoting Dominguez Dep. 137:13-20). Again, Dominguez's response highlights that in practice she would have streamlined. *Id.* ("[I]f this was our client and we were building a menu using a process, we would have selected funds that are best in breed."). Dominguez did not testify that she used a different process but that she would have built a best-in-class lineup.

When Defendant's patently false contentions regarding Dominguez's methodology are properly set aside, Defendant's objections to her opinions amount to claims that she should have drawn different conclusions from the data. As Judge Aaron held, disputes as to faults or gaps in methodology go to the weight, not the admissibility of testimony. Doc. 349 at 29 (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)). It is permissible to draw "inferences" that a professional would draw from "textbook" theory. *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 229 (S.D.N.Y. 2004). "The fact that contrary inferences" could be drawn "from the same data does not render [an] expert's testimony inadmissible." *Id.* Defendant can "contest [these] inference[s] both through the testimony of [its] own expert witnesses . . . and through cross-examination." *Id.*

## CONCLUSION

The Court should adopt Judge Aaron's report and recommendation (Doc. 349).

January 22, 2020                                Respectfully submitted,

                                               /s/ Joel D. Rohlf
                                               Schlichter Bogard & Denton LLP
                                               Andrew D. Schlichter, Bar No. 4403267
                                               Jerome J. Schlichter*
                                               Joel D. Rohlf*
                                               Scott T. Apking*
                                               100 South Fourth Street, Suite 1200
                                               St. Louis, Missouri 63102
                                               (314) 621-6115
                                               (314) 621-5934(fax)
                                               *admitted pro hac vice

                                               Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that, on January 22, 2020, a copy of the foregoing was filed electronically

using the Court's CM/ECF system, which will provide notice of the filing to all counsel of

record.

                                    By: /s/ Joel D. Rohlf
                                        Joel D. Rohlf